Jahan C. Sagafi (Cal. Bar No. 224887)
Relic Sun (Cal. Bar No. 306701)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com
Email: rsun@outtengolden.com

*Attorneys for Plaintiff-Intervenors,*
*Proposed Class Members, and on behalf of Aggrieved*
*Employees*

[Additional attorneys listed on following page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| BRANDON HARVEY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY SMITH BARNEY LLC,<br><br>Defendant.<br>------------------------------------------------<br>TRACY CHEN and MATTHEW LUCADANO, as aggrieved employees and on behalf of all others similarly situated, and as representatives of the California Labor Commissioner,<br><br>Plaintiff-Intervenors,<br><br>v.<br><br>MORGAN STANLEY SMITH BARNEY LLC,<br><br>Defendant. | Case No. 3:18-cv-02835-WHO<br><br>**PLAINTIFF-INTERVENORS' NOTICE OF MOTION AND MOTION TO INTERVENE; MEMORANDUM IN SUPPORT**<br><br>Judge: Hon. William H. Orrick<br>Date: February 27, 2019<br>Time: 2:00 p.m.<br>Room: Courtroom 2, 17th Floor |

Michael J. Scimone (*pro hac vice* motion forthcoming)
Christopher M. McNerney (*pro hac vice* motion forthcoming)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: cmcnerney@outtengolden.com

Pooja Shethji (*pro hac vice* motion forthcoming)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
Email: pshethji@outtengolden.com

Laura Sullivan (Cal. Bar No. 220529)
LAW OFFICE OF LAURA SULLIVAN
423 South Estate Drive
Orange, CA 92869
Telephone: (714) 744-1522
Facsimile: (714) 744-1524
Email: laurasullivan@laurasullivanlaw.com

Mark Humenik (Cal. Bar No. 231917)
HABER POLK KABAT
423 South Estate Drive
Orange, CA 92869
Telephone: (949) 636-5754
Facsimile: (216) 241-0739
Email: mhumenik@haberpolk.com

*Attorneys for Plaintiff-Intervenors,*
*Proposed Class Members, and on behalf of Aggrieved Employees*

## NOTICE OF MOTION AND MOTION

TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on February 27, 2019, at 2:00 p.m., or as soon thereafter as the Court and parties are available, proposed Plaintiff-Intervenors Tracy Chen and Matthew Lucadano ("Intervenors") will and hereby do move the Court for an order permitting them to intervene pursuant to Federal Rule of Civil Procedure 24.

Intervenors seek to intervene because this past Friday, Defendant Morgan Stanley Smith Barney LLC announced that it had reached a settlement with Plaintiff Brandon Harvey's lawyers to resolve not only this action (*Harvey*) but also Intervenors' Private Attorneys General Act ("PAGA") representative action on behalf of approximately 2,778 aggrieved employees pending in Orange County Superior Court Complex Division. Intervenors' action (*Chen*) has been litigated intensively for almost five years, and Judge William D. Claster had set the case for a bench trial to begin yesterday. Based on the announcement of the settlement, Judge Claster has postponed the *Chen* trial.

Intervenors are concerned that the *Harvey* settlement bears the red flags that commentators, the Ninth Circuit, and courts in this and other Districts have warned against, suggesting that it is a "reverse auction":

- <u>Low value:</u>  Although Morgan Stanley's exposure for PAGA and non-PAGA claims is currently estimated to be worth $313,000,000 to $464,000,000, the *Harvey* parties propose a settlement of $10,235,000, or 2-3% of the total.
- <u>Inadequate discovery:</u>  *Harvey* has barely been litigated, but *Chen* is poised for trial, with 31 motions litigated, 20 depositions taken, over 33,000 documents totaling over 250,000 pages produced by Morgan Stanley, 35 witnesses and 1,047 trial exhibits identified by the parties for trial, and, until last Friday, a trial set to begin yesterday.
- <u>The defendant's waiver of statute of limitations defense, arbitration defense, and counterclaims:</u>  *Harvey* seeks to use a PAGA limitations period many years longer than the applicable one-year period, it seeks to cover a class that is likely largely arbitration-bound, and it may end a Financial Industry Regulatory Authority ("FINRA") arbitration brought by Morgan Stanley against Harvey himself.
- <u>Suspicious timing:</u>  The original version of the *Harvey* settlement was reached in December 2018, despite no meaningful litigation and a class certification deadline of July 2019, and the expanded version of the *Harvey* settlement was reached one court day before the *Chen* trial was scheduled to begin.

1    Therefore, Intervenors' interests have been impaired by *Harvey* and will be impaired by

2   preliminary approval of the imminent *Harvey* settlement.  Harvey and Morgan Stanley are not

3   adequate to represent Intervenors' interests.

4    Intervenors respectfully request that the Court allow them to intervene and present

5   argument as to the reasonableness of any proposed settlement before and at the settlement

6   approval hearing(s) and to determine the appropriateness of Harvey's counsel to represent the

7   interests of the aggrieved employees in asserting PAGA claims in this action.

8    Intervenors' motion is based on this Notice of Motion and Motion, the accompanying

9   Memorandum of Points and Authorities, the Declaration of Jahan C. Sagafi ("Sagafi Decl.")

10  (attaching Intervenors' [Proposed] Complaint in Intervention), the pleadings and papers on file in

11  the above-captioned matter, and any further material and argument presented to the Court at the

12  time of any hearing.

13

14   Dated:  January 23, 2019               Respectfully submitted,

15                                          By:  */s/ Jahan C. Sagafi*

16                                               Jahan C. Sagafi

17                                          Jahan C. Sagafi (Cal. Bar No. 224887)
                                            Relic Sun (Cal. Bar No. 306701)
18                                          OUTTEN & GOLDEN LLP
                                            One California Street, 12th Floor
19                                          San Francisco, CA 94111
                                            Telephone: (415) 638-8800
20                                          Facsimile: (415) 638-8810
                                            Email: jsagafi@outtengolden.com
21                                          Email: rsun@outtengolden.com

22

23

24

25

26

27

28

---

PLAINTIFF-INTERVENORS' NOTICE OF MOTION AND MOTION
TO INTERVENE; MEMORANDUM IN SUPPORT
CASE NO. 18-cv-02835-WHO

Michael J. Scimone (*pro hac vice* motion forthcoming)
Christopher M. McNerney (*pro hac vice* motion forthcoming)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: cmcnerney@outtengolden.com

Pooja Shethji (*pro hac vice* motion forthcoming)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
Email: pshethji@outtengolden.com

Laura Sullivan (Cal. Bar No. 220529)
LAW OFFICE OF LAURA SULLIVAN
423 South Estate Drive
Orange, CA 92869
Telephone: (714) 744-1522
Facsimile: (714) 744-1524
Email: laurasullivan@laurasullivanlaw.com

Mark Humenik (Cal. Bar No. 231917)
HABER POLK KABAT
423 South Estate Drive
Orange, CA 92869
Telephone: (949) 636-5754
Facsimile: (216) 241-0739
Email: mhumenik@haberpolk.com

*Attorneys for Plaintiff-Intervenors,
Proposed Class Members, and on behalf of
Aggrieved Employees*

1

## **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.      INTRODUCTION ...................................................................................................... 1

        A.      *Harvey* Follows Four Years After *Chen*. ...................................................... 1

        B.      The Circumstances Suggest that Harvey Is a Reverse Auction. ....................... 2

II.     FACTUAL AND PROCEDURAL BACKGROUND........................................................ 4

        A.      Intervenors Have Litigated These Claims for Almost Five Years and Are on the
                Eve of Trial. ................................................................................................ 4

        B.      After a Few Years of Settlement Negotiations with Intervenors, Morgan Stanley
                Settled Chen with Harvey's Counsel, Temporarily Avoiding Trial. ................... 6

        C.      The Limited Lifespan of Harvey's Claims ........................................................ 7

        D.      The Proposed Harvey Settlement Provides Insufficient Value Except as a Worst-
                Case Scenario in Case Intervenors Lose Their Trial. ...................................... 8

III.    ARGUMENT ............................................................................................................ 9

        A.      Reverse Auctions Like This One Harm Class Members. ................................... 9

                1.      Reverse-Auction Settlements Require Particular Scrutiny. ................... 9

                2.      "Prudential Deference":  Where a Reverse-Auction Settlement Appears at
                        a Critical Decision Point in the Lead Case's Procedural Posture, Courts
                        Routinely Delay or Deny Preliminary Approval. .................................. 11

                3.      This Settlement Looks Like a Classic Reverse Auction. ........................ 15

        B.      The Court Should Permit Intervenors to Intervene in This Action....................... 16

                1.      Intervenors' Application Is Timely............................................................ 17

                2.      Intervenors Have a Protectable Interest That the Proposed Settlement
                        Would Impair. ........................................................................................ 18

                3.      Intervenors' Interests Are Not Adequately Represented. ........................ 21

                        a.      The Settlement Results from Procedural Unfairness. ................... 22

                        b.      The Settlement Amount Is Inadequate........................................... 23

                        c.      The Expanded PAGA Limitations Period Is Suspicious. ............. 23

        C.      Intervenors Will Assist the Court in Probing for Appropriate Additional
                Information to Evaluate the Expanded Harvey Settlement.................................... 23

1

IV.    Judicial Oversight and Coordination of Competing PAGA Cases Will Promote Judicial Economy and the Purposes of PAGA. ............................................................................ 24

V.     CONCLUSION ........................................................................................................... 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

CASES                                                                                          PAGE(S)

3

*Acosta v. Trans Union, LLC*,
    243 F.R.D. 377 (C.D. Cal. 2007) ...........................................................................14

4

5

*Akina v. Hawaii*,
    835 F.3d 1003 (9th Cir. 2016) ...............................................................................19

6

*Amaral v. Cintas Corp. No. 2*,
    78 Cal. Rptr. 3d 572 (Cal. Ct. App. 2008) ..............................................................4

7

8

*Blair v. Equifax Check Servs., Inc.*,
    181 F.3d 832 (7th Cir. 1999) .................................................................................14

9

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) .................................................................................12

10

11

*Blum v. Merrill Lynch & Co., Inc.*,
    No. 15 Civ. 1636 (S.D.N.Y.) .................................................................................13

12

13

*Boyd v. Avanquest N. Am. Inc*,
    No. 12-cv-4391-WHO, 2015 WL 4396137 (N.D. Cal. July 17, 2015) ....................9

14

*Brown v. Ralph's Grocery Co.*,
    239 Cal. Rptr. 3d 519 (Cal. Ct. App. 2018) ..........................................................23

15

16

*Buchet v. ITT Consumer Fin. Corp.*,
    845 F. Supp. 684 (D. Minn. 1994) ........................................................................22

17

18

*Carter v. City of Los Angeles*,
    169 Cal. Rptr. 3d 131 (Cal. Ct. App. 2014) ..........................................................14

19

*In re Checking Account Overdraft Litig.*,
    859 F. Supp. 2d 1313 (S.D. Fla. 2012) ............................................................11, 15

20

21

*Chen v. Morgan Stanley Smith Barney, LLC*,
    No. 30-2014-00724866-CU-OE-CXC (Orange County Super. Ct. filed May
    27, 2014) ..............................................................................................................1, 5

22

23

*Citizens for Balanced Use v. Mo. Wilderness Ass'n*,
    647 F.3d 893 (9th Cir. 2011) .................................................................................21

24

25

*In re Cmty. Bank of N. Va.*,
    418 F.3d 277 (3d Cir. 2005)...................................................................................20

26

*Cobarruviaz v. Maplebear, Inc.*,
    No. 15-cv-00697-EMC, 2016 WL 5725076 (N.D. Cal. Sept. 30, 2016)................20

27

28

*Cotter v. Lyft, Inc.*,
    193 F. Supp. 3d 1030 (N.D. Cal. 2016) ....................................................18

*Crawford v. Equifax Payment Servs., Inc.*,
    201 F.3d 877 (7th Cir. 2000) ...................................................................18

*Cullan & Cullan LLC v. M-Qube, Inc.*,
    No. 13 Civ. 172, 2014 WL 347034 (D. Neb. Jan. 30, 2014) .....................14

*Dalchau v. Fastaff, LLC*,
    No. 17-cv-01584-WHO, 2018 WL 1709925 (N.D. Cal. Apr. 9, 2018)............10, 15

*Day v. Apoliona*,
    505 F.3d 963 (9th Cir. 2007) ...................................................................17

*Diaz v. Tr. Territory of the Pac. Islands*,
    876 F.2d 1401 (9th Cir. 1989) ..................................................................20

*Figueroa v. Sharper Image Corp.*,
    517 F. Supp. 2d 1292 (S.D. Fla. 2007) .....................................................14

*Galeener v. Source Refrigeration & HVAC, Inc.*,
    No. 13-cv-04960-VC (N.D. Cal.) ...............................................................12

*Glass v. UBS Fin. Servs., Inc.*,
    No. 06-cv-4068-MMC, 2007 WL 474936 (N.D. Cal. Jan. 17, 2007)..............18, 19

*Heldt v. Payday Fin., LLC*,
    No. 13 Civ. 3023, 2016 WL 96156 (D.S.D. Jan. 8, 2016).........................13

*Iskanian v. CLS Transp. L.A., LLC*,
    327 P.3d 129 (Cal. 2014) .........................................................................24

*Koike v. Starbucks Corp.*,
    602 F. Supp. 2d 1158 (N.D. Cal. 2009) ..............................................19, 20

*League of United Latin Am. Citizens v. Wilson*,
    131 F.3d 1297 (9th Cir. 1997) ..................................................................17

*Litty v. Merrill Lynch & Co., Inc.*,
    No. 14 Civ. 425 (C.D. Cal.) .............................................................13, 16, 23

*Litty v. Merrill Lynch & Co., Inc.*,
    No. 14 Civ. 425, 2015 WL 4698475 (C.D. Cal. Apr. 27, 2015)...............13, 16, 23

*Lubocki v. ZipRealty, Inc.*,
    No. 07 Civ. 2959, 2009 WL 10670958 (C.D. Cal. Mar. 10, 2009) ..................21, 22

*Manuel v. Convergys Corp.*,
    430 F.3d 1132 (11th Cir. 2005) ................................................................14

*Martin v. Cargill, Inc.*,
  295 F.R.D. 380 (D. Minn. 2013)...................................................................................15

*Medeiros v. HSBC Card & Retail Servs., Inc.*,
  No. 14 Civ. 1786 (S.D. Cal. Oct. 9, 2015)..........................................................18, 22

*Meza v. Source Refrigeration & HVAC, Inc.*,
  No. 30-2014-00712145-CU-OE-CXC (Cal. Super. Ct.)..............................................12

*Nw. Forest Res. Council v. Glickman*,
  82 F.3d 825 (9th Cir. 1996) .......................................................................................17

*O'Connor v. Uber Techs., Inc.*,
  201 F. Supp. 3d 1110 (N.D. Cal. 2016) ....................................................19, 21, 24, 25

*Ochoa-Hernandez v. Cjaders Foods, Inc.*,
  No. 08-cv-2073-MHP, 2010 WL 1340777 (N.D. Cal. Apr. 2, 2010)........................19, 21

*Plant Insulation Co. v. Fibreboard Corp.*,
  274 Cal. Rptr. 147 (Cal. Ct. App. 1990) .....................................................................14

*Prezant v. De Angelis*,
  636 A.2d 915 (Del. 1994) ...........................................................................................14

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002) .......................................................................10, 14, 22, 23

*Ruderman ex rel. Schwartz v. Wash. Nat'l Ins. Co.*,
  263 F.R.D. 670 (S.D. Fla. 2010) .................................................................................21

*Smith v. SEECO, Inc.*,
  865 F.3d 1021 (8th Cir. 2017) ....................................................................................17

*Spangler v. Pasadena City Bd. of Ed.*,
  552 F.2d 1326 (9th Cir. 1977) ....................................................................................16

*Stone v. First Union Corp.*,
  371 F.3d 1305 (11th Cir. 2004) ..................................................................................21

*Sw. Ctr. for Biological Diversity v. Berg*,
  268 F.3d 810 (9th Cir. 2001) .............................................................................17, 20, 21

*Taylor v. Interstate Grp.*,
  No. 15-cv-05462-YGR, 2016 WL 861020 (N.D. Cal. March 7, 2016)...........................23

*Tech. Training Assocs. v. Buccaneers Ltd. Partnership*,
  874 F.3d 692 (11th Cir. 2017) ....................................................................................17

*Tsyn v. Wells Fargo Advisors*,
  No. 14-cv-02552-LB (N.D. Cal. Apr. 26, 2018)..............................................................8

x

*United States v. Aerojet Gen. Corp.*,
    606 F.3d 1142 (9th Cir. 2010) ...................................................................19

*Watson v. Tennant Co.*,
    No. 18 Civ. 2462, 2018 WL 5099281 (E.D. Cal. Oct. 17, 2018) ...........................23

*Weinberger v. Great N. Nekoosa Corp.*,
    925 F.2d 518 (1st Cir. 1991) ...................................................................12

*Wilderness Soc'y. v. U.S. Forest Serv.*,
    630 F.3d 1173 (9th Cir. 2011) ...................................................................17

*Williams v. Superior Ct.*,
    398 P.3d 69 (Cal. Sup. Ct. July 13, 2017) ...................................................24

*Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*,
    701 F.3d 938 (3d Cir. 2012)......................................................................17

**STATUTES**

29 U.S.C. § 216(b) ...................................................................................2

Cal. Civ. Proc. § 340 .............................................................................23

Cal. Lab. Code § 201 ................................................................................1

Cal. Lab. Code § 202 ................................................................................1

Cal. Lab. Code § 204 ................................................................................1

Cal. Lab. Code § 221 ................................................................................1

Cal. Lab. Code § 226 ................................................................................1

Cal. Lab. Code § 2699 ....................................................................4, 20, 24

Cal. Lab. Code § 2802 ..............................................................................1

**OTHER AUTHORITIES**

4 William B. Rubenstein, Newberg on Class Actions § 13:57 (5th ed. 2018) .............10, 12, 22

*Procedural Guidance for Class Action Settlements*, U.S. District Ct. for N.
    District Cal., https://cand.uscourts.gov/ClassActionSettlementGuidance (last
    updated Dec. 5, 2018) ...........................................................................10

Fed. R. Civ. P. 23 ......................................................................... *passim*

Fed. R. Civ. P. 24 ......................................................................... *passim*

1

Fed. R. Civ. P. 30 ....................................................................................................5

2

John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95
    Colum. L. Rev. 1343 (1995) .............................................................................11

3

4

Jonathan R. Macey & Geoffrey P. Miller, *Judicial Review of Class Action
    Settlements*, 1 J. Legal Analysis 167 (2009) ...................................................10

5

Standards and Guidelines for Litigating and Settling Consumer Class Actions,
    299 F.R.D. 160 (3d ed. 2014) ...........................................................................10

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF-INTERVENORS' NOTICE OF MOTION AND MOTION
TO INTERVENE; MEMORANDUM IN SUPPORT
CASE NO. 18-cv-02835-WHO

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       Proposed Plaintiff-Intervenors Tracy Chen and Matthew Lucadano seek to intervene in

4   this case to protect their rights and interests and those of approximately 2,778 aggrieved

5   employees on whose behalf they have been litigating Private Attorneys General Act ("PAGA")

6   claims for the past four and a half years against their former employer Morgan Stanley Smith

7   Barney, LLC ("Morgan Stanley").  *Chen v. Morgan Stanley Smith Barney, LLC* ("*Chen*"), No.

8   30-2014-00724866-CU-OE-CXC (Orange County Super. Ct. filed May 27, 2014).  *Chen* was set

9   for a 10-day bench trial before Judge William D. Claster beginning yesterday until Morgan

10   Stanley sought a continuance this past Friday afternoon.  This past Friday, Morgan Stanley

11   announced that, the night before, it had entered into a settlement with the *Harvey* plaintiffs that

12   purports to dispose of the *Chen* case in its entirety (even though the *Harvey* PAGA liability

13   period is approximately four years shorter than *Chen*'s, since *Harvey* was filed four years later).

14   Compared to Morgan Stanley's total exposure of approximately $313,000,000 to $464,000,000,

15   the *Harvey* proposed settlement of $10,235,000 is only 2-3% of the total exposure.

16       Out of deference to this Court, Judge Claster vacated the trial date and set a status

17   conference for February 4, 2019 to determine next steps.

18       **A.     *Harvey* Follows Four Years After *Chen*.**

19       *Chen* and *Harvey* overlap significantly.  Both cases assert:  (1) that Morgan Stanley's

20   Automated (or Alternative) Flexible Grid ("AFG") program[1] passes the cost of various business

21   expenses, much of which can be considered Morgan Stanley's overhead (e.g., support staff

22   compensation, IT infrastructure, marketing, mileage, etc.), onto Financial Advisors ("FAs")

23   through wage deductions, violating California law (Labor Code sections 2802, 221, and others),

24   and (2) that this results in inaccurate wage statements (violating Labor Code section 226).[2]

25   _____

[1] The AFG is funded by a lowered commission rate paid to the employee and is intended to pay
26   for business expenses, including but not limited to compensation for support staff, that are not
covered by an employee's Business Development Allowance.  Sagafi Decl. ¶ 14.  However, the
27   Business Development Allowance typically only covers a fraction of an employee's actual
business expenses.  *Id.*
28   [2] In addition, *Chen* asserts a third type of claim that *Harvey* does not: that the timing of Morgan
Stanley's salary and commission payments violates California law (e.g., California Labor Code

There are three main differences.  First, *Chen* is forty-eight months older than *Harvey*, has involved litigation of 31 motions, and is ready for trial, whereas *Harvey* has involved no real discovery or litigation to speak of, and a class certification motion deadline of July 26, 2019.  Second, the one-year PAGA limitations period in *Chen* spans April 23, 2013 to the present, whereas in *Harvey* it is May 9, 2017 to the present.[3]  Third, *Chen* is PAGA-only, whereas *Harvey* is a hybrid PAGA/class case.[4]

For the AFG reimbursement claims alone, Intervenors currently calculate the main PAGA claim penalties to be between $69,800,000 and $197,100,000 (depending on various options for calculating penalties) (without stacking), plus non-PAGA damages to be approximately $219,400,000.[5]  Sagafi Decl. ¶ 25.  In addition, wage statement penalties are estimated to be $23,800,000 to $47,400,000 (again, depending on various options for calculating penalties).  *Id.* ¶ 26.  The total exposure for the PAGA and non-PAGA claims together could be $313,000,000 to $464,000,000, assuming no stacking of penalties.  *Id.* ¶ 27.  Thus, $10,235,000 represents approximately 2-3% of that total exposure.  While a plaintiffs' lawyer might try to justify that take where the claims are highly undeveloped and the evidence is uncertain, it is an unreasonable discount for a hotly-litigated case that has progressed to eve of trial.  The contrast between the fledgling *Harvey* litigation and the highly-developed *Chen* litigation causes significant concern.

**B.   The Circumstances Suggest that Harvey Is a Reverse Auction.**

The impending Harvey settlement shows the classic signs of a "reverse auction":  a defendant, faced with two overlapping representative actions,[6] selects the weaker party in hopes

---

sections 201, 202, 204, and others), including late final payments of accrued wages upon termination of employment.
[3] Based on this overlap, had both cases been in federal or state court, they could have been coordinated as a Multidistrict Litigation or Judicial Council Coordinated Proceeding, *Harvey* could have been transferred to Judge Claster's court, or *Harvey* simply would have been stayed.
[4] It appears that Harvey opted out of Morgan Stanley's arbitration agreement and could, in a class action, represent the fraction of individuals who likewise opted out, while the vast majority of proposed class members would be subject to individual arbitration.  Sagafi Decl. ¶ 34.
[5] There are various ways to calculate exposure.  This is just one approach.
[6] The jurisprudence regarding Rule 23 class actions is often applicable to the other two major types of representative actions:  Fair Labor Standards Act ("FLSA") collective actions, *see* 29 U.S.C. § 216(b), and representative actions under laws like PAGA.  *Chen*, as a PAGA representative action on behalf of 2,000+ aggrieved employees, functions like a class action in

of securing a cheaper deal.  The lawyers in the weaker position, recognizing that they cannot catch up to the other case, are pleased to accept a deal that promises a windfall in attorneys' fees. Everyone is happy – except thousands of class members and their representatives in the stronger position, who have invested thousands of hours of time over years of litigation to get to that stronger position.

Intervenors therefore seek to intervene in this action to protect their rights and interests and those of the potential class members, aggrieved employees, and the State of California in both cases.  Intervenors are in a unique position to supply the Court with detailed information about the strengths of the class members' and the State's claims based on years of litigation, dozens of motions ruled on by Judge Claster and his predecessors, a quarter of a million pages of documents, scores of hours of deposition testimony, and intensive pretrial preparations. Intervenors also wish to demonstrate the procedural and substantive impropriety of the *Harvey* settlement.  In contrast to the usual uncontested preliminary approval process, an adversarial process here will empower the Court with adequate information with which to make a fully informed assessment of the deal.

In the meantime, Intervenors seek to proceed with trial.  A ruling from Judge Claster in phase one will be useful for this Court in assessing preliminary approval.  At preliminary approval, courts face the unenviable task of gauging the reasonableness of the discount from total best-case exposure figures.  They must assess the plaintiffs' lawyers' quantification of all the risks they face.  A case may be worth $100 if they surpass all the hurdles to recovery, but assuming a 50% chance of defeat at each of four upcoming hurdles, an appropriate settlement value could be $6.25 ($100 * $(½)^4$).  What are the chances of success at each hurdle?  How can the Court predict outcomes based on limited information?  Intervenors' experience will help this Court by describing the many hurdles they have surpassed (which Harvey has yet to face, perhaps explaining his lawyers' dour outlook on the case).  In addition, Intervenors' prosecution of the PAGA claims in *Chen* will help the Court by giving it actual information:  Judge Claster's

_____

that there are absent individuals represented by the named plaintiffs, and their rights and interests could be affected by the outcome of a representative action (e.g., *Chen* and *Harvey*).

1  ruling in phase one of Intervenors' trial will empower this Court with additional information

2  about the strength of the PAGA claims.

3          In sum, because the *Harvey* settlement may be a reverse auction and because Intervenors

4  have unique information about the strength of the claims at issue, intervention is appropriate and

5  will assist the Court.

6  **II.     FACTUAL AND PROCEDURAL BACKGROUND**

7          **A.     Intervenors Have Litigated These Claims for Almost Five Years and Are on
                the Eve of Trial.**

8

9          On May 27, 2014, Intervenor Chen filed *Chen* on behalf of herself and all other

10  aggrieved Morgan Stanley employees, including financial advisors.[7]  Sagafi Decl. ¶ 12.  On

11  November 17, 2017, Intervenor Chen amended her complaint to add Matthew Lucadano as an

12  additional representative plaintiff.  *Id.* ¶ 14.  *Chen* challenges Morgan Stanley's policies and

13  practices concerning the AFG and alleges under PAGA that Morgan Stanley unlawfully: (1)

14  shifts ordinary business costs to employees in violation of multiple sections of the California

15  Labor Code; (2) fails to timely pay all wages owed to its employees; and (3) provides inaccurate

16  wage statements.  *Id.* ¶ 15.  Based on PAGA's one-year statute of limitations, Intervenors' claims

17  on behalf of the aggrieved employees span from April 23, 2013, through the present, and

18  Intervenors seek to recover penalties for that entire time period.[8]  *Id.*

19          The four and a half years of litigation have been hard-fought, and the case has outlasted

20  changes in judges and defense counsel.  *See id.* ¶ 16.  To date, Intervenors and Morgan Stanley

21  have litigated at least 31 separate motions, including Morgan Stanley's unsuccessful effort to

22  remove the case to federal court, two motions for a stay, three motions to strike/for judgment on

23

24  _____

[7] Intervenor Chen simultaneously arbitrated individual claims against Morgan Stanley before
25  Financial Industry Regulatory Authority ("FINRA"), pursuant to the arbitration agreement in her
    employment agreement.  Sagafi Decl. ¶ 12.
26  [8] PAGA penalties are assessed based on the relevant Labor Code provision.  For any Labor Code
    provision that specifically provides a penalty, PAGA provides for recovery of that penalty.  For
27  any Labor Code provision that does not specifically provide a penalty, PAGA provides penalties
    for initial violations ($100 per pay period) and subsequent violations ($200 per pay period).  Cal.
    Lab. Code § 2699(f)(2).  PAGA penalties "are mandatory, not discretionary."  *Amaral v. Cintas*
28  *Corp. No. 2*, 78 Cal. Rptr. 3d 572, 617 (Cal. Ct. App. 2008).

the pleadings, four motions to compel, and cross-motions for summary adjudication.[9]  *Id.* ¶ 17.

The parties' discovery has been extensive and is ongoing.  Intervenors have served 163 requests and supplemental requests for the production of documents, 86 interrogatories (85 special interrogatories and 1 form interrogatory), and 23 requests for admissions.  *Id.* ¶ 19. Morgan Stanley has produced over 33,200 documents totaling over 250,000 pages; negotiated a comprehensive ESI search protocol; provided interrogatory and request for admission responses and supplements; and met and conferred with Intervenors over discovery issues over the years regarding virtually every aspect of discovery.  *Id.*  There have been 21 depositions:

- Four depositions of Persons Most Qualified ("PMQ," the California version of a Rule 30(b)(6) deposition):  Jamie Kemp (Head, Morgan Stanley Office of Business Management) – (two sessions), Marianne Giaccone (VP, Accounts Payable), and Kate Burns (Executive Director, Human Resources);
- Fourteen depositions of fact witnesses:  Lauren Veisz (Head, FA Compensation Service & Operations), Robert Hampton (Western Division HR Manager), Michele Hanna (L.A. Complex Manager), Justin Frame (Brea Branch Manager), Glenn Wiessner (Brea Branch Manager), Camille Gaffney (Brea Business Services Manager), Mark Mooney (Brea FA), Nick Villasenor (Brea FA), Greg Maniaci (Brea FA), Mark Carroll (Brea FA), Bradley Dykes (Oxnard Branch Manager), William Yuen (Brea FA), Tracy Chen (two sessions), and Matthew Lucadano; and
- Three depositions of expert witnesses:  Dwight Steward (Plaintiffs' expert) and Andrew Tasnady and Lloyd Aubry (Morgan Stanley's experts).[10]

*Id.* ¶¶ 20-21.

Judge Claster has phased the trial in two stages:  Phase One, in which the PAGA claims of the two plaintiffs (Intervenors) will be tried, and Phase Two, in which the remaining issues for all aggrieved employees will be tried.  *Id.* ¶ 22.

---

[9] While the *Chen* court denied Intervenor Chen's motion for summary judgment, it did so on extremely narrow grounds, finding that "Chen has met her initial burden of showing that compensation for supplemental support staff is a general operating cost to be borne by Morgan Stanley" but declining to resolve the factual dispute of whether that employee-borne expense was "reasonable and necessary" at that stage.  *See* Ex. A (Order, *Chen*, No. 30-2014-00724866-CU-OE-CXC (Cal. Super. Ct. Aug. 31, 2017)), at 6.  Thus, the summary judgment ruling supports the likelihood of Intervenors prevailing in the bench trial before the same judge. Notably too, the *Chen* court also denied Morgan Stanley's cross-motion for summary judgment regarding the legality of AFG.  *Id.* at 13.

[10] Dr. Steward has provided a declaration with extensive calculations of both the individual penalties recoverable by Intervenors and information as to the entire PAGA aggrieved employee group's claims.  Sagafi Decl. ¶ 21.

In final preparation for trial phase one, the *Chen* parties have identified approximately 1,047 exhibits and 35 witnesses and submitted detailed trial briefs and several pretrial motions. *Id.* ¶ 22.  Judge Claster held the Trial Readiness Conference earlier this month.  *Id.*

**B.**     **After a Few Years of Settlement Negotiations with Intervenors, Morgan Stanley Settled *Chen* with Harvey's Counsel, Temporarily Avoiding Trial.**

Intervenors have always been open to a reasonable settlement.  In May 2016, the *Chen* parties mediated unsuccessfully with Mark Rudy, and Intervenors remained open to settlement after Judge Claster's important summary adjudication ruling in August 2017.  *Id.* ¶ 18. Intervenors understood that settlement seemed unlikely until the parties received more information from the court, and the next such opportunity would be Judge Claster's ruling after the phase one trial; settlement was therefore unlikely until after phase one of trial.  So the parties returned to trial preparation.[11]

On December 13, 2018, Harvey's counsel informed Intervenors' counsel that the *Harvey* parties had reached a settlement in a mediation with Francis J. "Tripper" Ortman III to release the class claims going back four years from the complaint (as is typical) and the PAGA claims going back four years (not one year) (which is highly unusual) for approximately $9,700,000. *Id.* ¶¶ 29-30.  Chen's counsel were shocked – both because of the reverse auction dynamic and because the amount seemed quite low given potential liability well above $500,000,000 and *Chen*'s procedural history and posture.

At Morgan Stanley's suggestion, Intervenors agreed to postpone the trial commencement from January 14 to January 22, to allow for mediation between all the parties on Thursday, January 17.  *Id.* ¶ 32.  Intervenors sought to explore whether Harvey and Morgan Stanley truly believed that their settlement could pass muster, or whether it was simply an opening bid by a defendant hoping to avoid trial and plaintiffs' lawyers seeking to leverage *Chen*'s progress for an easy payoff.  *Id.*  Both Mr. Rudy (who had overseen *Chen* settlement talks for the past two and a

---

[11] Meanwhile, upon learning of *Harvey* this summer, Intervenors' counsel reached out to Harvey's counsel to explore cooperation and inquire about overlap and the implications of *Harvey* with Morgan Stanley.  Those conversations did not progress far.  Sagafi Decl. ¶ 28.

1    half years) and Mr. Ortman (who had overseen the December 2018 *Harvey* settlement talks)

2    attended.  *Id.*  The mediation was unsuccessful.  *Id.*

3          Simultaneously, Intervenors' counsel continued trial preparation: renting and assembling

4    an on-site office in Orange County, flying in out-of-town members of the legal team, finalizing

5    trial exhibits, preparing witnesses, drafting direct- and cross-examination outlines, doing test-

6    runs of courtroom technology, finalizing stipulations with Morgan Stanley, and otherwise putting

7    the final touches on trial logistics, tactics, and strategy.  *Id.* ¶ 23.

8          But last Friday (January 18) – one court day before the trial was set to begin – Morgan

9    Stanley informed Judge Claster and Chen's counsel that the *Harvey* parties had settled not only

10   *Harvey* but also "*all claims in* [*Chen*]" for $10,235,000.  Ex. B (emphasis added)[12]; Sagafi Decl.

11   ¶¶ 24, 33.  Intervenors understand that Mr. Ortman oversaw those final negotiations, resulting in

12   the revised and expanded *Harvey* settlement.  *Id.* ¶ 33.  To be clear, while the typical PAGA

13   limitations period is one year, the original *Harvey* settlement's PAGA period reached back four

14   years, and the revised *Harvey* settlement's PAGA period reaches back more than five years.

15         **C.     The Limited Lifespan of Harvey's Claims**

16         In contrast to *Chen*, litigation in *Harvey* is nascent and of limited scope.

17         First, the potential Rule 23 class is likely quite tiny.  While Harvey may have opted out of

18   Morgan Stanley's arbitration agreement, it is likely that the vast majority of FAs did not, so the

19   class he could represent in litigation is likely a small fraction of the approximately 2,000 FAs

20   who worked during the *Harvey* liability period – perhaps 200, perhaps 300, perhaps a few

21   more.[13]

22         Second, Harvey filed this action almost four years after *Chen* began.  Thus, while

23   Harvey's PAGA claims reach back to May 9, 2017, *see* ECF No. 11 ¶ 43 (stating that Harvey

24   served notice to the LWDA on May 9, 2018), Chen's reach back to April 23, 2013.

25   ───────────────────
     [12] Unless otherwise indicated, all exhibits are attached to the Declaration of Jahan C. Sagafi
26   ("Sagafi Decl.").
     [13] In this situation, defendants often move to strike class allegations to the extent they include
27   individuals who are subject to arbitration, or the parties simply agree, based on the clear-cut
     arbitration jurisprudence from the Supreme Court.  *See* Sagafi Decl. ¶ 34.  Here, Morgan Stanley
28   has not taken that easy step to cut the size of the case by 80-90% (assuming that 10-20% of the
     FAs opted out of arbitration).

Third, there is no indication that the parties have conducted any meaningful discovery. *See* ECF No. 26 (Joint Case Management Statement), at 6-7.  The most recent entry on the docket, the Initial Case Management Conference, occurred on September 18, 2018.  ECF No. 27. The contrast with *Chen* could not be starker.

Fourth, Harvey is in a weak bargaining position because Morgan Stanley has possible counterclaims against Harvey and has initiated a FINRA arbitration against him, *see* ECF No. 26 (Joint Case Management Statement), at 3:16-17; *see also* ECF No. 23 (Answer), at 5 (raising as an affirmative defense the doctrine of unclean hands on the basis of "Plaintiff's breach of fiduciary duty, theft of trade secrets, and unfair competition").  While Morgan Stanley employed the same tactics to try to defeat Chen's claims, the gambit was unsuccessful; in December 2015, Judge Moss denied Morgan Stanley's motion for judgment on the pleadings based on the outcome of Chen's FINRA arbitration.  *See* Ex. C (Notice of Order, *Chen*, No. 30-2014-00724866-CUOE-CXC (Cal. Sup. Ct. December 11, 2015)), at 4-5.

## D. The Proposed Harvey Settlement Provides Insufficient Value Except as a Worst-Case Scenario in Case Intervenors Lose Their Trial.

The $10,235,000 settlement is a poor valuation of the *Chen* and *Harvey* claims given Morgan Stanley's exposure of $313 million to $464 million (based on non-PAGA exposure of $219.4 million and PAGA exposure of $93.6 million to $244.6 million (depending on rulings to be made by Judge Claster after a liability determination).  Whereas Harvey's counsel settled a similar case against Wells Fargo for $9.5 million,[14] calculating total exposure at $38 million, the same lawyers' discount of *Chen*'s claims here is much steeper than the 75% discount there.

The result of the *Chen* trial will greatly aid this Court in assessing Harvey and Morgan Stanley's forthcoming preliminary approval motion.  Estimating a reasonable settlement value range is always a challenge – how does a court know how much money is enough for the class members?  Answering that question requires a detailed exposure analysis, discounting for reasonable risks – the hurdles of class certification, summary judgment, development of a strong

---

[14] In addition, that case involved not just reimbursement claims but also overtime misclassification claims.  *See* Ex. D (*Tsyn v. Wells Fargo Advisors* Settlement Agreement, ECF No. 159-1, Ex. 1, No. 14-cv-02552-LB (N.D. Cal. Apr. 26, 2018)), § 1.31(c).

1   evidentiary record, trial, and appeal.  Early in the case, these risks compound, often justifying a

2   significant discount.  But with each hurdle the plaintiff clears, that particular risk disappears, and

3   the justifiable discount decreases.  If a plaintiff can make it to trial, she and the class are in a

4   much stronger position.

5         Here, Intervenors and the class members have amassed a strong record and overcome

6   Morgan Stanley's summary adjudication motion.  They are in a strong position.  If they win the

7   trial, a 95% discount on Morgan Stanley's exposure would be absurd.  *See supra* Section 1.A

8   (calculating that $10,235,000 represents approximately 2-3% of Morgan Stanley's total

9   exposure).  If they lose and are left with an appeal as their only hope, then a 95% discount could

10  be reasonable.  But not now, on this record.

11        By paving the way for Judge Claster to proceed with trial (i.e., deferring preliminary

12  approval until after Judge Claster rules), this Court can protect the class members' interests.  If

13  Intervenors win the phase one trial, the class members will be in a much stronger position; if

14  Intervenors lose, the class members will be in the same position they are in today, with the

15  *Harvey* settlement providing them modest relief for their still-valuable claims (denied by Judge

16  Claster but subject to review by the California Court of Appeal and Supreme Court).

17  **III.  ARGUMENT**

18       **A.  Reverse Auctions Like This One Harm Class Members.**

19            **1.  Reverse-Auction Settlements Require Particular Scrutiny.**

20        Class action settlements always require judicial scrutiny given the absent class members'

21  important interests at stake, the absence of conventional adversarial briefing (i.e., because the

22  preliminary approval motion is unopposed or even joint), and the societal interest in robust

23  protection of public rights.  *See Boyd v. Avanquest N. Am. Inc*, No. 12-cv-4391-WHO, 2015 WL

24  4396137, at *2 (N.D. Cal. July 17, 2015) (Orrick, J.) (denying preliminary approval and

25  explaining that review must include the settlement negotiations, the terms of the settlement,

26  including if it "grant[s] preferential treatment to class representatives or segments of the class"

27  and whether it "falls within the range of possible approval" (quoting *State of Cal. v. eBay, Inc.*,

28  No. 12-cv-5874-EJD, 2014 WL 4273888, at *5 (N.D. Cal. Aug. 29, 2014)).

Where there are indicia of a reverse auction, a court should undertake an especially careful analysis.[15]  A reverse auction is a defendant's attempt to reach a low-value class deal with a plaintiff on tenuous footing, with the goal of precluding other representative claims that are being litigated from a position of greater strength.  *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (Posner, J.) (defining a reverse auction as "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant"); 4 William B. Rubenstein, Newberg on Class Actions § 13:57 (5th ed. 2018) (explaining the primary "problem in the reverse auction situation is that the class's interests have been sold out, and class members will get less than the full value of their claims"); Standards and Guidelines for Litigating and Settling Consumer Class Actions, 299 F.R.D. 160 (3d ed. 2014) ("[In a reverse auction] a defendant proposes a cheap settlement and shops around among plaintiffs' counsel until the defendant finds a lawyer willing to settle on its terms.  The potential for collusion and abuse is obvious if a lawyer agrees to a bad deal in order to secure fees.").  Two commentators have identified certain "yellow flags" of collusion:

> First is the situation in which the judge observes evidence of a reverse auction settlement.  Markers of a reverse auction include the presence of overlapping class actions involving similar claims against the same defendant; settlement discussions initiated by the defendant; settlement bargaining limited to one of the competing groups of plaintiffs' attorneys; settlement with the group of attorneys who present a less substantial threat of carrying the case forward to trial; lack of an extended process of settlement bargaining; agreements that promote the award of lucrative and potentially justified attorneys' fees; and sudden expansion of the scope of the settled case (for example, by converting the action from a statewide to a nationwide class).

Jonathan R. Macey & Geoffrey P. Miller, *Judicial Review of Class Action Settlements*, 1 J. Legal Analysis 167, 191-94 (2009); *cf. Dalchau v. Fastaff, LLC*, No. 17-cv-01584-WHO, 2018 WL

---

[15] Recognizing the importance of a robust review of the settlement *before* preliminary approval, Rule 23 was recently amended "to address issues related to settlement," *see* Fed. R. Civ. P. 23 advisory committee note to 2018 amendment, and this District recently updated and expanded its guidance to attorneys seeking approval of class settlements.  *Procedural Guidance for Class Action Settlements*, U.S. District Ct. for N. District Cal., https://cand.uscourts.gov/ClassActionSettlementGuidance (last updated Dec. 5, 2018).

1709925, at *4 (N.D. Cal. Apr. 9, 2018) (Orrick, J.) (considering the timing of a settlement, "the way in which it came about," and the lack of "vigorous[] litigat[ion]" of classwide claims in the settling case in concluding that a settlement "plausibly reflect[s] an attempt on the part of [the defendant] to undercut [the plaintiff] in the instant action" and escape liability).

Approval of reverse auction settlements creates perverse incentives in representative cases.  Namely, it "signals to the unscrupulous plaintiffs' attorney that by filing a parallel, shadow action . . . , [he or she] can underbid the original plaintiffs' attorney team that researched, prepared and filed the action."  John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1371 (1995) (exploring the issue).  Reverse auctions are particularly problematic in the context of the relatively new and unique enforcement scheme created by PAGA, where procedural issues are still being fleshed out by the courts.  This uncertainty creates room for exploitation and collusion, undermining the very purpose of PAGA – to empower diligent plaintiffs' counsel to recover penalties for workers, standing in the shoes of the State.  These gaps and uncertainties create a powerful incentive for unscrupulous plaintiffs' lawyers to file copycat lawsuits and defendants to exploit competition by pitting plaintiffs against each other.  Without careful judicial management, this incentive structure can lead to increasingly clogged dockets, wasted judicial resources, erosion of PAGA's and Rule 23's purposes, and inefficient use of plaintiffs' resources.  *See In re Checking Account Overdraft Litig.*, 859 F. Supp. 2d 1313, 1324 (S.D. Fla. 2012) ("Competing lawsuits involving the same parties and the same issues in separate jurisdictions waste judicial resources and can lead to conflicting results.").

**2.      "Prudential Deference":  Where a Reverse-Auction Settlement Appears at a Critical Decision Point in the Lead Case's Procedural Posture, Courts Routinely Delay or Deny Preliminary Approval.**

Reverse auctions are rare (but seemingly increasingly common), so there are few data points to guide courts and precious little statutory guidance.  However, this Court and others appear to have evolved an approach that could be described as "prudential deference":  where the case in a weaker position settles just as the stronger case is approaching a key hurdle, the court overseeing the weaker case defers decision on or denies preliminary approval—even absent

1    direct evidence of collusion.  *See* Newberg on Class Actions, *supra*, § 13:57 ("[C]ourts are wary

2    of situations in which there are multiple class suits, defendants settle one of the cases in order to

3    preclude the other actions, and the settlement with that particular group of plaintiffs and their

4    counsel seems suspicious.").

5          The Ninth Circuit specifically cautions that "[c]ollusion may not always be evident on the

6    face of a settlement, and courts therefore must be particularly vigilant not only for explicit

7    collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-

8    interests and that of certain class members to infect the negotiations."  *In re Bluetooth Headset*

9    *Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); *see id.* at 946 (explaining that proposed

10   settlements reached before class certification "must withstand an even higher level of scrutiny

11   for evidence of collusion or other conflicts of interest than is ordinarily required under Rule

12   23(e)"); *see also Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) ("It is

13   because of the potential risk that plaintiffs' attorneys and defendants will team up to further

14   parochial interests at the expense of the class that the Rule 23(e) protocol employed by several

15   circuits explicitly includes scrutinizing settlements for indicia of collusion . . . .").

16         Below are several cases illustrating prudential deference:

17         *Source Refrigeration.*  Here, plaintiffs (represented by Outten & Golden, Intervenors'

18   counsel) prosecuted federal and state wage and hour claims on a Rule 23 basis before Judge

19   Chhabria.  *Galeener v. Source Refrigeration & HVAC, Inc.*, No. 13-cv-04960-VC (N.D. Cal.).

20   Sagafi Decl. ¶ 35.  Approximately five months after *Galeener* was filed, another plaintiff's

21   attorney filed a suit alleging substantially similar claims on behalf a broader class of California

22   employees.  *Meza v. Source Refrigeration & HVAC, Inc.*, No. 30-2014-00712145-CU-OE-CXC

23   (Cal. Super. Ct.); *see* Sagafi Decl. ¶ 35.  After unsuccessful mediations between the *Galeener*

24   parties, the *Meza* parties reached a $3.4 million class action settlement, while Galeener's class

25   certification motion was pending.  Sagafi Decl. ¶ 35.  Galeener moved to intervene in *Meza*,

26   flagging the *Meza* settlement as a possible reverse auction.  *Id.*  Orange County Superior Court

27   Judge Robert J. Moss granted the intervention request and continued the preliminary approval

28   hearing until after resolution of the class certification motion, which effectively prioritized the

first-filed case over the copycat litigation.  *Id.*  Soon thereafter, *Galeener* settled for $10 million, and Judge Chhabria approved the settlement.  *Id.*

*Merrill Lynch.*  Here, Outten & Golden LLP negotiated a tolling agreement with Merrill Lynch to assert classwide off-the-clock claims on behalf of trainee employees (the "Tolled Group").  *Id.* ¶ 36.  The parties engaged in extensive negotiations but did not settle.  *Id.*  There was another case pending on behalf of an overlapping population, captioned *Litty v. Merrill Lynch & Co., Inc.*, No. 14 Civ. 425 (C.D. Cal. dismissed May 19, 2015) (case "B").  Litty had recently lost FLSA and Rule 23 certification.  *Id.*  Merrill Lynch turned to Litty's counsel to settle the claims for $5 million.  *Id.*  The Tolled Group plaintiffs moved to intervene in *Litty*, ECF No. 112, the Court denied preliminary approval, *Litty*, ECF No. 131, and the Court denied the intervention motion as moot, *id.* *Litty*, 2015 WL 4698475, at *10 (C.D. Cal. Apr. 27, 2015) (denying preliminary approval of settlement that had appearance of reverse auction "in light of the settlement amount, Plaintiff's weak negotiating position, and Defendants' effort to settle three separate cases with Plaintiff").  Soon thereafter, the Tolled Group settled for $14 million. Sagafi Decl. ¶ 36 (citing *Blum v. Merrill Lynch & Co., Inc.*, No. 15 Civ. 1636 (S.D.N.Y.)).

*Payday Financial.*  Here, the court denied settlement approval based on "signs . . . that the Plaintiffs' attorneys, who hope to receive a fee of as much as $3.5 million, have not adequately represented the class," while "counsel for the Intervenors has presented more detail on litigation against the Defendants and the Defendants' business in what amounts to zealous and highly effective advocacy."  *Heldt v. Payday Fin., LLC*, No. 13 Civ. 3023, 2016 WL 96156, at *10 (D.S.D. Jan. 8, 2016).  The resulting settlement won the annual Trial Lawyer of the Year award from Public Justice.  Sagafi Decl. ¶ 37.

In sum, courts overseeing cases settling from a weaker position tend to practice prudential deference, deferring a decision on settlement to make room for the stronger-positioned case to proceed.  This allows the class members an opportunity to benefit from a possible victory in the further-developed case and gives the court more information with which to evaluate the proposed settlement (i.e., the outcome of the next hurdle will provide information as to appropriate settlement value).  After such scrutiny, courts often deny approval.  *See, e.g.,*

1   *Reynolds*, 288 F.3d at 283 (district court abused discretion in approving settlement without

2   applying close scrutiny to circumstances suggesting a reverse auction despite the fact that there

3   was "no proof that the settlement was actually collusive"); *Acosta v. Trans Union, LLC*, 243

4   F.R.D. 377, 399 (C.D. Cal. 2007) (denying preliminary approval where proposed settlement that

5   "was reached is strikingly similar" to reverse auction); *Carter v. City of Los Angeles*, 169 Cal.

6   Rptr. 3d 131, 145 (Cal. Ct. App. 2014) (reversing final approval where settlement would release

7   claims in separate litigation and noting that "appellants deserve to litigate the merits of their

8   claims, not have them dismissed out of hand in a class action settlement").[16]

9       In evaluating the indicia of a reverse auction, courts give special attention to the existence

10  of parallel cases that seek the same relief for the same or similar classes, *see Blair v. Equifax*

11  *Check Servs., Inc.*, 181 F.3d 832, 838 (7th Cir. 1999); plaintiff's counsel "negotiat[ing] from a

12  position of weakness, *Figueroa*, 517 F. Supp. 2d at 1322; the "broadening of . . . claims, . . .

13  made to assure [the defendant] that all possible claims could be resolved in [the settling] case,"

14  *id.* at 1323; inadequate settlement amounts, *see Cullan & Cullan LLC*, 2014 WL 347034, at *9;

15  and the lack of "formal discovery or preliminary motion practice" in the settling case, *id.  See*

16  *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005) ("Where two actions

17  involving overlapping issues and parties are pending in two federal courts, there is a strong

18  presumption across the federal circuits that favors the forum of the first-filed suit under the first-

19  filed rule."); *Plant Insulation Co. v. Fibreboard Corp.*, 274 Cal. Rptr. 147, 150 (Cal. Ct. App.

20  1990) ("Under the rule of exclusive concurrent jurisdiction, 'when two superior courts have

21  concurrent jurisdiction over the subject matter and all parties involved in litigation, the first to

22  

23  

---

[16] *See also Cullan & Cullan LLC v. M-Qube, Inc.*, No. 13 Civ. 172, 2014 WL 347034, at *10 (D.
Neb. Jan. 30, 2014) ("In light of its timing, the pendency of other actions, the size of the class,
the amount of the settlement and some 'red flags' that could be signs of potential abuse or
collusion, the court finds that the plaintiffs' motion for preliminary approval should be denied at
this time."); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1323, 1329 (S.D. Fla.
2007) (denying settlement approval after concluding that the defendant "did play these Plaintiffs
off against [parallel] actions . . . to structure a poor settlement with weak parties"); *Prezant v. De
Angelis*, 636 A.2d 915, 919-20, 926 (Del. 1994) (reversing settlement approval and remanding
for the lower court to make specific findings as to the adequacy of the class representative where
the settling plaintiff was in a "significantly weaker bargaining position" than the plaintiff in the
first-filed lawsuit and "could not realistically have hoped to try this case but only to settle it with
the further hope of receiving a fee award").

1    assume jurisdiction has exclusive and continuing jurisdiction over the subject matter and all

2    parties involved until such time as all necessarily related matters have been resolved.'" (quoting

3    *Cal. Union Ins. Co. v. Trinity River Land Co.*, 163 Cal. Rptr. 802, 805 (Cal. Ct. App. 1980)).

4        Other examples support this principle of prudential deference.  For example, in light of a

5    troubling course of conduct by the parties before it, the District Court for the District of

6    Minnesota denied preliminary approval and a request to stay competing actions where there were

7    other, more-developed, earlier-filed actions pending.  *Martin v. Cargill, Inc.*, 295 F.R.D. 380,

8    387, 389 (D. Minn. 2013).  Similarly, when a defendant moved to stay class certification

9    proceedings in a later-filed case so that it could seek settlement approval in a competing case, the

10   court denied the request, citing the first-to-file rule.  *In re Checking Account Overdraft Litig.*,

11   859 F. Supp. 2d at 1321, 1323, 1325.

### 3.       This Settlement Looks Like a Classic Reverse Auction.

13       As discussed further below, this settlement has all the signs of a reverse auction.  The

14   *Harvey* settlement amount is low.  *Harvey* has proceeded through far fewer hurdles and amassed

15   a negligible record when compared with *Chen*.  The *Harvey* parties are attempting to settle out

16   claims that are broader than they could litigate – both because they go years further back in time

17   than Harvey could in litigation and because they encompass arbitration-bound individuals.  The

18   only apparent explanation of why they hope to accomplish this is that Morgan Stanley is

19   motivated to eliminate the risk of liability in *Chen*.  *Cf. Dalchau*, 2018 WL 1709925, at *4

20   (expressing concern with settlement of claims in another action that not been "vigorously

21   litigated" when "circumstances suggest that . . . addition of classwide causes of action occurred

22   at the behest of [defendant] to escape potential liability" in the action before that court).[17]

23   Harvey also appears to be in an extremely weak bargaining position given Morgan Stanley's

24   counterclaims and pending FINRA arbitration.

25

26

---

27   [17] Tellingly, in describing legal exposure to shareholders in its June 30, 2018 Consolidated
     Statement of Financial Condition, Morgan Stanley listed a single lawsuit in the entire country:
28   *Chen* (not *Harvey* or any other case). Ex. E, at 14.

1   Further, the *Harvey* parties have plainly been aware of the *Chen* litigation, *see* ECF No.

2   26 (Joint Case Management Statement) at 8; Ex. F (Notice of Related Case, *Chen*, No. 30-2014-

3   00724866-CU-OE-CXC (Cal. Super. Ct. May 29, 2018)), but secretly negotiated a settlement of

4   Intervenors' claims in December and made no attempt to involve Intervenors' counsel in the

5   settlement discussions until after a settlement was inked, *see Litty*, 2015 WL 4698475, at *10

6   (explaining that while there was "no evidence of overt misconduct, it is troubling that plaintiff

7   and defendant in addition to settling plaintiff's individual claims are also sweeping into the

8   settlement [the intervenors' claims] without involving [the intervenors'] counsel").

9   **B.    The Court Should Permit Intervenors to Intervene in This Action.**

10   The Court should allow Intervenors to intervene, so that they may comment on the

11   forthcoming settlement that could substantially undermine their claims.  Allowing Intervenors to

12   be heard now for the limited purpose of assisting the Court in probing the appropriateness of the

13   settlement agreement promotes judicial economy by avoiding the waste of judicial and parties'

14   resources that would result from a months-long notice process.  Correcting these defects now, at

15   preliminary approval, is preferable to proceeding to a final approval motion that may be

16   unsuccessful.  *See* Fed. R. Civ. P. 23(e)(1) advisory committee note to 2018 amendment ("The

17   decision to give notice of a proposed settlement to the class is an important event.  It should be

18   based on a solid record supporting the conclusion that the proposed settlement will likely earn

19   final approval after notice and an opportunity to object.").

20   Under Rule 24(a)(2), Intervenors are permitted to intervene to protect their rights and

21   interests and those of the Labor Commissioner and all aggrieved employees they seek to

22   represent in *Chen*.[18]  An applicant may intervene as of right if: (1) the motion is timely; (2) the

23   applicant claims a significantly protectable interest relating to the property or transaction which

24   is the subject of the action; (3) the applicant is so situated that the disposition of the action may

25   as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's

---

26   [18] Intervenors, alternatively, should be permitted to intervene under Rule 24(b) because they
27   have "a claim or defense that shares with the main action a common question of law or fact."
     Fed. R. Civ. P. 24(b)(1)(B).  "[A] district court's discretion in [determining whether to grant
     permissive intervention] is broad."  *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1329
28   (9th Cir. 1977).  Intervenors can provide further briefing on this point should the Court require it.

1   interest is inadequately represented by the parties to the action. *Wilderness Soc'y. v. U.S. Forest*

2   *Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011). In evaluating whether Rule 24(a)(2)'s requirements

3   are met, courts follow "'practical and equitable considerations' and construe the Rule 'broadly in

4   favor of proposed intervenors.'" *Id.* at 1179 (quoting *United States v. City of Los Angeles*, 288

5   F.3d 391, 397 (9th Cir. 2002)). In ruling on a motion to intervene, "[c]ourts are to take all well-

6   pleaded, nonconclusory allegations in the motion to intervene . . . as true . . . ." *Sw. Ctr. for*

7   *Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).[19]

8       Intervenors meet each of these factors.

9       ### 1.       Intervenors' Application Is Timely.

10      Intervenors' application is plainly timely. Courts in the Ninth Circuit consider "three

11  criteria in determining whether a motion to intervene is timely: (1) the stage of the proceedings;

12  (2) whether the parties would be prejudiced; and (3) the reason for any delay in moving to

13  intervene." *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996). The crucial

14  date is when the proposed intervenor should have been aware that its interests would no longer

15  be protected adequately by the parties. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d

16  1297, 1304-05 (9th Cir. 1997) (affirming the denial of a motion to intervene as untimely where

17  the intervenor was aware of "the prospect of inadequate representation on the part of future

18  defendants in future years" at the time litigation commenced but waited twenty-seven months to

19  intervene (emphasis omitted)). A "mere lapse of time, without more, is not necessarily a bar to

20  intervention." *Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007) (quoting *United States v.*

21  *Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004)). Courts are "general[ly] reluctan[t] to

22  dispose of a motion to intervene as of right on untimeliness grounds because the would-be

23  intervenor actually may be seriously harmed if not allowed to intervene." *Benjamin ex rel. Yock*

24  *v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938, 949 (3d Cir. 2012).

25      "Where a proposed intervenor seeks to intervene for purposes of objecting to a proposed

26  settlement, timeliness generally is measured from the date the proposed intervenor received

---

27  [19] Some circuits hold that denial of absent-class-member intervention as of right may be an abuse

28  of discretion. *See, e.g.*, *Tech. Training Assocs. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 698
    (11th Cir. 2017); *Smith v. SEECO, Inc.*, 865 F.3d 1021, 1024-26 (8th Cir. 2017).

notice that the proposed settlement was contrary to its interest." *Glass v. UBS Fin. Servs., Inc.*, No. 06-cv-4068-MMC, 2007 WL 474936, at *3 (N.D. Cal. Jan. 17, 2007); *accord Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 880 (7th Cir. 2000) ("Only when the class members suspect that the representative is not acting in their best interests is there a need to intervene. This means that delay must be measured from the time the would-be intervenors learned (or should have known) of the representative's shortcomings.").

Here, Intervenors' motion is timely. Intervenors learned of the original *Harvey* settlement on December 13, 2018, while preparing for trial. Sagafi Decl. ¶ 29. The revised, expanded Harvey settlement was signed last Friday. *Id.* ¶ 33. Harvey, meanwhile, has not yet filed his proposed settlement. *Cf.* Ex. G (Order, *Medeiros v. HSBC Card & Retail Servs., Inc.*, No. 14 Civ. 1786 (S.D. Cal. Oct. 9, 2015)), at 20 ("[W]ithout knowing the terms of the proposed settlement agreement, Intervenors would not have been able to fully craft their arguments in support of intervention.").

Because preliminary approval has not been granted, and notice has not yet been sent to the *Harvey* class members, this is the best time to allow Intervenors to intervene to protect the State's and their own interests. *See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016) ("[B]y scrutinizing the agreement carefully at the initial stage and identifying any flaws that can be identified, the court allows the parties to decide how to respond to those flaws (whether by fixing them or opting not to settle) before they waste a great deal of time and money in the notice and opt-out process."). If the Court grants preliminary approval, it will have done so based on a more fleshed-out record; if it denies preliminary approval, it will save the parties the cost, delay, uncertainty, and confusion brought about by a class notice process that would have resulted in denial of final approval.

### 2. Intervenors Have a Protectable Interest That the Proposed Settlement Would Impair.

Intervenors also have a concrete protectable interest in the claims potentially being released through this settlement. A claimed interest is sufficient for intervention if: (1) it is protected under some law; and (2) the applicant shows a relationship between the legally

1    protected interest and the parties' claims.  *Koike v. Starbucks Corp.*, 602 F. Supp. 2d 1158, 1160

2    (N.D. Cal. 2009).  Intervenors have a significant protectable interest in a lawsuit in which they

3    are proposed class members.  *See Glass*, 2007 WL 474936, at *2 ("As D'Aria is a member of the

4    *Glass* class, he has a significant protectable interest relating to the subject of the instant action.").

5    By the same logic, as representatives of the California Labor Commissioner in *Chen*, Intervenors

6    have a significant protectable interest, because *Harvey* purports to release the Labor

7    Commissioner's and the aggrieved employees' claims under PAGA.  *Cf. O'Connor v. Uber*

8    *Techs., Inc.*, 201 F. Supp. 3d 1110, 1120 (N.D. Cal. 2016) ("Because PAGA is an action on

9    behalf of the State, the PAGA settlement included in the Settlement Agreement would prohibit

10   any other driver from bringing a PAGA claim (or obtaining relief through a PAGA

11   representative suit) for the time period up to preliminary approval, even if that driver opts out of

12   the Settlement Agreement.").  This is especially true given that there is no opt-out right under

13   PAGA.  *See Ochoa-Hernandez v. Cjaders Foods, Inc.*, No. 08-cv-2073-MHP, 2010 WL

14   1340777, at *5 (N.D. Cal. Apr. 2, 2010) (explaining that unnamed employees lack "the ability to

15   opt-out of [a] representative PAGA claim").

16          "The question of whether protectable interests will be impaired by litigation," meanwhile,

17   "must be put in practical terms rather than in legal terms."  *Akina v. Hawaii*, 835 F.3d 1003,

18   1011 (9th Cir. 2016) (quoting 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

19   Federal Practice and Procedure § 1908.2 (3d ed. 2007)).  "Proposed intervenors' interests 'might

20   not be *impaired* if they have "other means" to protect them,' even if the lawsuit would affect

21   those interests."  *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1152 (9th Cir. 2010)

22   (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006)).

23          Courts have found that, when class members "seek intervention as a matter of right," the

24   "interest" and "impairment" requirements of Rule 24 "are satisfied by the very nature of Rule 23

25   representative litigation."  *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005); *see also*

26   *Diaz v. Tr. Territory of the Pac. Islands*, 876 F.2d 1401, 1405 n.1 (9th Cir. 1989) (recognizing

27   that a class member who timely applies "should have the right to intervene in a class action if he

28   can show the inadequacy of the representation of his interest by the representative parties before

1  the court" (quoting Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment)).   The

2  Ninth Circuit has also followed "the guidance of Rule 24 advisory committee notes that state that

3  '[i]f an absentee would be substantially affected in a practical sense by the determination made

4  in an action, he should, as a general rule, be entitled to intervene.'"  *Berg*, 268 F.3d at 822

5  (quoting Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment).

6          Here, Intervenors easily satisfy both prongs.  First, they have an interest in protecting

7  their valuable claims for civil penalties, on behalf of themselves, the Labor Commissioner, and

8  other aggrieved employees.  *Cf. Koike*, 602 F. Supp. at 1160-61 (recognizing ability to pursue

9  claims on a classwide basis is a significantly protectable interest).  Relatedly, Intervenors have an

10  interest in recovering their attorneys' fees and costs, and the *Harvey* settlement could impair that

11  interest if it narrows or eliminates the claims they can assert in *Chen*.  Cal. Lab. Code § 2699.3

12  (providing prevailing employees with entitlement to reasonable attorney's fees and costs).

13         Second, this interest will be impaired if the *Harvey* settlement is approved because it

14  could release Intervenors' (and other aggrieved employees') claims.  *See, e.g.*, *Cobarruviaz v.*

15  *Maplebear, Inc.*, No. 15-cv-00697-EMC, 2016 WL 5725076, at *2 (N.D. Cal. Sept. 30, 2016)

16  ("A judgment on the PAGA claim . . . would bind all affected workers, even in the absence of

17  class certification or notice, and preclude Plaintiffs herein from pursuing the overlapping PAGA

18  claim." (citing *Arias v. Sup. Ct.*, 209 P.3d 923, 933 (Cal. 2009) ("Because an aggrieved

19  employee's action under the Labor Code Private Attorneys General Act of 2004 functions as a

20  substitute for an action brought by the government itself, a judgment in that action binds all

21  those, including nonparty aggrieved employees, who would be bound by a judgment in an action

22  brought by the government.")).  Morgan Stanley also has successfully paused the *Chen* trial.

23         Further highlighting the importance of allowing intervention now, the usual Rule 23

24  protection of opting out is not available to Intervenors or the aggrieved employees they represent

25  as to their PAGA claims.  *See O'Connor*, 201 F. Supp. 3d at 1120; *see also Ochoa-Hernandez*,

26  2010 WL 1340777, at *5 ("Class actions litigated in federal court also contain numerous

27  procedural protections that are not available in PAGA claims.  Unnamed employees need not be

28

1    given notice of the PAGA claim, nor do they have the ability to opt-out of the representative

2    PAGA claim.").

### 3.   Intervenors' Interests Are Not Adequately Represented.

4    Intervenors' interests are not adequately protected by the *Harvey* Plaintiff and Morgan

5    Stanley. "The burden of showing inadequacy of representation is 'minimal' and satisfied if the

6    applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for*

7    *Balanced Use v. Mo. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011) (quoting *Arakaki v.*

8    *Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)); *see also Ruderman ex rel. Schwartz v. Wash.*

9    *Nat'l Ins. Co.*, 263 F.R.D. 670, 677 (S.D. Fla. 2010) ("[M]ere existence of colorable adequacy

10   issues satisfies Proposed Intervenors' minimal burden to show that representation of their

11   interests 'may be' inadequate."); Fed. R. Civ. P. 24(a) advisory committee note to the 1966

12   Amendment ("A class member who claims that his 'representative' does not adequately

13   represent him, and is able to establish that proposition with sufficient probability . . . should, as a

14   general rule, be entitled to intervene in the action.").

15   "In determining whether a would-be intervener's interests will be adequately represented

16   by an existing party, courts consider: (1) whether the interest of a present party is such that it will

17   undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and

18   willing to make such arguments; and (3) whether the would-be intervenor would offer any

19   necessary elements to the proceedings that other parties would neglect." *Berg*, 268 F.3d at 822.

20   A proposed intervenor can satisfy this burden by demonstrating divergence of interests

21   between himself and the class representative. *See Stone v. First Union Corp.*, 371 F.3d 1305,

22   1312 (11th Cir. 2004) (holding that employees were permitted to intervene as a matter of right

23   "to represent their interests where different than [plaintiff's] interests"); *Lubocki v. ZipRealty,*

24   *Inc.*, No. 07 Civ. 2959, 2009 WL 10670958, at *6 (C.D. Cal. Mar. 10, 2009) (finding that the

25   existing parties may not adequately represent the interests of the proposed intervenors where the

26   latter's interests were "likely to diverge with the interests of the named plaintiffs"); *Buchet v. ITT*

27   *Consumer Fin. Corp.*, 845 F. Supp. 684, 689-90 (D. Minn. 1994) ("[Intervenors] argue that the

28   [settlement] gives the class insufficient value, that the release is overbroad, and that the notice

given to class members was deficient.  This position clearly puts them at odds with class counsel, and, therefore, the Court finds that [intervenors] have made the minimal showing necessary to support their motions to intervene.").

Here, the divergence of interests in clear:  Harvey, Morgan Stanley, and their counsel seek to settle claims for insufficient value on the eve of Intervenors' trial.

### a.   The Settlement Results from Procedural Unfairness.

In light of the procedural background, signs of a reverse auction, and absence of adversarial input in the typical unopposed settlement approval motion process, Harvey and his lawyers cannot fairly and adequately represent Intervenors' interests.  *See Reynolds*, 288 F.3d at 283 (stating that "questionable antecedents and circumstances" of settlement proposal "demand[] closer scrutiny").  The original *Harvey* settlement was reached in the month before trial, and the expanded *Harvey* settlement, swallowing up the *Chen* claims, was reached one court day before trial.  *See* Newberg on Class Actions, *supra*, § 13:57 ("Factors that raise suspicions include a *quick settlement*, *settlement of the least well-developed case*, or settlement with the least experienced plaintiffs' counsel." (emphasis added)); *Reynolds*, 288 F.3d at 283-84 (reversing a judgment approving the class action settlement when the district court failed to consider the potential value of parallel litigation where "[t]he class had been certified, the case was proceeding in the Texas courts, and . . . the case had been set for trial," even if the "prospects for the class if the litigation continued were uncertain"); Ex. G (Order, *Medeiros*, No. 14 Civ. 1786), at 3, 20-21 (granting permissive intervention where the plaintiffs' docket showed "no motions, no substantive briefing, and no other significant litigation activity prior to the submission of the motion for preliminary settlement approval" whereas there had been extensive discovery and motion practice in the intervenors' case).

Harvey, meanwhile, "was not in a position to fairly or adequately negotiate . . . a sweeping [s]ettlement [a]greement" that releases both PAGA and non-PAGA claims given the strength of *Chen*, the arbitration agreements that likely apply to the vast majority of class members, the shorter PAGA limitations period in *Harvey*, and the potential counterclaims against Harvey.  *Litty*, 2015 WL 4698475, at *9.  Nonetheless, from this weak position, Harvey

1  negotiated a settlement with Morgan Stanley that attempts to reach beyond his own case to

2  encompass *all* claims at issue in *Chen*, strongly indicating some degree of collusion.

**b.      The Settlement Amount Is Inadequate.**

4        Perhaps most significant, the low amount of the settlement is a red flag suggesting

5  inadequate representation.  The *Harvey* settlement's $10.2 million valuation is less than 3% of

6  the $366 million estimate above.  But a $2,125,000 fee (25% of the $8,500,000 common fund)

7  would be an excellent payday for lawyers who filed a case only eight months ago, with limited

8  activity.  *Cf. Reynolds*, 288 F.3d at 282 ("The ineffectual lawyers are happy to sell out a class

9  they anyway can't do much for in exchange for generous attorneys' fees, and the defendants are

10  happy to pay generous attorneys' fees since all they care about is the bottom line—the sum of the

11  settlement and the attorneys' fees . . . .").

**c.      The Expanded PAGA Limitations Period Is Suspicious.**

13        The expanded *Harvey* settlement is also problematic because the release stretches the

14  PAGA limitations period from one to over five years, in an attempt to save Morgan Stanley from

15  the liability it faces in the earlier-filed *Chen* case.

16        There is extensive authority holding that the PAGA limitations period is one year.  *See,*

17  *e.g.*, Cal. Civ. Proc. § 340(a) (noting the default statute of limitations of one year); *Brown v.*

18  *Ralph's Grocery Co.*, 239 Cal. Rptr. 3d 519, 530 (Cal. Ct. App. 2018) (recognizing that PAGA

19  has a one year statute of limitations); *see also Taylor v. Interstate Grp.*, No. 15-cv-05462-YGR,

20  2016 WL 861020, at *3 (N.D. Cal. March 7, 2016); *Watson v. Tennant Co.*, No. 18 Civ. 2462,

21  2018 WL 5099281, at *3 (E.D. Cal. Oct. 17, 2018) ("[T]he legal authority holding that PAGA

22  claims are governed by Section 340(a)'s one-year statute of limitations is substantial.").

23        Why would Morgan Stanley settle PAGA claims four years further back in time than

24  courts allow?  It is hard to reach any conclusion other than that it seeks to insulate itself from the

25  liability it was set to face this month in the PAGA trial before Judge Claster.

**C.      Intervenors Will Assist the Court in Probing for Appropriate Additional Information to Evaluate the Expanded Harvey Settlement.**

27

28        The red flags in this settlement – low value; inadequate discovery; suspicious timing;

1    defendant's waiver of statute of limitations defenses, arbitration defenses, and counterclaims –

2    warrant especially searching scrutiny.  Given that Intervenors have lived with these claims

3    through almost five years of litigation, hundreds of thousands of document pages, dozens of

4    witnesses, hundreds of trial exhibits, and dozens of motions and hearings, Intervenors are in a

5    unique position to assist the Court in determining the reasonableness of the *Harvey* deal.

6    **IV.**    **Judicial Oversight and Coordination of Competing PAGA Cases Will Promote**

7            **Judicial Economy and the Purposes of PAGA.**

8        Given the important rights at stake under PAGA and the position of public trust played

9    by a private attorney general in representing the interests of the state, judicial oversight and

10    coordination between *Chen* and *Harvey* as to the PAGA overlap will be important.  *See Iskanian*

11    *v. CLS Transp. L.A., LLC*, 327 P.3d 129, 156-57 (Cal. 2014).

12        Although PAGA has no statutory analogue to Rule 23 to appoint class (or settlement)

13    counsel or interim class counsel, the Labor Code does provide for court "review and approv[al]"

14    of PAGA settlements.  Cal. Lab. Code § 2699(*l*)(2).  While the law is admittedly underdeveloped

15    in this area, it need not be the Wild West.  Courts have recognized that PAGA representative

16    plaintiffs "take on a special responsibility to their fellow aggrieved workers who are effectively

17    bound by any judgment." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Williams v. Superior Ct.*,

18    398 P.3d 69, 80-81 (Cal. Sup. Ct. July 13, 2017) (while noting differences between class and

19    PAGA actions, explaining that "absent fellow employees will be bound by the outcome of any

20    PAGA action . . . , just as absent class members are bound").  "Such a plaintiff . . . owes a

21    responsibility to the public at large." *O'Connor*, 201 F. Supp. 3d at 1134.  Given this

22    responsibility, Intervenors respectfully request that the Court inquire into whether Harvey's

23    counsel have sufficiently represented the interests of California and the aggrieved employees

24    under PAGA with respect to *both* lawsuits, and which counsel (Harvey's or Intervenors') should

25    represent the aggrieved employees going forward. *Cf. id.* at 1134 ("[D]espite this responsibility,

26    there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a

27    bargaining chip, wherein the rights of individuals who may not even be members of the class and

28    the public may be waived for little additional consideration in order to induce the employer to

1  agree to a settlement with the class.").

2  Here, if the expanded *Harvey* settlement does not become final, Harvey will begin

3  litigating his claims, some of which overlap with those that Intervenors have been litigating for

4  the past half decade.  Coordination of the cases, with special attention to the special role played

5  by a private attorney general under PAGA, will promote judicial economy, avoid inconsistent

6  results, and promote the goals of PAGA, which include the efficient presentation of workers'

7  claims for substantive resolution.  Likewise, this Court and Judge Claster may wish to guide the

8  plaintiffs in the two actions in their different focuses to minimize overlap and avoid

9  circumstances like this, where a defendant can exploit ambiguities in the law to the detriment of

10  the class members.[20]

11  ## V.  **CONCLUSION**

12  For the foregoing reasons, Intervenors respectfully request that they be allowed to

13  intervene to probe the settlement for signs of collusion and to ensure that the absent class

14  members' and the State's interests are fully protected by the counsel who have lived with this

15  case for the four years before Harvey filed his complaint.

16

17  Respectfully submitted,

18  By:   */s/ Jahan C. Sagafi*
                 Jahan C. Sagafi

18  Dated: January 23, 2019

19  Jahan C. Sagafi (Cal. Bar No. 224887)

20  Relic Sun (Cal. Bar No. 306701)
     OUTTEN & GOLDEN LLP

21  One California Street, 12th Floor
     San Francisco, CA 94111

22  Telephone: (415) 638-8800
     Facsimile: (415) 638-8810

23  Email: jsagafi@outtengolden.com
     Email: rsun@outtengolden.com

24

25

26

27

---

28  [20]   At Friday's conference in *Chen*, Judge Claster also said that he is happy to speak with this Court about the litigation.  Sagafi Decl. ¶ 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael J. Scimone (*pro hac vice* motion forthcoming)
Christopher M. McNerney (*pro hac vice* motion forthcoming)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: cmcnerney@outtengolden.com

Pooja Shethji (*pro hac vice* motion forthcoming)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
Email: pshethji@outtengolden.com

Laura Sullivan (Cal. Bar No. 220529)
LAW OFFICE OF LAURA SULLIVAN
423 South Estate Drive
Orange, CA 92869
Telephone: (714) 744-1522
Facsimile: (714) 744-1524
Email: laurasullivan@laurasullivanlaw.com

Mark Humenik (Cal. Bar No. 231917)
HABER POLK KABAT
423 South Estate Drive
Orange, CA 92869
Telephone: (949) 636-5754
Facsimile: (216) 241-0739
Email: mhumenik@haberpolk.com

*Attorneys for Plaintiff-Intervenors,
Proposed Class Members, and on behalf of
Aggrieved Employees*

PLAINTIFF-INTERVENORS' NOTICE OF MOTION AND MOTION
TO INTERVENE; MEMORANDUM IN SUPPORT
CASE NO. 18-cv-02835-WHO