EDWARD J. WYNNE (165819)
ewynne@wynnelawfirm.com
WYNNE LAW FIRM
Wood Island
80 E. Sir Francis Drake Boulevard, Suite 3G
Larkspur, CA 94939
Telephone:    (415) 461-6400
Facsimile:    (415) 461-3900

DAVID S. MARKUN (108067)
dmarkun@mzclaw.com
JEFFREY K. COMPTON (142969)
jcompton@mzclaw.com
MARKUN ZUSMAN FRENIERE &
COMPTON LLP
17383 Sunset Boulevard, Suite A380
Pacific Palisades, CA 90272
Telephone:    (310) 454-5900
Facsimile:    (310) 454-5970

JAMES F. CLAPP (145814)
jclapp@clapplegal.com
MARITA MURPHY LAUINGER (199242)
mlauinger@clapplegal.com
CLAPP & LAUINGER LLP
701 Palomar Airport Road, Suite 300
Carlsbad, California 92011
Telephone:    (760) 209-6565 ext. 101
Facsimile:    (760) 209-6565

Attorneys for Plaintiff
Brandon Harvey

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| BRANDON HARVEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY SMITH BARNEY LLC,<br><br>Defendant. | Case No. 3:18-cv-02835 WHO<br><br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL**<br><br>Judge: Hon. William H. Orrick<br>Date:   June 12, 2019<br>Time:  2:00 p.m.<br>Courtroom:  Courtroom 2, 17th Floor |

## NOTICE OF MOTION AND MOTION

TO THE COURT AND ALL INTERESTED PARTIES:

PLEASE TAKE NOTICE THAT on June 12, 2019 at 2:00 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Hon. William H. Orrick, United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, California, in Courtroom 2, 17th Floor, Plaintiff Brandon Harvey will and hereby does respectfully move the court for preliminary approval of the proposed class action and representative action settlement.

Plaintiff respectfully requests that the Court: (1) grant preliminary approval for the proposed class action and representative action settlement; (2) grant conditional certification of the proposed settlement class; (3) authorize the mailing of the proposed notice to the class of the settlement; and, (4) schedule a "fairness hearing," i.e., a hearing on the final approval of the settlement.

Plaintiff makes this motion on the grounds that the proposed settlement is within the range of possible final approval, and notice should, therefore, be provided to the class. This Motion is based upon this Notice of Motion and Motion for Preliminary Approval of Class Action Settlement, the Memorandum of Points and Authorities in Support Thereof, the Declaration of Edward J. Wynne, the Declaration of James F. Clapp, the Class Action Settlement and Release, any oral argument of counsel, the complete files and records in the above-captioned matter, and such additional matters as the Court may consider.

Dated: April 26, 2019                                    WYNNE LAW FIRM


                                                         _____/s/*Edward J. Wynne*_____
                                                         Edward J. Wynne
                                                         Attorneys for Plaintiff

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ............................................................................... i

INTRODUCTION ........................................................................................................... 1

PROCEDURAL STATEMENT .......................................................................................... 2

STATEMENT OF FACTS RELEVANT TO THE PROPOSED SETTLEMENT .................... 5

    A.    Morgan Stanley's AFG Program Pays For Additional Business Expenses ......... 5

        1.    Calculating The Amount That Goes Into The AFG ................................ 6

        2.    Morgan Stanley Claims The AFG Funds As A Deduction On Its Own Taxes ...................................................................................................... 7

    B.    AFG Categories of Expenses ................................................................. 7

        1.    Payments to Support Staff ..................................................................... 7

        2.    Business Development Expenses ........................................................... 7

        3.    Discretionary Fee Waivers .................................................................... 8

SETTLEMENT TERMS ................................................................................................... 8

    A.    Settlement Fund ................................................................................... 8

    B.    Class Definition ................................................................................... 9

    C.    Class Representatives and Class Counsel ............................................ 9

    D.    Notice Procedure ............................................................................... 10

    E.    Plan of Allocation .............................................................................. 10

        1.    Payments to Class Members ................................................................ 10

        2.    Named Plaintiff Award: ...................................................................... 11

        3.    Class Counsels' Fees and Costs .......................................................... 11

        4.    LWDA Payment .................................................................................. 11

        5.    Settlement Administrator: .................................................................... 11

CLASS CERTIFICATION FOR PURPOSES OF SETTLEMENT ....................................... 11

    A.    The Class Meets the Requirements of Rule 23 (a) .............................. 11

        1.    Numerosity .......................................................................................... 12

        2.    Commonality ....................................................................................... 12

        3.    Typicality ............................................................................................. 12

        4.    Adequacy ............................................................................................. 13

    B.    The Class Meets the Requirements of Rule 23 (b)(3) ......................... 13

        1.    Common Issues Predominate as to MSSB's AFG Program ................ 14

THE STANDARDS FOR PRELIMINARY APPROVAL ARE SATISFIED ......................... 15

A.    The Standard for Preliminary Approval...................................................... 15

B.    Strength of Plaintiff's Case ......................................................................... 17

C.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation .... 19

D.    The Amount Offered in Settlement.............................................................. 20

E.    Extent of Discovery Completed .................................................................. 23

F.    Experience and View of Counsel ................................................................ 24

THE PROPOSED CLASS NOTICE IS THE BEST NOTICE PRACTICABLE .................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

## Federal Cases

*Abdullah v. U.S. Sec. Assocs., Inc.,*
  731 F.3d 952 (9th Cir. 2013) ............................................................................ 12

*Aguilar v. Zep, Inc.,*
  2014 WL 4245988 (N.D. Cal. Aug. 27, 2014) .................................................. 18

*Alvarez v. Farmers Ins. Exch.,*
  No. 3:14-CV-00574-WHO, 2017 WL 2672710 (N.D. Cal. Jan. 17, 2017) ...... 23

*Bautista v. Harvest Mgmt. Sub LLC,*
  No. CV1210004FMOCWX, 2014 WL 12579822 (C.D. Cal. July 14, 2014)....... 23

*Blandino v. MCM Constr., Inc.,*
  No. C 12-1729 WHO, 2014 WL 11369763 (N.D. Cal. Mar. 6, 2014) ............. 23

*Boyd v. Bank of Am. Corp.,*
  300 F.R.D. 431 (C.D. Cal. 2014) ............................................................... 14, 20

*Brecher v. Citigroup Global Markets, Inc.,*
  S.D. Cal. Case 09-cv-1344 ........................................................................... 1, 21

*Buchanan v. HomeServices Lending, LLC,* 2013 WL 1788579
  (S.D. Cal. Apr. 25, 2013) ................................................................................ 18

*Churchill Village, LLC v. General Electric,*
  361 F.3d 566 (9th Cir. 2004) ............................................................................ 25

*Drake v. Morgan Stanley & Co.,* 2010 WL 2175819
  (C.D. Cal. Apr. 30, 2010) ................................................................................ 18

*Garett v. Morgan Stanley & Co.,*
  S.D. Cal. Case No. 04-cv-1858 ........................................................................ 22

*Gautreaux v. Pierce,*
  690 F.2d at 616 (7th Cir. 1982) ....................................................................... 16

*General Tel. Co. of Southwest v. Falcon,*
  457 U.S. 147 (1982) ......................................................................................... 13

*Hammon v. Barry,*
  752 F. Supp. 1087 (DDC 1990) ....................................................................... 24

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) .............................................................. 12, 13, 16

*Hein v. PNC Fin. Servs. Group, Inc.,*
  511 F.Supp.2d 563 (E.D. Pa. 2007) ................................................................ 22

*Hibbs-Rines v. Seagate Techs., LLC,* 2009 WL 513496
  (N.D. Cal. Mar. 2, 2009) ................................................................................. 19

PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL

*Hopkins v. Stryker Sales Corp.*,
  2012 WL 1715091 (N.D. Cal. May 14, 2012) ............................................................. 12

*Hopson v. Hanesbrands, Inc.*,
  CV 08-0844 EDL, 2008 WL 3385452 (S.D. Cal. Apr. 13, 2009) ................................. 23

*In re Armored Car Anti - Trust Litigation*,
  472 F. Supp. 1357 (ND GA 1979) ................................................................................ 24

*In re General Motors Corp.*,
  55 F.3d 768 (3rd Cir.1995) ........................................................................................... 19

*In re M.L. Stern Overtime Litig.*,
  No. CV 07-0118 BTM (JMAx), 2009 WL 995864 (S.D. Cal. Apr. 13, 2009) ............... 23

*In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, 2013 WL 6255697
  (D.N.J. Dec. 4, 2013) .................................................................................................... 17

*In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, 2014 WL 2101904
  (D.N.J. May 20, 2014) ................................................................................................... 17

*In re RBC Dain Rauscher Overtime Litig.*,
  703 F. Supp. 2d 910 (D. Minn. 2010) ........................................................................... 18

*In re Traffic Executive Association-Eastern Railroads*,
  627 F.2d 631 (2d Cir. 1980) .......................................................................................... 16

*In Re Wells Fargo Home Mortg.*,
  571 F.3d 953 (9th Cir. 2009) ........................................................................................ 14

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978) ........................................................................................ 13

*Levya v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ........................................................................................ 13

*Linney v. Cellular Alaska Partnership*,
  151 F.3d 1234 (9th Cir. 1998) ...................................................................................... 15

*Marr v. Bank of Am.*,
  No. 09–cv–05978 WHA, 2011 WL 845914 (N.D. Cal. Mar. 8, 2011) ........................... 14

*Nguyen v. Wells Fargo Bank*,
  No. 15-CV-05239-JCS, 2016 WL 5390245 (N.D. Cal. Sept. 26, 2016) ................... 14, 18

*Novak v. The Boeing Company*,
  2011 WL 9160940 (C.D. Cal. Jul. 20, 2011) ................................................................ 18

*Officers for Justice v. Civil Service Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ........................................................................................ 15

*Overton v. Hat World, Inc.*,
  2012 U.S. Dist. LEXIS 144116 (E.D. Cal. 2012) ......................................................... 25

PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL

*Sommers v. Abraham Lincoln Federal Savings & Loan Association*,
 79 F.R.D. 571 (ED PA 1978)..........................................................................................24

*Steinberg v. Carey*,
 470 F. Supp. 471 (NY 1979)..........................................................................................24

*Stewart v. Abraham*,
 275 F.3d 220 (3d Cir. 2001)..........................................................................................12

*Stuart v. RadioShack Corp.*,
 641 F.Supp.2d 901 (N.D. Cal. 2009) .............................................................................14

*Takacs v. A.G. Edwards & Sons, Inc.*,
 444 F. Supp. 2d 1100 (S.D. Cal. 2006) ..........................................................................14

*Torres v. Wells Fargo*, 2016 WL 7373856,
 (C.D. Cal. Oct. 12, 2016) ................................................................................................17

*Torrisi v. Tucson Elec. Power Co.*,
 8 F.3d 1370 (9th Cir. 1993)............................................................................................16

*Tsyn v. Wells Fargo*,
 N.D. Cal. Case 14-cv-02552-LB .....................................................................1, 20, 21, 23

*Villalobos v. Calandri Sonrise Farm LP*,
 No. CV 2122615 PSG (JEMx), 2015 WL 12777959, (C.D. Cal. Dec. 4, 2015) .............23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
 396 F.3d 96 (2nd Cir. 2005)...........................................................................................16

*Walters v. Reno*,
 145 F.3d 1032 (9th Cir. 1998)........................................................................................12

*Wit v. United Behavioral Health*,
 317 F.R.D. 106 (N.D. Cal. 2016) ...................................................................................12

### State Cases

*Duran v. U.S. Bank Nat. Assn.*,
 59 Cal. 4th 1 (2014) ................................................................................................14, 20

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
 42 Cal.4th 554 (2007) ....................................................................................................14

*Grissom v. Vons Companies, Inc.*,
 1 Cal.App.4th 52 (1991) ................................................................................................14

*Koehl v. Verio, Inc.*,
 142 Cal. App. 4th 1313 (2006) .................................................................................17, 22

*Litty v. Merrill Lynch & Co.*,
 L.A. Sup. Ct. Case No. BC582127 .............................................................................1, 21

*Morgan v. Wet Seal*,
 210 Cal.App.4th 1341 (2012) ........................................................................................18

PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL

*Nordstrom Comm'n Cases,*
    186 Cal.App.4th 576 (2010) ...................................................................23

*Prachasaisoradej v. Ralphs Grocery Co., Inc.,*
    42 Cal. 4th 217 (2009) .........................................................................17

*Rope v. Auto–Chlor Sys. of Wash., Inc.,*
    220 Cal. App. 4th 635, 651 n.7 (2013)...............................................19

*Schachter v. Citigroup,*
    47 Cal. 4th 610, 621 (2009) ................................................................17

### Federal Statutes

26 U.S.C.
    § 162..............................................................................................15, 17

Federal Rules of Civil Procedure
    Rule 23 .........................................................................................passim

### State Statutes

California Labor Code
    § 2699..............................................................................................1, 11

California Labor Code
    § 2802.........................................................................................passim

### Other Authorities

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice &
    Procedure
    § 1778 (2d ed. 1986) ...........................................................................13

Herr, *Manual for Complex Litigation,*
    *Fourth*, § 21.632 (2004)......................................................................16

U.S. Dept. of Labor, Wage & Hour Div., Opinion Letter
    FLSA2006-43, 2006 WL 3832994 (Nov. 26, 2006)......................................22

**INTRODUCTION**

Plaintiff Brandon Harvey ("Plaintiff") seeks preliminary approval of this $10,235,000 non-reversionary, arms'-length negotiated, class action and Labor Code Private Attorneys General Act ("PAGA") settlement between Plaintiff and Defendant Morgan Stanley Smith Barney, LLC ("MSSB" or "Morgan Stanley"). The proposed settlement would fully resolve all claims between Plaintiff and MSSB that are pending before this Court.

This proposed settlement covers the wage and hour claims of Plaintiff and all other individuals employed by MSSB within the State of California from April 23, 2013, through the date of Preliminary Approval who worked as Financial Advisors and/or Private Wealth Advisors (collectively, "FAs"). Plaintiff has alleged that MSSB violated California Labor Code §§ 201-204, 204.2, 221, 223, 226, 400-410, 1174, 1174.5, 2802, 2804, and Title 8 of the California Code of Regulations, § 11040(8).[1] Plaintiff has also alleged derivative claims pursuant to the California Unfair Competition Law, California Business & Professions Code § 17200, et seq. ("UCL"), and seeks civil penalties for the Labor Code violations on behalf of himself and other allegedly aggrieved employees under PAGA (Labor Code § 2699 *et seq.*). Plaintiff contends his Labor Code and UCL claims should be certified under Fed. R. Civ. P. 23 and his PAGA claim should be allowed to proceed as a representative action on behalf of the aggrieved employees and the State of California. Plaintiff submits that the proposed settlement is fair, reasonable and in the best interests of the class members, aggrieved employees, and the State of California, as it will provide them with real benefits in the face of the risk (both as to merits and certification), expense, and complexity of further litigation. Specifically, the settlement compares favorably to three recent similar class action settlements reached on behalf California financial advisors that were approved by their respective courts: *Tsyn v. Wells Fargo Advisors,* N.D. Cal. Case 14-cv-02552-LB; *Brecher v. Citigroup Global Markets, Inc.,* S.D. Cal. Case 09-cv-1344; and *Litty v. Merrill Lynch & Co.*, L.A. Cty. Sup. Ct. Case No. BC582127. As

---

[1] The parties have concurrently filed a stipulation for Plaintiff to conditionally amend the operative complaint. Plaintiff's Proposed Second Amended Complaint includes additional labor code provisions.

Plaintiff will explain below, the proposed settlement provides substantial, immediate recovery for the class members while avoiding the delays and uncertainties associated with trial on the merits and subsequent appeals.

**PROCEDURAL STATEMENT**

On May 14, 2018, Plaintiff Brandon Harvey filed this action in the Northern District of California alleging various wage-related claims against MSSB. Plaintiff filed his First Amended Complaint on July 12, 2018. The lawsuit was styled as a class action on behalf of California Financial Advisors under Rule 23 and a representative action under PAGA. MSSB answered the First Amended Complaint on August 30, 2018.

Soon after the initial filing, Plaintiff engaged in extensive informal discovery and written discovery. As a result of Plaintiff's informal discovery efforts, Plaintiff was able to gather evidence in order to prosecute the action. In total, Plaintiff's counsel interviewed more than twenty FAs about their potential claims. (Declaration of Edward J. Wynne in Support of Motion for Preliminary Approval, ¶ 13.)

As required by Rule 26(f) and this Court's May 25, 2018 Case Management Conference Order (Dkt. 10), on August 3, 2018, the parties met and conferred in preparation for the upcoming Initial Case Management Conference.  On August 28, 2018, the parties filed an ADR stipulation selecting private mediation, which the Court approved and ordered on August 30. (Dkt. 20, 22.) Following the Initial Case Management Conference on September 18, 2018 (Dkt. 26), the parties exchanged substantial amounts of information, including thousands of pages of documents, data, and information. On September 7, 2018, MSSB served its initial disclosures. On September 17, 2018, Plaintiff served his initial disclosures, along with a production of documents. On September 20, 2018, Plaintiff propounded his first set of interrogatories and requests for production of documents on MSSB. Plaintiff continued to conduct discovery focused on MSSB's policies and practices related to business expenses, compensation, and payroll and deductions. MSSB produced nearly 2,000 pages of documents between October and November 2018.  (Decl. of Wynne, ¶ 19.)

In preparation for the mediation and in response to discovery that Plaintiff had served on

MSSB, MSSB produced a number of documents necessary to evaluate Plaintiff's claims and MSSB's defenses such as: all versions of the Financial Advisor Compensation Plan, all versions of MSSB's AFG Program, all versions of MSSB's AFG Process, all versions of MSSB's Expense Policy, all policies and procedures related to Financial Advisor compensation and adjustments made to compensation, and the Plaintiff's entire personnel and payroll file. In addition, MSSB provided critical data on the number of Financial Advisors covered by Plaintiff's case, the total amount allocated to AFG broken down by category of expense and by year, and the number of Financial Advisors covered by arbitration agreements and whether they were current versus former. (Decl. of Wynne, ¶ 21.)

MSSB also produced extensive and detailed data sets. The data sets reflected, among other things: (1) the total dollar amount that putative class members directed MSSB to allocate to AFG[2]; (2) the amount of expenses incurred from AFG, itemized by category of expense; (3) information related to approval of expenses; and, (4) class wide statistics for the putative class members, including employment status, workweeks, and pay periods. (Decl. of Wynne, ¶ 22.)

The parties also engaged in informal discovery to assist the mediation process. In preparation for the mediations, MSSB provided data relevant to Plaintiff's claims, specifically:

- Estimated number of putative class members, for both active and former FAs

- Estimated number of workweeks for both active and former FAs

- Estimated number of pay periods, for both active and former FAs

- Estimated gross number of expenses allocated by FAs

- Gross expenses allocated to AFG by category (including travel and entertainment, registration, promotion marketing, website services, remote access, research and supplemental support staff compensation)

- Gross expenses allocated to the Business Development Allowance ("BDA" – an award by MSSB for marketing expenses) by category

- Estimated unspent AFG at termination

---

[2] "Alternative Flexible Grid." Plaintiff contends AFG is a program whereby FAs allocate a certain amount of their commissions on a pre-tax basis in order to pay for marketing expenses.

PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL

1

- Estimated unspent AFG at year-end

2

- Estimated PAGA pay periods

3

- Estimated claimed amount of expenses by FAs

4

- Estimated amount of expenses not approved but requested by FAs

5

- Estimated FAs with grid-rate reductions and gross amounts of reduction (Decl. of

6

Wynne, ¶ 23.)

7       The parties participated in an arm's-length mediation with Tripper Ortman on November

8   8, 2018. The parties were unable to reach an agreement but met again on November 19, 2018, at

9   which point they still were unable to reach resolution. On November 21, 2018, the parties orally

10  reached an agreement to resolve the claims asserted in *Harvey*. In doing so, the parties agreed

11  that before they submitted any request for preliminary approval to this Court, the parties would

12  approach plaintiff's counsel in *Chen v. Morgan Stanley Smith Barney* (Orange County Superior

13  Court Case No. 30-2014-00724866-CU-OE-CXC) and attempt to reach an agreement with

14  Chen's counsel that would (1) provide a global resolution of *Harvey* and *Chen* with an

15  additional settlement payment for the portion of the *Chen* limitations period not previously

16  covered by *Harvey*, and (2) compensate *Chen's* counsel for attorneys' fees and costs spent

17  litigating *Chen*. (Decl. of Wynne, ¶ 24.)

18      On January 18, 2019, in an attempt to reach a global settlement with the *Chen* Plaintiffs,

19  Plaintiff Harvey, MSSB, and the *Chen* Plaintiffs attended a joint mediation with both Mark

20  Rudy, the original mediator in *Chen*, and Mr. Ortman, who mediated the settlement in this case.

21  Unfortunately, that mediation was unsuccessful.  (Decl. of Wynne, ¶ 25.)

22      On January 23, 2019, the *Chen* plaintiffs filed a motion to intervene in this action. (Dkt.

23  28.) Plaintiff and Defendant opposed the motion. (Dkt. Nos. 36 and 37.) The Court heard the

24  motion on February 27, 2019. The Court allowed the *Chen* plaintiffs to file an amicus brief in

25  response to Plaintiff's motion for preliminary approval and deferred ruling on the motion to

26  intervene until such time as preliminary approval is determined. (Dkt. 41.)

27      After the hearing, Plaintiff, Defendant and the *Chen* plaintiffs engaged in further global

28  settlement discussions through mediator Tripper Ortman. Those discussions spanned several

weeks but ultimately were not successful. (Decl. of Wynne, ¶ 26.)

## STATEMENT OF FACTS RELEVANT TO THE PROPOSED SETTLEMENT

**A.      Morgan Stanley's AFG Program Pays For Additional Business Expenses**

Defendant has two programs for Advisors to spend money on business development purposes. One is the Business Development Allowance (BDA) and the other is the Alternative Flexible Grid (AFG). This case focuses on the AFG. In the Financial Advisor Compensation Plan, Morgan Stanley generally describes the program in this way:

> The Alternative Flexible Grid ("AFG") is a program through which participating Advisors, prior to the start of the calendar year, may elect an effective Credit Rate adjustment for the year and become eligible for certain additional Firm funds for expenditure on additional luxury resources. With these additional Firm funds, the Advisor may direct the Firm to provide additional compensation to support staff as well as additional resources above those necessary to perform Advisor duties.

Morgan Stanley describes the business expenses as "luxury items" and "above those necessary." Defendant describes the business expenditures in this manner because it claims the expenses are neither reasonable nor necessary. However, as discussed below, Plaintiff does not agree. The Compensation Plan goes on to state:

> Advisors should utilize the AFG worksheet prior to the start of the year to determine whether to participate and, if so, at what level. In this worksheet, the effective Credit Rate adjustment requested by the Advisor is calculated by determining elected additional support staff compensation contemplated by the Advisor and additional luxury business resources. With Branch Manager approval, this effective Credit Rate adjustment will be applied to transactions between January 1, 2018 through November 30, 2018. Only after the implementation of this Credit Rate adjustment will Incentive Compensation be determined for participating Advisors, as set forth in this Program.

> The magnitude of the AFG effective Credit Rate adjustment elected will determine the AFG amount. This amount will enable the Advisor to direct the Firm to provide additional support staff compensation and additional luxury business resources. Any remaining balance at year-end will not be carried forward into the following year.

The AFG program requires that the Branch Manager approve how much the FA is going to attribute to the AFG. "Managers must review, and approve or reject all elections…" Morgan Stanley's oversight and management of the AFG is not limited to approving the allocation. Morgan Stanley also must approve the expenditure.

### 1.    Calculating The Amount That Goes Into The AFG

Defendant's AFG program is described in more detail in the "Alternative Flexible Grid Policy." In terms of logistics, Plaintiff contends the percent of reduction to the FA's grid used to pay for AFG, referred to as an "AFG Adjustment," is applied to all "creditable transactions" during an 11-month period from January to November. The month of December is then used to determine what the FA will do the following calendar year.

Plaintiff contends that, in order to calculate the amount of "AFG Adjustment," the FA estimates how much he or she is going to spend on support staff and marketing expenses for the coming year as a percent of their production from the previous year. In order to make that projection, Defendant provides the FAs with an "AFG Election Worksheet." The worksheet tells FAs how much they spent in the prior year for each category of expense.

Plaintiff contends that, once the FA estimates his or her business expenditures and the Branch Manager signs off on the amounts, the AFG Adjustment is determined by dividing the estimated business expenses into the FA's production for the past year. In other words, the business expenses are determined as a percent of the FA's production. That percent is then used to reduce the grid rate for the FA's compensation from what the FA would have received but for enrollment in AFG. The example Morgan Stanley gives is an FA who wishes to spend $11,000 in staff/marketing expenses and did $550,000 in production over the past year. Because $11,000 is 2% of $550,000, Plaintiff contends the FA's grid rate is reduced by 2%.[3]

Relatedly, Morgan Stanley provides the opportunity for the FA to adjust – up or down – the AFG Adjustment. Depending on how business is going and whether an FA wishes to have access to additional or fewer AFG funds, FAs may change their percent to make sure that their business expenses are paid for. This opportunity is referred to as the "Mid-year Checkpoint."

Plaintiff contends that the consequence of the "AFG Adjustment" coupled with the adjustments is that FAs' compensation is subject to a dollar-for-dollar reduction in the commissions in order to pay for staff compensation and business expenses. Morgan Stanley

---

[3] Morgan Stanley disputes this characterization to the extent is presumes that FAs are entitled to the grid rate.

PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL

disputes this point on multiple grounds, including that (1) AGF does not create a deduction from wages because the FA elects to participate in AFG and selects his or her desired AFG Adjustment before Morgan Stanley has offered or promised incentive compensation at any rate and before the FA completes any transactions, and (2) AFG-eligible expenses, including supplemental support staff compensation, are optional, luxury expenses that are neither reasonable nor necessary.

### 2.     Morgan Stanley Claims The AFG Funds As A Deduction On Its Own Taxes

Unused AFG balances are forfeited by year-end and cannot be transferred or paid to anyone at termination regardless of the reason for termination. The AFG Policy states that the eligibility for any expense is determined pursuant to Morgan Stanley's expense policies. It adds that "Eligible Expenses reimbursed through … AFG may not be claimed as deductions on the Advisor's personal tax returns." The reason for this is because Morgan Stanley is claiming these expenses as deductions on its own tax returns (which Morgan Stanley contends is appropriate).

### B.     AFG Categories of Expenses

The AFG Policy identifies three general categories of eligible expenses: (1) "supplemental support compensation," (2) "additional luxury resources," and (3) "additional Discretionary Fee Waiver Allowance."   Morgan Stanley contends each of these is optional, unnecessary, and a matter of personal preference or luxury; Plaintiff disagrees.

### 1.     Payments to Support Staff

Supplemental support compensation, i.e., payments to client service associates ("CSAs") or additional sales support staff beyond the firm-provided CSA, can take four forms: revenue share, monthly payments, quarterly discretionary bonuses including year-end bonuses, and base salary. Aside from revenue share, FAs can only pay support staff through AFG. Morgan Stanley contends that it pays market salaries for CSAs independent of AFG program funds and that any additional payments that FAs might want to make to CSAs are optional and unnecessary.

### 2.     Business Development Expenses

In terms of "additional luxury resources," the AFG Policy defines expenses that are not eligible for reimbursement. The expenses that are potentially allowed for reimbursement are set

forth in detail in "Morgan Stanley's Wealth Management Expense Policy." The Expense Policy details the types and extent of expenses that reimbursement can be sought for. The Expense Policy identifies the general categories as: business travel, client entertainment, business development, overtime expenses, phone/internet/remote commuting, continuing education and licensing, professional services, and, office expenses.

### 3.    Discretionary Fee Waivers

The AFG Process also defines and explains how AFG funds can be used for discretionary fee waivers. Plaintiff contends this program allows FAs to waive or reverse fees for their clients so that the money does not come from Morgan Stanley – it comes from AFG.

### <u>SETTLEMENT TERMS</u>

The details of the settlement are set forth in the Class Action Settlement Agreement and Release attached to the Declaration of Edward J. Wynne as Exhibit 1. A summary is set forth below:

### A.    Settlement Fund

In return for a release of all claims that were asserted in the action, MSSB shall create a non-reversionary $10,235,000 gross settlement fund consisting of $8,500,000 in cash, as well as $1,735,000 in future immediate payments of business expenses to pay categories of expenses for current California FAs that otherwise could have been submitted to the AFG program. Because this is not a claims-made settlement, Class Members will not be required to make a submission to participate in the settlement. (Decl. of Wynne, ¶ 28.)

Of the $10,235,000 gross settlement fund, $600,000 is attributed to the PAGA claims broken down into two tiers ("Tier 1 PAGA Pay Period" and "Tier 2 PAGA Pay Period"). The Tier 1 PAGA Pay Period covers the period from April 23, 2013 to May 9, 2014. This is the period of time covered by Plaintiff's amended complaint. $500,000 is attributed to the Tier 1 PAGA Pay Period. The Tier 2 PAGA Pay Period covers the period from May 9, 2014 through Preliminary Approval, which is also covered by Plaintiff's class claims, and $100,000 has been attributed for this second period. (Decl. of Wynne, ¶ 29.) The allocation between the PAGA tiers reflects that aggrieved employees receiving Tier 2 PAGA Payments also are class members who, unless they opt out, will receive additional, valuable settlement payments in connection

with the class claims, the potential exposure for which is substantially higher than the PAGA claims. Of the Tier 1 and Tier 2 PAGA Payments, 75% is allocated to the State of California as is required by PAGA.

After certain deductions identified below, all class members who do not opt out and all aggrieved employees will be paid on a pro rata basis based on the number of pay periods they worked for MSSB as a FA in California during the settlement period, which extends from May 14, 2014 to the date of Preliminary Approval for the class claims and from April 23, 2013, to the date of Preliminary Approval for the PAGA claims. This allocation formula—i.e., calculating settlement payments based on the number of pay periods worked—has been adopted in other broker reimbursement cases that have settled in this District. (Decl. of Wynne, ¶ 30.)

MSSB will pay for the employer's share of payroll taxes on the wage portion of each Class Member's recovery separate and apart from the Maximum Settlement Amount. Employer Payroll Taxes will be computed by the Settlement Administrator based on the amounts to be paid to each class member. (Decl. of Wynne, ¶ 31.)

The deductions from the gross settlement fund include attorneys' fees and costs, class representative enhancement award, payment to the California Labor Workforce Development Agency and the cost of settlement administration. (Decl. of Wynne, ¶ 32.)

**B.     Class Definition and Aggrieved Employees**

Subject to Court approval, the parties have stipulated to certification for settlement purposes only of a class defined individuals employed by MSSB within the State of California from May 14, 2014, through the date of Preliminary Approval who worked as Financial Advisors and/or Private Wealth Advisors (collectively, "FAs"), which constitute the proposed "Class." There are approximately 2,800 FAs in the Class covered by the *Harvey* action. (Decl. of Wynne, ¶ 33.) Relatedly but separate from the class, "Aggrieved Employees" are those FAs employed by MSSB within the State of California from April 23, 2013, to the date of Preliminary Approval.

**C.     Class Representatives and Class Counsel**

Subject to Court approval and for settlement purposes only, the parties have stipulated

that Plaintiff Brandon Harvey be appointed class representative. Also subject to Court approval, the parties have stipulated that Edward J. Wynne, Wynne Law Firm; James F. Clapp, Clapp & Lauinger LLP; David S. Markun and Jeffrey K. Compton, Markun, Zusman, Freniere & Compton LLP be appointed class counsel. (Decl. of Wynne, ¶ 34.)

**D.      Notice Procedure**

Subject to Court approval, the parties have agreed on KCC, Inc. as the Settlement Administrator. After updating the database provided by MSSB through the National Change of Address database, the Settlement Administrator will mail the Class Notice to each class member.  The Class Notice shall include a pre-printed change of address form and instructions on how to opt-out of or object to the settlement. The Settlement Administrator will establish a website for class members to view and download the important documents such as the Settlement Agreement, Class Notice, opt-out form, motion for approval and attorneys' fees. The website will also have the ability for Class Members to update their contact information and contact Class Counsel. (Decl. of Wynne, ¶ 35.)

With the exception of remailings due to returned Class Notices and a reminder card for class members who have not negotiated their checks by the stale date, no other materials will be sent to class members. Because this is not a claims-made settlement, Class Members will not be required to make a submission to participate in the settlement. (Decl. of Wynne, ¶ 36.)

Aggrieved Employees will be sent a letter that describes the settlement and that they will be receiving a payment. It also includes Plaintiff's counsels' contact information in case employees have any questions.

**E.      Plan of Allocation**

**1.      Payments to Class Members**:

From the cash portion of the settlement fund, payments to individual class members shall be calculated and apportioned based on the number of pay periods during the settlement class period after deductions for attorneys' fees and costs, the Named Plaintiff Award, the cost of settlement administration and payment to the LWDA.  (Decl. of Wynne, ¶ 37.)

**2.      Named Plaintiff Award:**

Plaintiff will seek and MSSB will not oppose Plaintiff's request for a $10,000 payment to Brandon Harvey as a Named Plaintiff Award. (Decl. of Wynne, ¶ 38.)

**3.      Class Counsels' Fees and Costs:**

Pursuant to the parties' agreement, the Court may award to Class Counsel for the services they have rendered and will render to Plaintiff and the Class in relation to prosecuting the claims involved in this Lawsuit which will be paid out of the Cash Payment Amount. Class counsel will seek a fee award not to exceed $2,558,750 or 25% of the Maximum Settlement Amount. Class Counsel will also seek reimbursement of costs in an amount not to exceed $35,000. Because this is a non-reversionary, common fund settlement, any portion of the requested fees and costs that are not approved by the Court would be distributed to the class members. (Decl. of Wynne, ¶ 39.)

**4.      LWDA Payment:**

The parties have agreed to pay the LWDA $450,000 (or 75% of the $600,000 attributed to the PAGA claim) per Labor Code § 2699 (i) to settle this claim, and the parties have submitted or will submit this settlement to the California Labor Workforces Development Agency ("LWDA") per California Labor Code section 2699(l)(2). (Decl. of Wynne, ¶ 40.) This payment to the LWDA provides real value to the State (unlike many PAGA settlements), which will assist the State in enforcing California's labor laws and regulations.

**5.      Settlement Administrator:**

The Settlement Administrator, KCC, has agreed to a cap for its services in the amount of $32,000. (Ex. 2 to Decl. of Wynne.) Class Counsel solicited bids from two other well-known settlement administrators and KCC was the most competitive. (Decl. of Wynne, ¶ 41.)

## CLASS CERTIFICATION FOR PURPOSES OF SETTLEMENT

**A.      The Class Meets the Requirements of Rule 23 (a)**

Plaintiff submits that the proposed settlement class meets the requirements for certification under Fed.R.Civ.P. 23. A court should certify a class if the following prerequisites are met: "(1) the class is too numerous, making joinder of the parties impracticable; (2) common

questions of law or fact exist among the class members; (3) the claims of the class representatives are typical of the claims of the class; and (4) the class representatives will adequately represent the interest of the class." *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998). Plaintiff contends that, in the context of settlement, each of these requirements is met.

### 1.    Numerosity

Fed.R.Civ.P.23 (a)(1) requires that the class be "so numerous that joinder of all members is impracticable." In *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001), the court observed that if a class exceeds 40 members, the numerosity requirement is satisfied. Here, there are approximately 2,800 class members who worked during the *Harvey* class period. (Decl. of Wynne, ¶ 43.)  Hence, numerosity is satisfied.

### 2.    Commonality

Rule 23 (a) requires the presence of a single key common question that is capable of class-wide resolution. *Abdullah v. U.S. Sec. Assocs., Inc.* 731 F.3d 952, 957 (9th Cir. 2013); *Wit v. United Behavioral Health*, 317 F.R.D. 106, 121 (N.D. Cal. 2016). Judge Lucy Koh observed, "District courts throughout this circuit have found that commonality is met when, as here the proposed class of plaintiffs asserts that an employer adopted a policy of not reimbursing its employees' necessary business expenses in violation of Cal. [Labor] Code § 2802." *Hopkins v. Stryker Sales Corp.¸* 2012 WL 1715091, *5 (N.D. Cal. May 14, 2012). Plaintiff alleges the same is true here. Whether MSSB's charging its FAs for business expenses violates Cal. Labor Code § 2802 provides common questions that unite the class. Plaintiff submits that the resolution of this common question turns on testimony from MSSB's corporate representatives, the legal interpretation of MSSB's Financial Advisor Compensation Plan, and MSSB's payroll policies and procedures. As such, Plaintiff submits that the commonality requirement is satisfied.

### 3.    Typicality

A class representative's claims are typical if they are "reasonably coextensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The commonality and typicality requirements of Rule 23 (a) tend to merge. Both serve as guideposts for determining whether under the particular

circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982). The Plaintiff was employed by MSSB as a Financial Advisor in California during the class period and at some time allocated a portion of his compensation to the AFG program. (Decl. of Wynne, ¶ 42.) Typicality is therefore satisfied.

### 4. Adequacy

"[T]wo criteria for determining the adequacy of representation have been recognized. First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). Plaintiff has no interests that are antagonistic to those of the other class members because he has not brought any individual non-class claims in this action. (Decl. of Wynne, ¶ 42.) Also, Plaintiff has retained counsel who are highly experienced in employment class actions in the financial services industry, including involving financial advisors and programs similar to the AFG here. (Decl. of Wynne, ¶¶ 2-11; Decl. of Clapp, ¶¶ 5-9.)

### B. The Class Meets the Requirements of Rule 23 (b)(3)

Plaintiff contends that the requirements of Rule 23 (b)(3) are satisfied because: (1) questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Rule 23 (b)(3) tests whether "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (*quoting* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed. 1986)). The presence of some individualized issues, such as damages, does not preclude a finding that common issues predominate. *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013). In wage and hour cases, courts have found that

1    predominance is satisfied where, as shown here, liability will be determined based on the

2    lawfulness of class-wide, written policies. *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 442

3    (C.D. Cal. 2014) citing *In Re Wells Fargo Home Mortg.,* 571 F.3d 953, 958–59 (9th Cir. 2009)

4    ("uniform corporate policies will often bear heavily on questions of predominance and

5    superiority."); *see also, Duran v. U.S. Bank Nat. Assn.*, 59 Cal. 4th 1, 30 (2014) ("an employer's

6    uniform policy or consistent practice" supports certification).

7        **1.     Common Issues Predominate as to MSSB's AFG Program**

8        California protects employees by providing that "[a]n employer shall indemnify his or

9    her employee for all necessary expenditures or losses incurred by the employee in direct

10    consequence of the discharge of his or her duties…" Labor Code § 2802 (a). Section 2802,

11    subsection (c) defines the term "necessary expenditures or losses" as "all reasonable costs…"

12    "'Necessity is by nature a question of fact' and that 'the reasonableness of any given

13    expenditure must turn on its own facts.'" *Nguyen v. Wells Fargo Bank*, No. 15-CV-05239-JCS,

14    2016 WL 5390245, at *9 (N.D. Cal. Sept. 26, 2016) *quoting Grissom v. Vons Companies, Inc*.,

15    1 Cal.App.4th 52, 58 (1991). In order for an expense to be "necessary" under section 2802, it

16    need not be mandatory. *Id.* citing *Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100,

17    1104 (S.D. Cal. 2006).

18        The elements of a claim under Labor Code § 2802 are: (i) the employee made

19    expenditures or incurred losses; (ii) the expenditures or losses were incurred in direct

20    consequence of the employee's discharge of his or her duties, or obedience to the directions of

21    the employer; and (iii) the expenditures or losses were reasonable and necessary. *Marr v. Bank

22    of Am.,* No. 09–cv–05978 WHA, 2011 WL 845914, at *1 (N.D. Cal. Mar. 8, 2011) citing

23    *Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal.4th 554, 568, (2007). "In addition, the employer

24    'must either know or have reason to know that the employee has incurred [the] expense.'" *Id.*

25    citing *Stuart v. RadioShack Corp.,* 641 F.Supp.2d 901 (N.D. Cal. 2009).

26        With respect to the AFG program, Plaintiff contends that FAs made allocations for

27    expenditures from their commissions, made the expenditures, that the expenditures were made

28    in discharging their duties or that MSSB knew the expenditures were made, and that the

expenditures were reasonable and necessary. Plaintiff contends that because MSSB has already determined that the expenditures were "ordinary and necessary" for tax deductibility purposes per 26 U.S.C. § 162(a), MSSB has already determined that the expenditures are reimbursable under Labor Code § 2802 as "reasonable and necessary."

MSSB disagrees with Plaintiff's position. MSSB contends that a determination of an expenditure as "ordinary and necessary" for purposes of federal tax law deductibility is not equivalent to a determination that the expense is "reasonable and necessary" under the California Labor Code. MSSB contends that it supplied FAs with the resources they needed to perform their jobs. MSSB further contends that the expenses at issue in this case are optional luxury expenses that are not "necessary" and are instead are for preference or convenience, and that AFG expenses are paid for with Morgan Stanley funds.

Plaintiff disagrees, but submits that the resolution of this dispute is purely legal and constitutes a predominant common question satisfying Rule 23.

## THE STANDARDS FOR PRELIMINARY APPROVAL ARE SATISFIED

### A.    The Standard for Preliminary Approval

The "universal standard" for evaluating the fairness of a settlement is whether the settlement is "fundamentally fair, adequate and reasonable." *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id*.

As the Ninth Circuit has recognized, "the very essence of a settlement is compromise." *Id*. at 624. "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998). Even if the amount of a proposed monetary settlement is a fraction of the potential recovery, that does

1    not necessarily mean the settlement is inadequate. *Id.*

2          Court approval of a class action settlement is a two-step process. First, counsel submits

3    the proposed terms of the settlement to the court, and the court makes a preliminary fairness

4    evaluation. If the preliminary evaluation of the settlement does not disclose a basis to doubt its

5    fairness or other obvious deficiencies, the court directs that notice be given to the class and sets

6    a final fairness hearing. Herr, *Manual for Complex Litigation, Fourth,* § 21.632 (2004).

7          Preliminary approval should be granted if the proposed settlement falls "within the range

8    of possible final approval." *Gautreaux v. Pierce,* 690 F.2d at 616, 621 n.3 (7th Cir. 1982).

9    Preliminary approval is "a determination that there is what might be termed 'probable cause' to

10   submit the proposal to class members and hold a full-scale hearing as to its fairness." *In re*

11   *Traffic Executive Association-Eastern Railroads*, 627 F.2d 631, 634 (2d Cir. 1980).

12         A proposed settlement is presumed to be fair when: it is reached through arm's-length

13   negotiations; the putative class is represented by experienced counsel; and the parties have

14   conducted sufficient discovery. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2nd

15   Cir. 2005). Here, all of the factors giving rise to a presumption of fairness exist. As detailed

16   above, the proposed settlement was the product of extensive arm's-length, non-collusive

17   negotiations, overseen by more than one experienced mediator; the class and aggrieved

18   employees are represented by experienced counsel; and the parties have conducted sufficient

19   discovery. Thus, the settlement is presumed to be fair.

20         The Ninth Circuit has also suggested that district courts consider the following factors in

21   evaluating the fairness of a class action settlement: the strength of the plaintiff's case; the risk,

22   expense, complexity, and likely duration of further litigation; the risk of maintaining class

23   action status throughout the trial; the amount offered in settlement; the extent of discovery

24   completed and the stage of the proceedings; the experience and views of counsel; the presence

25   of a governmental participant; and the reaction of the class members to the proposed settlement.

26   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). The relative degree of

27   importance to be attached to any particular factor depends upon the circumstances of each case.

28   *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). Here, the pertinent

- 16 -

3:18-cv-02835 WHO

1    factors weigh in favor of granting preliminary approval.

2    **B.      Strength of Plaintiff's Case**

3         With respect to the AFG program, Plaintiff is not aware of any court (or administrative

4    body) being asked to decide whether an employer's representation to the IRS that an expense is

5    tax deductible ("ordinary and necessary" under 26 U.S.C. § 162 (a)) is a binding admission for

6    purposes of the employee's request for reimbursement under Labor Code § 2802 (a). The lack

7    of any prior rulings or decisions in Plaintiff's favor on this issue is an argument in support of

8    MSSB's position that the two standards are not equivalent.

9         MSSB will point out that it successfully defended the AFG program in multi-district

10   putative class action litigation, where a federal district court held under similar law that AFG

11   does not create a deduction from wages, and therefore dismissed deductions claims under the

12   laws of New York, New Jersey, and Connecticut. *See In re Morgan Stanley Smith Barney LLC*

13   *Wage & Hour Litig.*, 2013 WL 6255697 (D.N.J. Dec. 4, 2013), and *In re Morgan Stanley Smith*

14   *Barney LLC Wage & Hour Litig.*, 2014 WL 2101904 (D.N.J. May 20, 2014).

15        MSSB will also argue that AFG does not create a wage deduction because existing case

16   law permits it and FAs to prospectively agree on how the FAs' incentive compensation rate

17   would be determined. *See Prachasaisoradej v. Ralphs Grocery Co., Inc.*, 42 Cal. 4th 217 (2009)

18   (wage rights "derive exclusively from the [compensation] plan itself"); *Schachter v. Citigroup*,

19   47 Cal. 4th 610, 621 (2009) (the employment agreement determines when incentive

20   compensation is earned); *Torres v. Wells Fargo,* 2016 WL 7373856, *4 (C.D. Cal. Oct. 12,

21   2016) (under agreement terms, "Plaintiffs could expect a commission that was subject to a final

22   calculation which included adjustments….'[t]his final figure, and this figure only, once

23   calculated, was the amount offered or promised as compensation for labor performed by eligible

24   employees….'") (quoting *Ralphs*, 42 Cal. 4th at 229); *Koehl v. Verio, Inc.*, 142 Cal. App. 4th

25   1313, 1329-37 (2006) (commissions become earned when conditions precedent have been

26   satisfied). Based on this, Morgan Stanley contends there is no unlawful deduction of any

27   "wages" under AFG because, at the time FAs select their AFG Adjustment, Morgan Stanley had

28   not offered or promised Plaintiffs incentive compensation at a particular rate or amount, such

1    that earned wages are not impacted.

2        Defendant also will argue that the expenses submitted to the AFG program were

3    optional and therefore not "reasonable and necessary." Some courts have found that optional

4    business expenses are not reimbursable. For instance, in *Novak v. The Boeing Company*, 2011

5    WL 9160940 (C.D. Cal. Jul. 20, 2011), the employee sought reimbursement for expenses that

6    certainly were reasonable and job related – the cost of telephone and internet used to perform

7    his job duties from his home office. The court held, however, that the employer was not

8    required to reimburse because the entire "work at home" program was optional, and the

9    employee could instead have come into the office to perform his job duties to avoid expenses.

10   *See also, Aguilar v. Zep, Inc.,* 2014 WL 4245988 (N.D. Cal. Aug. 27, 2014) (partially granting

11   defendant's motion for summary judgment on plaintiff's Section 2802 claims finding that some

12   of the business expenses plaintiffs incurred were not required and thus optional).

13       In addition to the strength of Plaintiff's case, there is also the question of class

14   certification. Some courts have denied certification of Section 2802 claims especially when it

15   has been found that the expenses were optional. *See, e.g., Buchanan v. HomeServices Lending,*

16   *LLC*, 2013 WL 1788579 (S.D. Cal. Apr. 25, 2013) (class certification denied for optional

17   marketing programs); *see also, Morgan v. Wet Seal*, 210 Cal.App.4th 1341, 1356-57 (2012)

18   (class certification denied on Section 2802 claim where individualized issue predominated on

19   whether employees reasonably believed they had to participate in programs to do their jobs);

20   *Drake v. Morgan Stanley & Co.*, 2010 WL 2175819, at *1, 7 (C.D. Cal. Apr. 30, 2010)

21   (denying class certification of claims concerning MSSB's expense reimbursement practices,

22   including AFG, because "under California law, questions as to whether Defendants were

23   required to reimburse employees' claimed business expenses involves an individualized factual

24   determination of whether each employee (1) incurred an expense (2) that was necessary (3) and

25   reasonable (4) as a direct consequence of the discharge of his or her duties."). In *In re RBC*

26   *Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910 (D. Minn. 2010), the court denied

27   certification of a similar claim under California law against another brokerage firm, holding that

28   "[t]o determine whether RBC violated § 2802 of the California Labor Code for failure to

reimburse employees for necessary expenses, the Court must examine each employee's alleged expenses and must determine whether they were 'reasonable.'" *Id.* at 969.

Furthermore, certification at the trial court level is no guarantee of success. In *Huy Nguyen v. Wells Fargo Bank, Nat'l Ass'n*, No. 15-CV-05239-JCS, 2017 WL 4224930 (N.D. Cal. Sept. 22, 2017), another case being prosecuted by counsel herein, Judge Spero granted plaintiff's motion for class certification where plaintiff alleged a violation of Labor Code § 2802 regarding optional marketing expenses. On December 20, 2017, the Ninth Circuit granted defendant's request to appeal the order. Oral argument was heard on April 19, 2019.

Plaintiff also expects that MSSB would challenge manageability of the PAGA claims. While Plaintiff believes the claims are manageable, MSSB contends they are unmanageable for the same reasons it asserts regarding class certification. MSSB argues that manageability poses an even greater challenge than class certification because, to recover penalties, a PAGA plaintiff must prove each and every predicate Labor Code violation as to each aggrieved employee for each pay period for which the plaintiff seeks penalties. *See Rope v. Auto–Chlor Sys. of Wash., Inc*., 220 Cal. App. 4th 635, 651 n.7 (2013) ("PAGA requires that the representative plaintiff establish that the employer have committed the Labor Code violations for which recovery is sought against the aggrieved employees."); *Hibbs-Rines v. Seagate Techs., LLC*, 2009 WL 513496, at *4 (N.D. Cal. Mar. 2, 2009) ("Plaintiff will have to prove Labor Code violations with respect to each and every individual on whose behalf plaintiff seeks to recover civil penalties under PAGA."). While Plaintiff disagrees with this position, MSSB's nevertheless presents a risk to Plaintiff's case.

With respect to the PAGA claims, while Plaintiff believes they have real value, MSSB would likely contend that PAGA penalties awards have historically been relatively low and that penalties are subject to dramatic reduction by courts.

**C.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

To assess the fairness, adequacy and reasonableness of a class action settlement, the Court must weigh the immediacy and certainty of substantial settlement proceeds against the risks inherent in continued litigation. *In re General Motors Corp.,* 55 F.3d 768, 806 (3rd

1   Cir.1995) ("The present value of the damages plaintiffs would likely recover if successful,

2   appropriately discounted for the risk of not prevailing, should be compared with the amount of

3   the proposed settlement."); *Boyd v. Bechtel Corp.,* 485 F. Supp. 610, 616-17 (N.D. Cal.1979).

4        This factor supports preliminary approval here. This counsel's experience in *Duran v.*

5   *U.S. Bank N.A.*, 59 Cal.4th 1 (2014), perhaps best exemplifies the risk, expense, complexity and

6   duration of further litigation. Counsel herein was successful in obtaining certification for that

7   case and subsequently prevailed at trial after eight years of litigation only to have the entire

8   judgment and certification ultimately reversed by the California Supreme Court after an

9   additional five years of litigation. (Decl. of Wynne, ¶ 4.) The case was remanded back to the

10  Superior Court where class certification was denied, and Plaintiff's subsequent appeal was

11  denied. (*Id.*) Even prevailing at the trial court is no guarantee of recovery especially against a

12  large corporate defendant like MSSB. In essence, the risk in continued litigation is extremely

13  high and the class members and aggrieved employees could ultimately end up with nothing.

14  Thus, it is Counsels' informed opinion that benefits of this settlement substantially outweigh the

15  risk and that settlement at this juncture is in the best interests of the class, aggrieved employees,

16  and the State of California.

17  **D.      The Amount Offered in Settlement**

18       MSSB will pay $10,235,000 consisting of $8,500,000 in cash (of which $600,000 will

19  be designated as PAGA penalties) plus $1,735,000 in future payments of business expenses for

20  California Financial Advisors. There are 108,045 monthly pay periods covered by this case and

21  2,847 FAs who worked during the *Harvey* class period. According to MSSB, FAs contributed

22  approximately $155 million into AFG during the statutory period covered by *Harvey*. The gross

23  settlement represents $94.72 per monthly pay period or $3,595 on average per individual. The

24  gross settlement represents a recovery that is approximately 6.6% of what Plaintiff contends is

25  MSSB's total potential exposure. (Decl. of Wynne, ¶ 43.)

26       This settlement compares very favorably to the most recent similar case, *Tsyn v. Wells*

27  *Fargo,* N.D. Cal. Case 14-cv-02552-LB, which settled for $9,500,000 as approved by

28  Magistrate Judge Beeler last year. In *Tsyn*, the plaintiffs alleged virtually identical claims for

1   unreimbursed business expenses under Labor Code § 2802. Indeed, like Harvey, Tsyn was a

2   Financial Advisor working for Financial Services firm defendant under a similar compensation

3   plan, challenging a business expense program that was strikingly similar to Morgan Stanley's

4   AFG program and which also involved supplemental support staff compensation. However, the

5   *Tsyn* plaintiffs also alleged they were misclassified as exempt and therefore owed overtime

6   compensation in addition to other derivative claims. (Decl. of Wynne, ¶ 44.) Thus, while *Tysn*

7   involved nearly the same legal and factual issues, the *Tsyn* claims also were broader than the

8   claims alleged here.

9     The *Tsyn* settlement equated to approximately $72.72 per work month, while the *Harvey*

10   settlement equates to approximately $94.72 per work month – an increase of 30%. In terms of

11   total exposure, this settlement is also superior to *Tsyn*. This settlement represents 6.6% of

12   MSSB's total exposure (less the Tier 1 PAGA payment) while the settlement in *Tsyn*

13   represented 5.75% of Wells Fargo's total exposure of $165 million.[4] (Decl. of Wynne, ¶ 45.)

14     This settlement also compares favorably to two other recent cases brought on behalf of

15   California Financial Advisors. In *Brecher v. Citigroup Global Markets, Inc.,* S.D. Cal. Case 09-

16   cv-1344, plaintiffs alleged unlawful forfeiture of benefits and also unreimbursed business

17   expenses under Labor Code § 2802 for payments made to support staff. The court granted final

18   approval of a $3,700,000 non-reversionary settlement on behalf of a 1,006 person class. Sixty-

19   percent of the settlement was attributed to the expense reimbursement claim. Participating class

20   members received $3,171 on average – as compared to $3,595 that is the average on a

21   headcount basis class members on average can expect to receive here. (Decl. of Wynne, ¶ 47.)

22   In *Litty v. Merrill Lynch & Co.*, L.A. Sup. Ct. Case No. BC582127, the court approved a

23   $2,465,000 class action settlement reached on behalf of 2,501 FAs employed by Merrill Lynch

24   in California. The *Litty* complaint alleged claims for unreimbursed business expenses under

25   Labor Code § 2802 and derivative claims under the UCL and PAGA.  The average settlement in

26

---

27   [4] Financial Advisors at Wells Fargo Advisors paid for sales assistants outside of its version of
AFG. Specifically, FAs at Wells Fargo paid $38 million through their version of AFG and
28   another $127 million outside of it. (Decl. of Wynne, ¶ 46.)

PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL

1    *Litty* was $1,147 per class member. (Decl. of Wynne, ¶ 48.)

2         Two major developments in the last 12-15 years have substantially driven down the

3    settlement value of wage and hour lawsuits brought on behalf of California financial advisors.

4    First, both courts and the U.S. Department of Labor have rejected the theory that financial

5    advisors are entitled to overtime pay. *See, e.g. Hein v. PNC Fin. Servs. Group, Inc.*, 511

6    F.Supp.2d 563, 575 (E.D. Pa. 2007); *Tsyn v. Wells Fargo Advisors, LLC*, 2016 WL 612926, *11

7    (N.D. Cal. Feb. 16, 2016); U.S. Dept. of Labor, Wage & Hour Div., Opinion Letter FLSA2006-

8    43, 2006 WL 3832994 (Nov. 26, 2006).

9         Second, claims for unlawful wage deductions under Labor Code §§ 221-224 were much

10   stronger than they are now because financial services firms' compensation plans did not clearly

11   specify when financial advisors' commissions became "earned," making the plans vulnerable to

12   attack as creating unlawful wage deductions. As a result of those lawsuits, financial service

13   companies revised their compensation plans to clarify that commission wages did not become

14   "earned" until all expenses listed in the plan had been deducted; and in *Koehl v. Verio, Inc.*, 142

15   Cal.App.4th 1313, 1330 (2006), the court affirmed that the earning of commission wages for

16   purposes of Labor Code §§ 221-224 is dictated by the terms of the compensation plan. Thus,

17   while *Garett v. Morgan Stanley & Co.,* S.D. Cal. Case No. 04-cv-1858, involved a class of

18   California-based FAs represented by Plaintiff's counsel and settled for $42 million on a claims-

19   made basis (equating to $219 per work month for FAs), it is not a useful benchmark to evaluate

20   this proposed settlement.[5] (Decl. of Clapp, ¶ 5.)

21        The PAGA payment is entirely consistent with amounts awarded by other courts both in

22   terms of a relative amount and absolute amount. As set forth above, the parties have designated

23   $600,000 for the PAGA payment divided into two buckets – one payment of $500,000 for the

24   Tier 1 PAGA Payment (i.e., the *Chen*-only period) and another payment of $100,000 for the

25   Tier 2 PAGA Payment (i.e., the *Harvey* period). The total PAGA payment of $600,000 is 5.8%

26   of the Maximum Settlement Amount.

27
     _____
28   [5] *Garrett* alleged unpaid overtime under federal and state law, as well as claims for
     unreimbursed business expenses under Labor Code sections 221-224, 400-410, and 2802.

In *Tysn v. Wells Fargo Advisors*, *supra*,  Judge Beeler approved a $20,000 allocation to the LWDA from a $9,500,000 gross settlement representing .2% of the total settlement. In *Alvarez v. Farmers Ins. Exch.*, No. 3:14-CV-00574-WHO, 2017 WL 2672710, at *2 (N.D. Cal. Jan. 17, 2017), an FLSA case, this Court approved a payment of $30,000 to the LWDA from a $4,900,000 settlement representing .6% of the total settlement. In *Blandino v. MCM Constr., Inc.,* No. C 12-1729 WHO, 2014 WL 11369763, at *2 (N.D. Cal. Mar. 6, 2014), a wage and hour class action, this Court approved a $25,000 to the LWDA from a $865,000 settlement representing 2.8% of the total settlement.

Other district courts in California have approved similar PAGA allocations. In *Villalobos v. Calandri Sonrise Farm LP*, No. CV 2122615 PSG (JEMx), 2015 WL 12777959, (C.D. Cal. Dec. 4, 2015), the court approved a $5,900 allocation to the LWDA representing .8% of the settlement. 2015 WL 12777959, at *3. In *Bautista v. Harvest Mgmt. Sub LLC*, No. CV1210004FMOCWX, 2014 WL 12579822, at *3 (C.D. Cal. July 14, 2014) the court approved a $15,000 allocation to the LWDA representing .6% of the settlement. *See also, In re M.L. Stern Overtime Litig.*, No. CV 07-0118 BTM (JMAx), 2009 WL 995864, at *1 (S.D. Cal. Apr. 13, 2009) (approving PAGA settlement of 2% or $20,000); *Hopson v. Hanesbrands, Inc.*, CV 08-0844 EDL, 2008 WL 3385452, at *1 (S.D. Cal. Apr. 13, 2009) (approving a PAGA settlement of .3% or $1,500). Indeed, some courts have approved settlements alleging PAGA where no allocation was made to the claim. *See, e.g., Nordstrom Comm'n Cases*, 186 Cal.App.4th 576, 589 (2010) (approving settlement of wage and hour class claims and PAGA claims under which no money was allocated to the PAGA claims).

Here, the $600,000 allocation to the LWDA represents 5.8% and is therefore within the range of allocations courts have approved.

**E.    Extent of Discovery Completed**

Plaintiff conducted extensive formal and informal discovery. Plaintiff propounded written discovery in terms of interrogatories and document requests resulting on the production of over 2,000 pages of documents. Plaintiff also received informal discovery from MSSB prior to mediation which included extensive and detailed data sets. This information allowed Plaintiff

1  to refine his calculations and estimates. Based on the evidence and counsel's extensive

2  experience in wage-and-hour class claims, including in the financial services industry, Plaintiff

3  was able to make an informed decision that settlement was in the best interests of the class.

4  **F.    Experience and View of Counsel**

5        Courts do not substitute their judgment for that of the proponents, particularly when

6  settlement has been reached by experienced counsel familiar with the litigation. *Hammon v.*

7  *Barry*, 752 F. Supp. 1087 (DDC 1990); *Steinberg v. Carey*, 470 F. Supp. 471 (NY 1979); *In re*

8  *Armored Car Anti - Trust Litigation*, 472 F. Supp. 1357 (ND GA 1979); *Sommers v. Abraham*

9  *Lincoln Federal Savings & Loan Association*, 79 F.R.D. 571 (ED PA 1978).

10        While the recommendations of counsel proposing the settlement are not conclusive, the

11  court can properly take them into account, particularly if they have been involved in litigation

12  for some period of time, appear to be competent, have experience with this type of litigation,

13  and significant discovery has been completed. In this case, Plaintiff and the class are

14  represented by competent and highly experienced counsel who have expertise in the financial

15  services industry and are deeply familiar with the types of employees and claims at issue here.

16  Plaintiff's counsel recommends the proposed settlement as fair, adequate and reasonable to the

17  class members and in their best interests. (Decl. of Wynne, ¶¶ 49-51; Decl. of Clapp ¶ 10.)

18  <u>**THE PROPOSED CLASS NOTICE IS THE BEST NOTICE PRACTICABLE**</u>

19        Pursuant to Fed.R.Civ.P. 23 (e)(1), "[t]he court must direct notice in a reasonable

20  manner to all class members who would be bound by the proposal." Pursuant to Fed.R.Civ.P.

21  23(c)(2)(B), "[t]he notice must clearly and concisely state in plain, easily understood language:

22  (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues,

23  or defenses; (iv) that a class member may enter an appearance through an attorney if the

24  member so desires; (v) that the court will exclude from the class any member who requests

25  exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a

26  class judgment on members under Rule 23 (c)(3)." Notice is satisfactory if it "generally

27  describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to

28  investigate and come forward and be heard." *Churchill Village, LLC v. General Electric*, 361

1   F.3d 566, 575 (9th Cir. 2004).

2          The parties have agreed, subject to Court approval, to have the Settlement Administrator

3   mail notice via first class mail, postage prepaid, to the last-known addresses of the class

4   members as updated through the U.S. Postal Service's NCOA database. This method meets the

5   requirements of due process. *Overton v. Hat World, Inc.*, 2012 U.S. Dist. LEXIS 144116 at *5

6   (E.D. Cal. 2012) (noting that individual notice to class members' last known address meets the

7   requirements of due process). Returned mail with forwarding addresses will be re-mailed while

8   returned mail without forwarding addresses will be skip traced to get an updated address and

9   then re-mailed. The Settlement Administrator shall be responsible for creating and maintaining

10  a website for class members that links to the Settlement Agreement, Notice, motions for

11  approval and for attorneys' fees, and other important documents in the case including the ability

12  for class members to update their contact information and contact class counsel. For any class

13  member that has not negotiated their check following final approval and distribution of the

14  settlement funds, the Settlement Administrator shall mail a reminder postcard on the 90th day

15  following the initial mailing. Accordingly, the proposed notice plan complies with Rule 23 and

16  due process.

17         Additionally, Aggrieved Employees will be sent a letter that describes the settlement and

18  that they will be receiving a payment.  It also includes Plaintiff's counsel's contact information

19  in case employees have any questions.

20                                    **<u>CONCLUSION</u>**

21         In light of the forgoing, Plaintiff respectfully requests that the Court grant the motion for

22  preliminary approval of the class action settlement and certify the proposed class.

23

24  Dated: April 26, 2019                         WYNNE LAW FIRM

25

26                                        _____/s/*Edward J. Wynne*_____
                                          Edward J. Wynne
27                                        Attorneys for Plaintiff

28