Jahan C. Sagafi (Cal. Bar No. 224887)
Relic Sun (Cal. Bar No. 306701)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com
Email: rsun@outtengolden.com

Michael J. Scimone (*pro hac vice*)
Christopher M. McNerney (*pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: cmcnerney@outtengolden.com

Laura Sullivan (Cal. Bar No. 220529)
LAW OFFICE OF LAURA SULLIVAN
423 South Estate Drive
Orange, CA 92869
Telephone: (714) 744-1522
Facsimile: (714) 744-1524
Email: laurasullivan@laurasullivanlaw.com

Mark Humenik (Cal. Bar No. 231917)
HABER POLK KABAT
423 South Estate Drive
Orange, CA 92869
Telephone: (949) 636-5754
Facsimile: (216) 241-0739
Email: mhumenik@haberpolk.com

Pooja Shethji (*pro hac vice*)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
Email: pshethji@outtengolden.com

*Attorneys for Objector Matthew Lucadano*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| BRANDON HARVEY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY SMITH BARNEY LLC,<br><br>Defendant. | Case No. 3:18-cv-02835-WHO<br><br>**OBJECTIONS OF MATTHEW LUCADANO TO CLASS ACTION SETTLEMENT; MEMORANDUM IN SUPPORT**<br><br>Judge: Hon. William H. Orrick<br>Date: February 5, 2020<br>Time: 2:00 p.m.<br>Room: Courtroom 2, 17th Floor |

**OBJECTIONS**

Class member Matthew Lucadano, by and through his counsel, submits the following objections and comments to the proposed settlement agreement between Plaintiff Brandon Harvey and Defendant Morgan Stanley Smith Barney LLC ("Morgan Stanley"). Lucadano's specific objections are:

1.      The settlement is not fair, reasonable, or adequate.

2.      The proposed settlement significantly undervalues the released claims, as is evident from analyses of Morgan Stanley's actual exposure, the strength of the claims, and comparator cases.

3.      Harvey does not satisfy several requirements under Rule 23 of the Federal Rules of Civil Procedure, including adequacy.

4.      Harvey's plan of allocation is deficient and violates Rule 23(e) because it does not take into account the basis for the claims at issue (AFG contributions) or key factors that Harvey and Morgan Stanley use to justify the settlement (arbitration agreements and releases).

5.      Harvey has failed to provide sufficient information for the Court to review, evaluate or certify the class (or appropriate sub-classes), and the limited information he did provide was inaccurate and misleading.

6.      Harvey fails to disclose the identifying agreements required by Rule 23(e)(3), including (i) the initial MOU reached by the *Harvey* parties in December 2018 (before this broader agreement was struck to resolve *Chen* and add other claims to the SAC), and (ii) any agreement concerning the status or disposition of the FINRA arbitration that Morgan Stanley filed against him regarding his alleged theft of confidential information from the firm.

7.      Harvey and his counsel are inadequate representatives of the class as a whole. Fed. R. Civ. P. 23(a)(4).

8.      *This* class settlement is not a superior means of resolving the parties' dispute.

9.      The inadequate settlement was the result of a reverse auction.

10.      The allocations of attorneys' fees, costs, and service payments neglects to recognize *Chen* counsel and the *Chen* Plaintiffs.

11.     The conditionally certified class fails Rule 23(b)(3)'s predominance test.

12.     Lucadano joins and incorporates the objections made by Tracy Chen in her representative proxy capacity on behalf of real party-in-interest the Labor and Workforce Development Agency, State of California (LWDA), as well as any additional objections made by any other class member, aggrieved employee, or the LWDA that are not inconsistent with those objections made or incorporated herein, including: (a) an overbroad release of claims on both temporal and substantive grounds; (b) Harvey's lack of statutory standing to compromise the PAGA claim, including for failure to exhaust and improperly seeking to pursue penalty claims beyond his one-year limitations period; (c) inappropriate jurisdiction; (d) improper valuation of the PAGA claim; and (e) inadequate investigation into the underlying Labor Code violations.

13.     Lucadano also incorporates the objections and arguments that Proposed Intervenors Tracy Chen and Matthew Lucadano made in their *amicus curiae* brief in opposition to preliminary approval.

* * *

Lucadano's objections are more fully discussed in the attached memorandum in support and are based on the Declaration of Mark Humenik ("Humenik Decl.") filed herewith, the pleadings and papers on file in the above-captioned matter, and any further material and argument presented to the Court at the hearing.

Dated:  December 5, 2019                    Respectfully submitted,

                                           By:   /s/ Jahan C. Sagafi
                                                   Jahan C. Sagafi

Laura Sullivan (Cal. Bar No. 220529)       Jahan C. Sagafi (Cal. Bar No. 224887)
LAW OFFICE OF LAURA SULLIVAN               Relic Sun (Cal. Bar No. 306701)
423 South Estate Drive                     OUTTEN & GOLDEN LLP
Orange, CA 92869                           One California Street, 12th Floor
Telephone: (714) 744-1522                  San Francisco, CA 94111
Facsimile: (714) 744-1524                  Telephone: (415) 638-8800
Email: laurasullivan@laurasullivanlaw.com  Facsimile: (415) 638-8810
                                           Email: jsagafi@outtengolden.com
                                           Email: rsun@outtengolden.com

OBJECTIONS OF MATTHEW LUCADANO TO CLASS ACTION SETTLEMENT;
MEMORANDUM IN SUPPORT
CASE NO. 18-cv-02835-WHO

Mark Humenik (Cal. Bar No. 231917)
HABER POLK KABAT
423 South Estate Drive
Orange, CA 92869
Telephone: (949) 636-5754
Facsimile: (216) 241-0739
Email: mhumenik@haberpolk.com

Michael J. Scimone (*pro hac vice*)
Christopher M. McNerney (*pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: cmcnerney@outtengolden.com

Pooja Shethji (*pro hac vice*)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
Email: pshethji@outtengolden.com

*Attorneys for Objector Matthew Lucadano*

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

I.      INTRODUCTION ............................................................................................. 1

II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY ....................... 2

     A.    From 2014-19, Chen and Lucadano Litigated Their PAGA Lawsuit to the
        Eve of Trial. ........................................................................................... 3

     B.    In 2018, Harvey Filed and Settled His Rule 23 and PAGA Lawsuit. .................. 3

     C.    The *Harvey* Settlement ............................................................................ 5

III.    ARGUMENT ..................................................................................................... 6

     A.    Careful Scrutiny Is Particularly Important Here. ............................................ 6

     B.    The Settlement Amount Is Unreasonably Low. ............................................... 7

          1.    Total Exposure Is Significantly More than Harvey Estimates. .................. 7

          2.    Comparator Settlements Highlight that Harvey's Settlement Value Is
              Unreasonably Low. ....................................................................... 8

     C.    Harvey Does Not Satisfy Several Rule 23 Requirements Because of
        Intra-class Rivalries and Irreconcilable Conflicts Between Class Members
        and Its Sole Representative. ..................................................................... 10

          1.    The Plan of Allocation Is Deficient. ..................................................... 10

          2.    Harvey Fails to Provide Sufficient Information. ..................................... 12

          3.    Harvey's Counsel Are Inadequate. ....................................................... 12

          4.    *This* Class Settlement Is Not a Superior Way to Resolve the Dispute. ..... 15

     D.    The Settlement's Flaws Are the Result of a Reverse Auction. ........................... 16

     E.    The Allocation of Attorneys' Fees, Costs, and Service Payments Should
        Recognize the Contributions of *Chen* Counsel and the *Chen* Plaintiffs. ............. 16

IV.     CONCLUSION .................................................................................................. 17

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Acosta v. Trans Union, LLC,*
   243 F.R.D. 377 (C.D. Cal. 2007) ...................................................................................14

*Altamirano v. Shaw Indus.,*
   No. 13-cv-00939-HSG, 2015 WL 4512372 (N.D. Cal. Jul. 24, 2015) ....................................10

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997).................................................................................................10

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) ....................................................................................6

*Cotter v. Lyft,*
   176 F. Supp. 3d 930 (N.D. Cal 2016) ..................................................................7, 13

*In re Dry Max Pampers Litig.,*
   724 F.3d 713 (6th Cir. 2013) ....................................................................................7

*Gonzalez v. Corecivic of Tenn., LLC,*
   No. 16 Civ. 1891, 2018 WL 4388425 (E.D. Cal. Sep. 13, 2018) .....................................13, 14

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ..................................................................................7

*Haralson v. U.S. Aviation Servs. Corp.,*
   383 F. Supp. 3d 959 (N.D. Cal. 2019) ........................................................................14

*In re HP Inkjet Printer Litig.,*
   716 F.3d 1173 (9th Cir. 2013) ..................................................................................6

*Koby v. ARS Nat'l Servs.,*
   846 F.3d 1071 (9th Cir. 2017) ..................................................................................7

*Maciel v. Bar 20 Dairy, LLC,*
   No. 17 Civ. 902, 2018 WL 5291969 (E.D. Cal. Oct. 23, 2018) .......................................8

*McGuire v. Int'l Paper Co.,*
   No. 92 Civ. 593, 1994 WL 261360 (S.D. Miss. Feb. 18, 1994) ......................................15

*In re Mercury Interactive Corp. Sec. Litig.,*
   618 F.3d 988 (9th Cir. 2010) ....................................................................................7

*Murray v. Scelzi Enters., Inc.,*
   No. 18 Civ. 1492, 2019 WL 6045146 (E.D. Cal. Nov. 15, 2019) ...................................13

*Newman v. Americredit Fin. Servs.*,
    No. 11 Civ. 3041, 2014 WL 12789177 (S.D. Cal. Feb. 3, 2014) ...........................................10

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).............................................................................................................10

*Philliben v. Uber Tech., Inc.*,
    No. 14-cv-05615-JST, 2016 WL 4537912 (N.D. Cal. Aug. 30, 2016).....................................10

*Pineda v. Bank of Am.*,
    241 P.3d 870 (Cal. 2010) .......................................................................................................8

*Sanchez v. Frito-Lay, Inc.*,
    No. 14 Civ. 797, 2015 WL 4662636 (E.D. Cal. Aug. 5, 2015) ..............................................10

*Trotsky v. L.A. Fed. Sav. & Loan Ass'n*,
    121 Cal. Rptr. 637 (Ct. App. 1975) ......................................................................................14

*Valdez v. Neil Jones Food Co.*,
    No. 13 Civ. 519, 2014 WL 3940558 (E.D. Cal. Aug. 11, 2014) ............................................10

*Weinberger v. Great N. Nekoosa Corp.*,
    925 F.2d 518 (1st Cir. 1991) .................................................................................................6

STATUTES

Fair Labor Standards Act .................................................................................................14, 15

Cal. Lab. Code § 201 ...............................................................................................................5, 8

Cal. Lab. Code § 202 ...............................................................................................................5, 8

Cal. Lab. Code § 203 ...........................................................................................................6, 7, 8

Cal. Lab. Code § 204 ...................................................................................................................5

Cal. Lab. Code § 221 ...................................................................................................................7

Cal. Lab. Code § 226 ................................................................................................................6, 7

Cal. Lab. Code § 2802 .............................................................................................................7, 13

OTHER AUTHORITIES

Fed. R. Civ. P. 23 ...............................................................................................................*passim*

*Secret*, Lexico, https://www.lexico.com/en/definition/secret (last visited Dec. 4,
    2019) .......................................................................................................................................4

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   **INTRODUCTION**

The *Harvey* settlement merits special scrutiny, and under that scrutiny, it becomes apparent that the settlement is neither fair nor reasonable.

<u>First</u>, the settlement results from a flawed bargaining process, through which Morgan Stanley chose the weaker party to bargain with (Harvey), silently ignored the ongoing settlement discussions overseen by Mark Rudy with the stronger party (Chen and Lucadano), chose a new mediator (Tripper Ortman), and held fresh settlement discussions with Harvey that it did not tell Chen, Lucadano, or Mark Rudy about.  In the resulting November 2018 settlement discussions, Harvey had only a sliver of the documentary evidence and none of the deposition evidence, none of the experience of actual litigation of these issues, and none of the positional strength that Chen and Lucadano did.  While Harvey was negotiating in the dark at the beginning of his case, Chen and Lucadano were on the cusp of trial, having surmounted many obstacles during their four years of litigation.

<u>Second</u>, by any measure the settlement amount is unreasonably low.  By Harvey's flawed calculations, the settlement is approximately 4.9% of total exposure.  *See* ECF No. 58 ("Harvey Preliminary Approval Reply"), at 11 & n.12, 13:15.  By Lucadano's calculations, the settlement is approximately between 1.7% and 2.1% of total exposure.  *See* Declaration of Mark Humenik ("Humenik Decl.") ¶ 84.  This steep discount compares poorly to comparable cases listed in the *Chen* Plaintiffs' amicus brief, ECF No. 52, at 16-17, which cluster around 25% to 49% of total exposure.  Put another way, the Harvey settlement results in net payments of $5 per worker per month for Tier 1 aggrieved employees and $42 per worker per month for Tier 2 aggrieved employees, compared to a range of $47 to $430 for comparator settlements.  *Id.*  And critically, those comparator cases were in a much weaker position than *Chen*, as they were largely far from trial, whereas *Chen* was stayed one court day before trial.  It is one thing to settle a case at the outset for a significant discount, where there is so much uncertainty.  It is another thing to settle on the cusp of trial, after evidence has been amassed and procedural and substantive obstacles have been surmounted, decreasing the risk for the plaintiffs and ratcheting up pressure on the

1    defendant.  Harvey's argument that a "[s]teep [d]iscount [i]s [i]n [o]rder," Harvey Preliminary

2    Approval Reply at 12:1, ignores the strengths of the claims to be released.

3         _Third_, the plan of allocation is flawed, reflecting Harvey's unusual experience in a way

4    that disproportionately rewards him and others with low-value claims.  Although the core claims

5    rest on Financial Advisors' ("FAs") contributions to Morgan Stanley's Alternative Flexible Grid

6    ("AFG"), for which electronic data are readily available from Morgan Stanley, the plan of

7    allocation bases each class member's settlement payment on time worked as opposed to harm

8    suffered.  This is significant, because approximately ████████ of the class members

9    participated minimally or not at all in AFG.  Humenik Decl. ¶ 109.[1]  Furthermore, the plan does

10   not fairly reflect the strength of claims – for example, individuals with valid releases should

11   receive less, as should individuals subject to arbitration agreements.

12        _Fourth_, the PAGA release, which spans five years, is overbroad.  As more fully discussed

13   in the Objections of Tracy Chen, Harvey improperly stretches the PAGA period several years

14   past the one-year statute of limitations.

15        _Fifth_, the allocation of attorneys' fees, costs, and service award fails to recognize the

16   contributions made by _Chen_ counsel and the _Chen_ Plaintiffs, as described in detail in the _Chen_

17   Plaintiffs' Motion for Award of Attorneys' Fees, Costs, and Service Awards, ECF No. 86.

18   **II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

19        The procedural background of is well-chronicled, and Lucadano provides only a brief

20   overview of certain facts relevant to his objections.[2]

---

[1]    Pursuant to the protective order entered in _Chen_, a portion of Lucadano's objections are redacted because they are based on documents and data that Morgan Stanley produced in _Chen_ and designated as confidential.

[2]    For a more complete discussion of the procedural history, Lucadano references and incorporates the procedural history stated in the Objections of Tracy Chen, which Lucadano joins and incorporates.  Chen Objections § 2.  Lucadano also refers the Court to the _Chen_ Plaintiffs' previous filings in this matter, ECF Nos. 28 (Motion to Intervene), 52 (Amici Curiae Brief in Opposition to Preliminary Approval), 85 (Motion to Intervene), and 88 (Motion for Attorneys' Fees Costs, and Service Awards).

1

2

### A.    From 2014-19, Chen and Lucadano Litigated Their PAGA Lawsuit to the Eve of Trial.

3        On April 23, 2014, Tracy Chen served her PAGA notice, and on May 27, 2014, she filed a

4  PAGA representative action (later joined by Matthew Lucadano) to vindicate the rights of

5  thousands of Morgan Stanley FAs.  Humenik Decl. ¶¶ 2-3.  *Chen* alleged that Morgan Stanley

6  violates the Labor Code by: (1) shifting ordinary business costs to employees; (2) failing to

7  timely pay all wages owed to its employees; and (3) providing inaccurate wage statements.

8  While Morgan Stanley's AFG program is at the center of the *Chen* case, not all of the *Chen*

9  plaintiffs' claims are derivative of their AFG-related claims.  *See* ECF No. 52-1 (Declaration of

10  Laura M. Sullivan in Support of Brief of Amici Curiae ("Sullivan Amici Decl.") ¶ 36.

11        The *Chen* Plaintiffs progressed through discovery and surmounted various procedural

12  hurdles, then agreed to mediation with Mark Rudy, one of the preeminent mediators of California

13  employment disputes, in May 2016.  *Id.* ¶¶ 3-7.  Although the mediation did not result in

14  settlement, *Chen* counsel remained in regular contact with Mr. Rudy, checking in regularly to

15  express interest in continuing settlement talks with Morgan Stanley.  *See id.* ¶ 7.  Despite

16  conveying their willingness to actively engage in settlement talks, the *Chen* Plaintiffs were

17  unable to schedule another mediation with Morgan Stanley, and never received an offer during

18  the years leading up to Morgan Stanley's decision to negotiate with Harvey counsel.  The only

19  offers Morgan Stanley made during *Chen* were its November 2018 Rule 998 offer of $40,000 to

20  Mr. Lucadano in exchange for a full release and its January 4, 2019 Rule 998 offer of $400,000

21  for all aggrieved employees (including fees and costs).  *Id.* ¶¶ 8-9.

22        *Chen* was scheduled to go to trial in January 2019, and the *Chen* Plaintiffs were preparing

23  for trial up until January 18, 2019, when the case was stayed in light of this settlement.  *Id.*

24  ¶¶ 12-13; Humenik Decl. ¶¶ 19.

25        ### B.    In 2018, Harvey Filed and Settled His Rule 23 and PAGA Lawsuit.

26        On May 14, 2018, Plaintiff Brandon Harvey filed his Rule 23 (non-PAGA) action, ECF

27  No. 1, challenging the same AFG wrongdoing being litigated in *Chen*, and on July 12, 2018, he

28

amended his complaint to add PAGA claims (based on his May 9, 2018 PAGA notice, which

created a PAGA period from May 9, 2017, forward), ECF No. 11 ("FAC") ¶ 43.

In fall 2018, Morgan Stanley was engaging in frequent discussions with *Chen* counsel

and participating in court hearings in *Chen* as preparations for the January 2019 *Chen* trial heated

up.  *See* ECF No. 87-3 (Declaration of Laura M. Sullivan in Support of Motion to Intervene and

Motion for Fees, Costs, and Service Awards), ¶¶ 12, 15.  At that time, the *Chen* parties had an

ongoing relationship with their mediator Mark Rudy, who continued to press Morgan Stanley to

come back to the table, but *Chen* counsel understood that Morgan Stanley would not be

interested in further talks until after the trial.  Sullivan Amicus Decl. ¶ 7.

Against this backdrop, in November 2018, Morgan Stanley secretly engaged a new

mediator (Francis J. "Tripper" Ortman III) to engage in undisclosed settlement talks with

Harvey.[3]  *Id.* ¶¶ 11-13.  These talks yielded a signed memorandum of understanding ("MOU")

for a cash payment of $8,000,000 plus $1,735,000 in future reimbursements, in exchange for a

release of the *Harvey* claims as well as a large portion of the *Chen* claims.  *Id.* ¶ 11.

In January 2019, *Chen* counsel, *Harvey* counsel, and Morgan Stanley attended a global

mediation that included both Mr. Rudy and Mr. Ortman, but because Morgan Stanley and Harvey

counsel were contractually bound by the preexisting MOU, no further progress was made.  *Id.*

¶ 12.  Mr. Rudy and *Chen* counsel left the mediation, and then Morgan Stanley and *Harvey*

counsel expanded their settlement by adding $500,000 to the cash payment and an expanded

release of claims, encompassing the entire *Chen* liability period, measured from the date of Ms.

---

[3]   Respectfully, while the Court stated that "it cannot be said that the Parties negotiated in secret or attempted to cut out the Proposed Intervenors," ECF No. 76, at 4:20-21, these negotiations do meet the definition of "secret," which simply means "not known or seen or not meant to be known or seen by others."  *Secret*, Lexico, https://www.lexico.com/en/definition/secret (last visited Dec. 4, 2019).  Here, the engagement of Tripper Ortman was "not known" by *Chen* counsel and, based on Morgan Stanley's failure to disclose that fact to *Chen* counsel while engaged in frequent communications with them and having already retained Mark Rudy as their mediator, it is inescapable that that fact was "not meant to be known . . . by" *Chen* counsel.  There is no evidence that anyone other than the *Harvey* parties knew of the confidential negotiations with Tripper Ortman.  Thus, they were "secret."

1    Chen's 2014 PAGA letter (filed over four years earlier than Mr. Harvey's PAGA letter).  *See id.*;

2    ECF No. 36-4 (Declaration of Edward J. Wynne in Opposition to Intervention), ¶¶ 26, 29.

3         On April 26, 2019, the *Harvey* parties filed a proposed stipulation for a second amended

4    complaint ("SAC"), ECF No. 47 ("Stipulation"), which the Court endorsed, ECF No. 50.  The

5    *Harvey* parties entered "this stipulation for the purposes of settlement only," which requires

6    Harvey to withdraw the SAC "[s]hould the Court not approve the settlement."  Stipulation ¶ 5.

7    For purposes of settlement only, then, the SAC cites Chen's PAGA letter as the basis for

8    Harvey's new PAGA limitations period expanding back through April 23, 2013, ECF No. 48-3

9    (SAC) ¶ 51, and adds three new claims under Labor Code sections 201, 202 and 204, which were

10   among the Labor Code violations already being pursued in *Chen*, but never before in *Harvey*, *id.*

11   ¶¶ 28-44.

12        **C.     The *Harvey* Settlement**

13        The *Harvey* Agreement, ECF No. 48-3, provides for (1) a $7,900,000 common fund class

14   payment, (2) a $600,000 PAGA payment, and (3) a temporary adjustment to Morgan Stanley's

15   AFG program to allow FAs still employed at Morgan Stanley in future years to seek payment for

16   certain AFG expenses up to $1,735,000 ("Expense Fund"), described as a "Maximum Settlement

17   Amount" ("MSA") of $10,235,000.  *Id.* ¶ 61(d).

18        Tellingly, the settlement allocates $500,000 to the 12.5-month "Tier 1" PAGA Period (the

19   period actually covered by *Harvey*) plus $100,000 for the 63.5-month "Tier 2" PAGA Period (the

20   period covered by *Chen* but not covered by *Harvey*).  Thus, the *Chen/Harvey* overlap time (Tier

21   1) is valued at 25x times as much as non-*Harvey/Chen* time (Tier 2).

22        Despite the Procedural Guidance, Harvey provided little explanation at preliminary

23   approval for the value of the released claims, instead waiting until his reply brief to proclaim

24   "these [new] claims [in the SAC] have no value compared to the core claims being released."

25   Harvey Preliminary Approval Reply at 9:8.  Harvey's failure to investigate the value of the

26   released claims confirms his lack of adequacy as a settlement class representative, hamstrings the

27   Court in its duty to assess the reasonableness of the settlement, and prevents class members from

28   making an informed choice about whether to object or opt out.

Harvey originally understated Morgan Stanley's total exposure in three ways.  <u>First</u>, he miscalculated AFG, misstating that "FAs contributed approximately $155 million into AFG during the statutory period covered by *Harvey*."  ECF No. 48-2 (Declaration of Edward J. Wynne in Support of Preliminary Approval ("Wynne Decl.")) ¶ 43.  After the *Chen* plaintiffs pointed out his math errors, Harvey amended his estimate upwards to $193.5 million.  Harvey Preliminary Approval Reply at 11:21.  <u>Second</u>, he implicitly valued the PAGA claims at $0, by failing to attribute any value to them in his description of exposure.  In his reply brief, he miscalculated total PAGA exposure as $15.4 million, *id.* at 13:15, although that calculation assumed $100 per violation (rather than the $200 subsequent violation penalty) and only one violation per pay period (rather than multiple violations for multiple violations of the Labor Code).  While a PAGA plaintiff may certainly recover less than full penalties, the exposure analysis, if done with proper thoroughness, calculates the total potential recovery.  <u>Third</u>, Harvey ignored other components of potential non-PAGA recovery, such as interest (10% in California), Labor Code section 203 waiting time penalties, and Labor Code section 226 wage statement penalties.

In the end, Harvey's total exposure figure (which is artificially depressed, as summarized above) is $208.9 million ($193.5 million + $15.4 million).  This means that by his math, the settlement is either 3.8% of total exposure ($7.9 million common fund ÷ exposure) or 4.9% (MSA ÷ exposure).  As explained below, the true exposure is significantly greater, meaning that the settlement is even steeper than the 95% discount Harvey admits.

## III.  ARGUMENT

### A.  Careful Scrutiny Is Particularly Important Here.

Particularly before class certification, scrutiny of a class settlement is critical.  *See In re Bluetooth Headset Prod. Liab. Litig.* ("*Bluetooth*"), 654 F.3d 935, 946 (9th Cir. 2011).  Courts "must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees."  *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)).

1    To guard against this danger, the court acts as a "fiduciary for the class . . . with a jealous

2  regard" for the rights and interests of absent class members.  *In re Mercury Interactive Corp. Sec.*

3  *Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (internal quotations and citations omitted).  There is no

4  presumption in favor of settlement approval; the proponents of a settlement bear the burden to

5  prove its fairness.  *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1079 (9th Cir. 2017) (citing *In re*

6  *Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir. 2013)).  A presumption favoring settlement

7  would be inconsistent with the required probing inquiry.  *See Hanlon v. Chrysler Corp.*, 150 F.3d

8  1011, 1026 (9th Cir. 1998)).

9    **B.    The Settlement Amount Is Unreasonably Low.**

10    The proposed settlement significantly undervalues the released claims, as is evident from

11  analyses of Morgan Stanley's actual exposure, the strength of the claims, and comparator cases.

12    **1.    Total Exposure Is Significantly More than Harvey Estimates.**

13    Below is a summary of the exposure as calculated by the *Chen* plaintiffs versus Harvey:

14
| Claim | Morgan Stanley's Exposure for This Claim | |
|---|---|---|
| | *Chen* Plaintiffs' Analysis[A] | Harvey's Analysis |
| §§ 2802 & 221[B] | $200.42 million | $193.5 million |
| 10% interest | $42.42 million | $0 |
| § 203 (waiting time penalties) | $13.82 million | $0 |
| § 226 (wage statements) | $11.388 million | $0 |
| PAGA | $216.56-$344.33 million | $15.4 million |
| **Total** | **$484.6-$612.4 million** | **$208.9 million** |

19  NOTE A:  These calculations are described at Humenik Decl. ¶ 84; *see also id.* ¶¶ 45-85.
   NOTE B:  Labor Code sections 2802 and 221 provide two alternative paths to proving a
20  violation, but with the same potential recovery to the class.

21    First, as Harvey now concedes, his original Labor Code section 2802 calculation ($155

22  million) was premised on a math error because it ignored the last nine (now eleven) months of

23  the liability period.  Harvey Preliminary Approval Reply at 11; *see Cotter v. Lyft*, 176 F. Supp. 3d

24  930, 940 (N.D. Cal 2016) (rejecting settlement for failure to include 7.5 months of liability in

25  exposure analysis).  The resulting 25% increase from $155 to $193.5 million warrants a

26  corresponding increase in the settlement amount.

27    Second, Harvey's exposure estimate is based only on his Labor Code section 2802 claim,

28  ignoring all other claims (i.e., assigning them $0 value).  For example, waiting time penalties

7

1    under Labor Code sections 201-203 (*see Pineda v. Bank of Am.*, 241 P.3d 870, 872 (Cal. 2010)),

2    worth $13.8 million, are not mentioned.  *See* Humenik Decl. ¶¶ 58-66.  This failure to value

3    some released claims precludes approval of the settlement.  *See, e.g.*, *Maciel v. Bar 20 Dairy,*

4    *LLC*, No. 17 Civ. 902, 2018 WL 5291969, at *6 (E.D. Cal. Oct. 23, 2018) (rejecting class and

5    PAGA settlement when claims were released for no consideration).

6          Third, Harvey argues that a significant discount is appropriate because his "theory of

7    recovery is novel, has not been tested on appeal, and there is only one other similar case."

8    Harvey Preliminary Approval Reply at 15:12-13.  Novelty creates risk for both sides, as

9    Harvey's counsel acknowledges in another context.[4]  In addition, Harvey's argument might be

10   appropriate at the outset of a case, but it is not appropriate where the case is on the verge of trial,

11   and significant obstacles have been overcome (e.g., Morgan Stanley lost its motion for summary

12   adjudication challenging Chen and Lucadano's "novel" theory).  *See* Sullivan Amici Decl. ¶¶ 17-

13   24.

14                  **2.      Comparator Settlements Highlight that Harvey's Settlement Value Is**

15                          **Unreasonably Low.**

16          Comparator settlements in the brokerage industry further show that the *Harvey* settlement

17   is unreasonably low.  At preliminary approval, Harvey's counsel focused on only two of his own

18   twenty cases (*Tsyn* and *Brecher*) plus one more (*Litty*).  ECF No. 48 (Harvey Preliminary

19   Approval Br.), at 20-22.  As shown in the table below, *Brecher* actually supports Lucadano's

20   objections, since it settled at 25% to 30% of total exposure, yielding a monthly payout per class

21   member almost twice Harvey's.  The other two cases were settled after much less litigation.

22   *Tsyn*, like *Harvey*, involved negligible litigation of expense claims.  Humenik Decl. ¶ 91.  There,

23   the parties litigated the *overtime* claims intensively; once Wells Fargo had largely prevailed on

24   those, Tsyn shifted gears, turning to the expense claims.  *Id.* ¶ 92.  *Litty* was a salvage job,

25

26   _____

     [4]      Harvey's counsel, James Clapp, explains that the novelty of his theory that stock brokers
27   were misclassified as exempt caused brokerage firms to realize "they faced enormous exposure
     on the overtime claims, and this was a substantial driving force that led to the large settlements"
28   in those cases.  ECF No. 58-2 (Supplemental Declaration of James F. Clapp in Support of
     Preliminary Approval ("Clapp Suppl. Decl.")), at 3:4-7.

settling the expense reimbursement claims after a busted reverse auction of overtime claims.  *Id.*
¶ 103-04.  Harvey's settlement is worse than all three, and much worse than the other eight
comparators.  *See id.* ¶¶ 89-94, 116, Ex. 11.

| Case | Settlement Amount | % of Total Exposure | Net Cash / Class Member / Month |
|---|---|---|---|
| *Thill v. Edward Jones* | $21,000,000 | 40% | $430 |
| *Bahramipour v. Citigroup* | $48,000,000 | 25-28% | $386 |
| *Bowman v. UBS* | $44,000,000 | 45% | $375 |
| *Takacs v. AG Edwards* | $20,000,000 | 33% | $275 |
| *McLeod v. Bank of Am.* | $11,000,000 | 49.6% | $178 |
| *Garett v. Morgan Stanley* | $42,500,000 | Not specified | $164 |
| *Brecher v. Citigroup* | $3,700,000 | 25-30% | $136 |
| *In re Wachovia* | $39,000,000 | Not specified | $134[A] |
| *Steinberg v. Morgan Stanley* | $50,000,000 | 10-25% | $64[B] |
| *Tsyn v. Wells Fargo* | $9,500,000 | 25% | $47[C] |
| *Harvey v. Morgan Stanley* | $8,500,000 cash + $1,735,000 fund | 2% (4.9% per Harvey) | Tier 2:  $40 Tier 1:  $5 |
| *Litty v. Merrill Lynch* | $2,465,000 | Not specified | Not specified |

NOTE A:  The *Wachovia* figure is for California class members only.
NOTE B:  The *Steinberg* figure is for California assistant branch managers only.
NOTE C:  Harvey's counsel testified to Judge Beeler that *Tsyn* achieved 25% of total
exposure.  *See* Humenik Decl. ¶ 92.[5]

  This chart illustrates the weakness of Harvey's settlement and reveals why Harvey
ignored the Court's instruction to list his "20" comparator cases.  Most comparator cases settled

---

[5]  The court approved the settlement in reliance on Harvey's counsel's representation that
recovery was 25% of exposure.  *See id.*, Ex. 20 (preliminary approval order) at 14 (relying on
calculating $9.5/$38 to find that the "the gross settlement amount" was "25%" of "total
exposure").  Harvey's revised 5.75% figure, Harvey Preliminary Approval Br. at 21, should not
be credited.

for 25% to 49% of exposure, yielding approximately 200% to 800% more money per class member per month than Harvey's settlement.  These comparators show that Harvey's proposed settlement of 1.7% to 2.1% of total exposure is significantly below a reasonable amount.

### C. Harvey Does Not Satisfy Several Rule 23 Requirements Because of Intra-class Rivalries and Irreconcilable Conflicts Between Class Members and Its Sole Representative.

#### 1. The Plan of Allocation Is Deficient.

A plan of allocation must reasonably take into account the strengths of the class members' claims.[6]  Harvey's plan of allocation is deficient because it does not take into account the basis for the claims at issue (AFG contributions) or key factors that Harvey and Morgan Stanley use to justify the settlement (arbitration agreements and releases).  This unreasonable plan of allocation fails to account for weaker claims (releases, arbitration agreements), violating Rule 23(e)(2), (a)(4), and (b)(3).  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 840 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  These flaws may have resulted from the *Harvey* parties' rush to reach a settlement with a new mediator before the *Chen* parties could learn of the settlement negotiations, as the *Chen* trial loomed.

<u>First</u>, although "Plaintiff's claims are based on Defendant's Alternative Flexible Grid ("AFG") program," ECF No. 48-3 (Notice), at 35, the plan of allocation bases each class member's recovery not on her contributions to AFG, but on the amount of time she worked during the class period.  *Harvey* Agreement ¶ 61(a)(i).  However, many class members did not participate in AFG and therefore have no AFG-based claims.  Specifically, during the class

---

[6]     *See, e.g.*, *Philliben v. Uber Tech., Inc.*, No. 14-cv-05615-JST, 2016 WL 4537912, at *4-5 (N.D. Cal. Aug. 30, 2016) (rejecting settlement treating class members who had a strong claim the same as those who did not); *Sanchez v. Frito-Lay, Inc.*, No. 14 Civ. 797, 2015 WL 4662636, at *10-11 (E.D. Cal. Aug. 5, 2015) (identical treatment unwarranted where some employees worked different hours for different pay); *Altamirano v. Shaw Indus.*, No. 13-cv-00939-HSG, 2015 WL 4512372, at *1 (N.D. Cal. Jul. 24, 2015) ("proposed pro rata method did not account for [the] reality" of intraclass disparities, resulting in "drastic[] undercompensate[ion]" for one class subgroup); *Valdez v. Neil Jones Food Co.*, No. 13 Civ. 519, 2014 WL 3940558, at *9 (E.D. Cal. Aug. 11, 2014) (rejecting settlement where class members made differing wages and were subject to different violations); *Newman v. Americredit Fin. Servs.*, No. 11 Civ. 3041, 2014 WL 12789177, at *5 (S.D. Cal. Feb. 3, 2014) (rejecting a settlement that proposed treating equally all members of a class where significant portion of the class potentially had no claim).

1    period, between ████████ of FAs did not participate in the AFG program in a given year.[7]

2    Humenik Decl. ¶ 109.

3            Harvey did not participate in Morgan Stanley's AFG program in 2013, 2014, 2015, 2016,

4    or 2018.  *Id.* ¶ 106, Ex. 14.  Harvey contributed ████████ to AFG in 2017.  *Id.* ¶ 107.  By

5    contrast, there are many examples of individual FAs who contributed hundreds of thousands or

6    even millions of dollars to AFG over the course of the class period.  *Id.* ¶ 115, Ex. 16.

7            Second, Harvey and Morgan Stanley point to releases and arbitration agreements as bases

8    for a low settlement value, but they do not include them in their plan of allocation.  Specifically,

9    "an estimated minimum" of 600 of the 2,867 class members signed releases (including,

10   apparently, Harvey; though Lucadano did not).  ECF No. 58-1 (Supplemental Declaration of

11   Edward J. Wynne in Support of Preliminary Approval ("Wynne Suppl. Decl.")), ¶ 6; Humenik

12   Decl. Ex. 8, at 5.  In addition, "an estimated minimum of" 1,800 class members are bound by

13   arbitration agreements.  Wynne Suppl. Decl. ¶ 6; Humenik Decl. Ex. 8.  If these factors are

14   important enough to justify a low settlement value, they should be included in the plan of

15   allocation.

16           Harvey offers no justification for a tenure-based allocation formula here, other than

17   noting that it has "been adopted in other broker reimbursement cases."  Harvey Preliminary

18   Approval Br. at 9.[8]  But in *Harvey* counsel's *Brecher* settlement, payments were allocated

19   according to each advisor's relative contribution to the AFG.  Humenik Decl. ¶ 112.  And the

20   settlement in *Brecher* was further allocated among three discrete subgroups based on the relative

21   values of their individual claims, including a smaller allocation for class members who "signed a

22   ─────────────────
     [7]     For example, ████ of ████ California FAs (████) participated in AFG in 2014.  In
23   2015-17, the figures were ████, ████, and ████, respectively.  *Id.* ¶ 109.
     [8]     Each of the other broker reimbursement cases cited by Harvey to support a tenure-based
24   allocation approach contained overtime/misclassification claims, which was the key reason
     Harvey's counsel claimed those comparator cases are irrelevant in evaluating this settlement's
25   value.  Clapp. Suppl. Decl. at 1:20-22.  This case does not include an overtime or
     misclassification claim.  Nor did *Brecher* involve an overtime claim; it was primarily a
26   reimbursement case (with a separate subclass of members who had a claim for stock forfeiture).
     *Id.* at 5 n.2.  For the very reason that Harvey claims the broker overtime/reimbursement
27   comparators are irrelevant when making a valuation comparison, there is no valid reason to shunt
     the pay-period based allocation plans from those broker overtime/reimbursement cases onto this
28   broker reimbursement only case either.

release" and a greater allocation for those who did not.  *Id.* ¶ 99.  Harvey does not explain why a similar allocation plan, and subclassing to account for the disparate value of claims being released, is not warranted here – especially given that each class member's cumulative AFG contributions and damages can be calculated precisely and easily, just as the *Chen* plaintiffs already have done, and where the number of class members bound by a release or arbitration agreement is well-known.

### 2.   **Harvey Fails to Provide Sufficient Information.**

Harvey has failed to provide sufficient information for the Court to review, evaluate or certify the class (or appropriate sub-classes), and the limited information he did provide was inaccurate and misleading.  *See* Harvey Preliminary Approval Br. at 11-15.

Harvey's preliminary approval motion and SAC also omit critical information about Harvey's work history at Morgan Stanley, including even when he was employed there or whether (and when) he participated in the AFG program.  He also fails to disclose the identifying agreements required by Rule 23(e)(3), including (i) the initial MOU reached by the *Harvey* parties in December 2018 (before this broader agreement was struck to resolve *Chen* and add other claims to the SAC), and (ii) any agreement concerning the status or disposition of the FINRA arbitration that Morgan Stanley filed against him regarding his alleged theft of confidential information from the firm.[9]  Without such information, the Court cannot perform its fiduciary duties or determine whether Harvey meets the requirements of Rule 23 – including whether his experience is typical of the class, whether individual issues predominate, whether he is an adequate representative, and whether his facts support the new claims pleaded in *Chen*, never before raised by Harvey, and which all will be withdrawn if the settlement is not approved.

### 3.   **Harvey's Counsel Are Inadequate.**

Harvey's counsel are inadequate for several reasons.

---

[9]    Lucadano respectfully requests that the Court order Harvey and Morgan Stanley to divulge, before the final approval hearing, the status of Morgan Stanley's FINRA's claim against Harvey, including whether Morgan Stanley agreed to waive or dismiss its claims in FINRA arbitration against Harvey.  He also should produce the MOU and any other agreements with Morgan Stanley as required by Rule 23(e)(3).

1    Very Weak Bargaining Position. Harvey was in a very weak bargaining position, with

2  Morgan Stanley insisting on the release of *Chen* claims in addition to his own, forcing Harvey to

3  roll in those claims without properly valuing them.  Additionally, Morgan Stanley has significant

4  counterclaims against Harvey and brought a FINRA arbitration against him, *see* ECF No. 26

5  (Joint Case Management Statement), at 3:16-17; *see also* ECF No. 23 (Answer), at 5 (raising

6  unclean hands as affirmative defense based on "Plaintiff's breach of fiduciary duty, theft of trade

7  secrets, and unfair competition").  This exposure provided real incentive for Harvey to settle now

8  to eliminate further risk.[10]  This point was raised by the *Chen* plaintiffs at intervention, *see*

9  Intervention Br. at 8, and again at preliminary approval, but Harvey failed to address its status or

10  disposition either time and should be deemed to have conceded it.

11    Failure to value claims.  As described above, Harvey undercalculated the Labor Code

12  section 2802 claims, failed to value certain claims (e.g., interest, waiting time penalties, and

13  wage statement penalties), and completely ignored the value of the PAGA penalties in reaching

14  his settlement amount.  These failures to appreciate the value of the claims he is releasing require

15  denial of approval and a finding that Harvey's counsel are inadequate.  *See, e.g.*, *Cotter*, 176 F.

16  Supp. 3d at 940 (rejecting settlement for failure to include 7.5 months of liability in exposure

17  analysis); *see also Murray v. Scelzi Enters., Inc.*, No. 18 Civ. 1492, 2019 WL 6045146, at *13

18  (E.D. Cal. Nov. 15, 2019) ("The failure to adequately explain why the PAGA penalties were not

19  considered in the calculation of the total value of the suit and the overly-excessive discounts on

20  those penalties prevents the undersigned from any 'real evaluation of the reasonableness of this

21  settlement.'" (quoting *Gonzalez v. Corecivic of Tenn., LLC*, No. 16 Civ. 1891, 2018 WL

22  4388425, at *9 (E.D. Cal. Sep. 13, 2018)).

23    Arbitrary PAGA Allocations.  Harvey allocates $600,000 for the PAGA claims ($500,000

24  for April 23, 2013 to May 9, 2014 (Tier 1) and $100,000 for May 9, 2014 through Preliminary

25  Approval (Tier 2)).  *Harvey* Agreement ¶¶ 34, 48, 49.  Harvey's only justification for allocating

26  ────────────────

27  [10]    While Morgan Stanley employed the same tactics to try to defeat Chen's claims, the
*Chen* court already ruled that Chen's FINRA arbitration had no collateral estoppel effect because
unclean hands is no defense to a PAGA action, *see* ECF No. 39-2 (Sagafi Suppl. Intervention

28  Decl. Ex. L), at 2, 4-5.  But it is relevant to a Rule 23 representative's adequacy.

13

approximately 25 times as much value to the Tier 1 period ($40,000 per month vs. $1,574.80 per month) is that the Tier 2 period coincides with the Rule 23 period and that a "sliding scale" analysis applies.  Harvey Preliminary Approval Reply at 12:23.  This nonresponse is not supported in the law.  In *Chen*, the claims in the Tier 1 and Tier 2 periods are equivalent.  No distinction is warranted, and Harvey fails to show that his PAGA claims are 24 times as valuable as the *Chen*-only PAGA claims.

Agreement to withdraw the SAC.  Harvey's willingness to drop claims of class members if the settlement is not approved raises additional serious questions as to his adequacy.  *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 385-86 (C.D. Cal. 2007) (willingness to drop claims "calls into question the named plaintiffs' commitment to the interests of those plaintiffs").

Release of claims Harvey describes as "worthless."  In his reply brief in support of preliminary approval, Harvey proclaimed that the Labor Code claims added in the SAC "have no value compared to the core claims being released."  Harvey Preliminary Approval Reply at 9:8. If that were true, Harvey is not an adequate representative to bring such claims in the first place; and the Court in any event cannot approve the settlement of claims that Harvey concedes are worthless.  *Cf. Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 967-68 (N.D. Cal. 2019) (finding problematic the proposed settlement's inclusion of a release of Fair Labor Standards Act claims where such claims had "never been part of [the] litigation" and the "only reasonable inference . . . is that the Settlement assigns those claims no value"); *Trotsky v. L.A. Fed. Sav. & Loan Ass'n*, 121 Cal. Rptr. 637 (Ct. App. 1975) ("Any attempt to include in a class settlement terms which are outside the scope of the operative complaint should be closely scrutinized by the trial court to determine if the plaintiff genuinely contests those issues and adequately represents the class.").  As the court stated in *Gonzalez v. Corecivic of Tennessee, LLC*, No. 16 Civ. 1891, 2018 WL 4388425, at *6 (E.D. Cal. Sep. 12, 2018), in the context of a settlement under the Fair Labor Standards Act:

> [P]laintiff's explanation that the [released] FLSA claims were meritless on their face essentially confirms the inference that it was defendants who insisted on their inclusion in the waiver . . . [and] highlights why these claims are inappropriate to include in the settlement of this case. If

14

> plaintiff believed such claims so lacked merit and worth that they should not even be alleged, plaintiff could not possibly represent the best interests of any class members who might be eligible to participate in a FLSA settlement. Moreover, amending a complaint to add a claim that plaintiff believes is meritless and has a "non-existent" value may violate Rule 11. In any event, it is apparent the court cannot approve any FLSA settlement here because there appears to be no bona fide dispute about FLSA liability: instead, plaintiff effectively concedes defendant is not liable under the FLSA. Without a bona fide dispute about FLSA liability, the court cannot approve a settlement of those claims.

*Id.* (citation omitted).  Harvey's counsel are inadequate due to their failure to investigate the value of the released claims and account for their value as part of the settlement.

## 4.       *This* Class Settlement Is Not a Superior Way to Resolve the Dispute.

*This* class settlement is not a superior means of resolving the parties' dispute.[11]  In evaluating superiority, courts consider factors including "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(A)-(B).  Those interests "may be so strong as to call for denial of a class action."  Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment.

The *Chen* Plaintiffs' interest in maintaining the integrity of their own case warrants the denial of the proposed settlement class in *Harvey*.  *Chen* has been litigated for five years, was on the eve of trial, and there is no doubt that the *Chen* Plaintiffs can properly represent the aggrieved employees covered by their action.  *See McGuire v. Int'l Paper Co.*, No. 92 Civ 593, 1994 WL 261360, at *8 (S.D. Miss. Feb. 18, 1994) ("The Court finds . . . that the existing state court litigation is extensive and superior to the proposed class action.").  *Harvey* was not litigated at all, settled quickly, and its ability to extend back to erase *Chen* is unauthorized.  Especially given the nominal PAGA exposure attributed by Harvey, when compared with the *Chen* plaintiffs, *Chen* is the best chance for aggrieved employees to achieve a real PAGA recovery.

---

[11]       Harvey's preliminary approval motion forgoes any analysis of superiority.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      The Settlement's Flaws Are the Result of a Reverse Auction.**

The particular procedural posture of this case explains how the fatal flaws of the settlement came to be:  Morgan Stanley sought to escape massive trial exposure by choosing to stop negotiating with the plaintiffs who had progressed to the eve of trial after dozens of motions, twenty depositions, and a quarter million pages of discovery, and commence new, secret negotiations with the newcomer who still had all the hurdles to surmount (*e.g.*, FINRA discipline, counterclaims, arbitration agreements, class certification, summary judgment, decertification, motions to compel, and then trial).  This is the essence of a reverse auction – to bid down to a sub-market price with the weaker party, as described in detail by Professor Andrew D. Bradt.[12]  *See* ECF No. 52-6 (Declaration of Andrew D. Bradt), ¶¶ 16-18, 20-21.  The context of the negotiations is critical here, because that is how Morgan Stanley was able to secure a deal that was so much cheaper than the comparator cases, at a discount over 95% off, for a case one day from trial.

**E.      The Allocation of Attorneys' Fees, Costs, and Service Payments Should Recognize the Contributions of *Chen* Counsel and the *Chen* Plaintiffs.**

Given the time and effort expended by Lucadano, Chen, and their counsel in creating substantial litigation pressure on Morgan Stanley to lay the groundwork for a strong settlement, Lucadano also objects to Harvey's requests for attorneys' fees, costs, and the service award. Lucadano incorporates his Motion for Award of Attorneys' Fees, Costs, and Service Awards, ECF No. 86, which outlines why Chen counsel should be awarded attorneys' fees in proportion to the value that they created and actual costs of $186,603.25, as well as why the $10,000 in service payments should be shared by Chen, Lucadano, and Harvey.  At a minimum, the Court

---

[12]      It is well established that collusion, while sufficient, is not a necessary component, and there is not enough information to determine if there was such conspiracy here.  *See* Manual for Complex Litigation § 21.61 (4th ed. 2004) (describing reverse auction without reference to collusion); *see also* ECF No. 52-6 (Declaration of Andrew D. Bradt), ¶ 20 (explaining that a reverse auction may emerge "when there is a case that has been litigated over a period of years by one set of attorneys and an overlapping case is brought by a new attorney significantly later, and filed in a different court," and that in such a situation " the new attorney is inherently at a disadvantage *even if she is acting in good faith* because she is beginning her litigation from scratch" (emphasis added)).

should award Lucadano's counsel a pro rata share of the 25% fee based on lodestar contribution, all of his costs (taken from the 25% fee award to the extent it exceeds requested costs), and an equal share of the $10,000 service award.

Lucadano also respectfully requests that the Court require Harvey counsel to produce to him and his counsel and to the Court (for in camera inspection, without public filing) Harvey's counsel's detailed time records at least three weeks before the final approval hearing.

## IV.   **CONCLUSION**

For the foregoing reasons, Lucadano respectfully requests that the Court (1) order *Harvey* counsel to produce to Lucadano and his counsel and to the Court (for *in camera* inspection, without public filing) Harvey's counsel's detailed time records at least three weeks before the final approval hearing and (2) either (a) deny final approval of the proposed *Harvey* settlement or (b) grant his fee, cost, and service award request.

Dated: December 5, 2019

Respectfully submitted,

By:   */s/ Jahan C. Sagafi*
           Jahan C. Sagafi

Laura Sullivan (Cal. Bar No. 220529)
LAW OFFICE OF LAURA SULLIVAN
423 South Estate Drive
Orange, CA 92869
Telephone: (714) 744-1522
Facsimile: (714) 744-1524
Email: laurasullivan@laurasullivanlaw.com

Jahan C. Sagafi (Cal. Bar No. 224887)
Relic Sun (Cal. Bar No. 306701)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com
Email: rsun@outtengolden.com

Mark Humenik (Cal. Bar No. 231917)
HABER POLK KABAT
423 South Estate Drive
Orange, CA 92869
Telephone: (949) 636-5754
Facsimile: (216) 241-0739
Email: mhumenik@haberpolk.com

Michael J. Scimone (*pro hac vice*)
Christopher M. McNerney (*pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: mscimone@outtengolden.com
Email: cmcnerney@outtengolden.com

Pooja Shethji (*pro hac vice*)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile: (202) 847-4410
Email: pshethji@outtengolden.com

*Attorneys for Objector Matthew Lucadano*