Edward J. Wynne (165819)
ewynne@wynnelawfirm.com
George R. Nemiroff (262058)
gnemiroff@wynnelawfirm.com
WYNNE LAW FIRM
Wood Island
80 E. Sir Francis Drake Blvd., Ste. 3-G
Larkspur, CA 94939
Telephone:  (415) 461-6400
Facsimile:   (415) 461-3900

Class Counsel

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRANDON HARVEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY SMITH BARNEY LLC,<br><br>Defendant. | Case No. 3:18-cv-02835-WHO<br><br>**DECLARATION OF EDWARD J. WYNNE IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**Date: February 5, 2020**<br>**Time: 2:00 p.m.**<br>**Court: 2**<br>**Hon. William H. Orrick** |

3:18-cv-02835-WHO

I, Edward J. Wynne declare:

1.    I am an attorney at law duly licensed to practice in all the courts of the state of California and am admitted to practice in this District Court. I am an attorney at Wynne Law Firm, attorneys of record for Plaintiff Brandon Harvey ("Plaintiff") herein.

## Adequacy of Counsel

2.    I graduated with honors from the University of California at Berkeley in 1989.  I graduated from the University of Santa Clara Law School in 1992.  I am admitted to practice law before the following courts: United States Court of Appeals, Ninth Circuit, United States District Court for all Districts of California, and all of California's state courts.

3.    My practice has been devoted to complex class action litigation for the past twenty-five years.  Much of this litigation has involved class action prosecution of the wage and hour laws in both state and federal courts.

4.    I have tried to judgment the only known misclassification class action in California at both the liability and damages phases which resulted in the published opinion *Duran et al. v. U.S. Bank, N.A.*, 59 Cal.4th 1 (2014). The Supreme Court called it "an exceedingly rare beast." *Id.* at 12. After getting the case certified and prevailing at trial, the judgment was reversed by the Court of Appeal, affirmed by the Supreme Court, and plaintiffs' second effort at certification in the Superior Court was denied (and affirmed by the Court of Appeal) after 17 years of hard-fought litigation. While the judgment has been reversed, the opinion is a watershed case that will stand with *Sav-on v. Superior Court,* 34 Cal.4th 319 (2004) and *Brinker Restaurant Corp. v. Superior Court,* 53 Cal.4th 1004 (2012) as one of the pillars in wage and hour litigation because it holds that "[s]tatistical sampling may provide an appropriate means of proving *liability* and damages" in class action litigation (*id*. at 13), and found that defendants do "not have an unfettered right to present individualized evidence in support of a defense," let alone "a due process right to litigate an affirmative defense as to each individual class member." *Id.* at 34, 38. In addition, the opinion reaffirmed in the strongest sense

California's public policy in favor of the class action device and employee protections, by, *inter alia*, citing with approval Justice Werdegar's concurring opinion in *Brinker*.

5.      In 2012, I tried, along with co-counsel, a certified wage and hour class action that was in its fourth month of trial in San Diego County when it settled.  The case - *Puchalski et al. v. Taco Bell Corp.* (San Diego County Superior Court Case GIC 870429) - was tried under California's executive exemption. The case was single phased for liability and damages with a planned second penalty phase. The case settled after Plaintiffs completed their case-in-chief.

6.      I was counsel in *Sav-on v. Superior Court,* 34 Cal.4th 319 (2004), a certified class action of over 1,500 managers of Sav-on stores in California seeking earned and unpaid overtime compensation and derivative penalties under the California Labor Code. The California Supreme Court opinion affirmed the trial court's grant of class certification which had been reversed by the court of appeal in a published decision.  The issue at the heart of the *Sav-on* opinion is of paramount importance to all California attorneys practicing in the area of wage and hour law because it focuses on the whether the predominance element of certification can be established in an action seeking overtime compensation. The issue has been, and continues to be, one of hot debate among practitioners in this field due to the "fact intensive inquiry" articulated in *Ramirez v. Yosemite Water Company,* 20 Cal.4th 785 (1999) under California's quantitative standard. Should Wynne Law Firm and its co-counsel not have prevailed before the California Supreme Court, there is little doubt employees would have faced tremendous hurdles in recovering back wages in anything but single-plaintiff cases which puts the employee at a decided disadvantage to the employer.

7.      I have been recognized as one of California's "Top Labor and Employment Lawyers" by the *Daily Journal* in 2014.  I have been recognized by *Northern California Super Lawyers Magazine* in the area of Labor and Employment every year since 2012.

8.      I have invited to speak and write specifically on wage and hour issues before various forums including, the Labor and Employment Section of the California State Bar Association's 2004 Annual Meeting in Anaheim, California, the Los Angeles County Bar

Association in Los Angeles, California, the Santa Clara County Bar Association in Santa Clara, California, Bridgeport's 2007, 2009, 2010, 2012, 2016 and 2019 Continuing Education Conferences in San Francisco, California, the *Employment Law Reporter* of the Labor and Employment Section of the California State Bar, the radio program "Your Legal Rights" of KALW, San Francisco, California, and Mealy's *Wage & Hour Litigation Teleconference*.

9.     I have litigated or am in the process of litigation over 75 wage and hour class and collective actions in both state and federal court on the issues of overtime compensation (*Albrecht v. Rite Aid Corp.*, San Diego County Superior Court, 729219), meal and rest breaks (*Winfrey v. Chief Auto Parts,* San Francisco County Superior Court, CGC 95-974016), vacation pay (*Leung v. Rite Aid Corp.*, Los Angeles County Superior Court, BC 214742*),* final payments at time of termination (*Nelson-Rupp v. The Gap*, Orange County Superior Court, 00CC12661), off-the-clock compensation (*Scura v. Shurgard,* USDC, N. Cal., 02-4506), and minimum wage violations (*Iriarte v. Rubio Arts*, Los Angeles County Superior Court, BC340377), to name a few. I have litigated or am litigating class actions under the executive exemption (*Aguardo v. Pizza Hut, Inc.*, San Francisco County Superior Court, 994947), the administrative exemption (*Burakoff et al.  v. USBancorp.* Los Angeles County Superior Court, BC341430), the outside sales exemption (*Duran v. US Bank*, Alameda County Superior Court, 2001-035537), the commissioned sales exemption (*Schmoekel v. VALIC*, USDC, C. Cal., 06-5282), the professional exemption (*Kress et al. v. PricewaterhouseCoopers LLP*, USDC E. Cal. 08-00965) and the exemption for drivers (*O'Donnell v. Starving Students*, Marin County Superior Court, CV 004930).

10.     I have litigated a number of class actions in state and federal court against financial services firms. I have previously litigated two class actions against this Defendant on behalf of Financial Advisors: *Brecher v. Citigroup Global Markets, Inc.*, S.D. Cal Case 09-cv-1344 and *In re Citigroup Inc. Securities Litigation*, S.D. N.Y. Case 09 MDL 2070. The *Brecher* case made the same allegations here, to wit, that CGMI's[1] "Automated Flexible Grid" program

---

[1] CGMI was a joint venture between Morgan Stanley and Citigroup, Inc. Morgan Stanley subsequently merged with Smith Barney.

(which Morgan Stanley Smith Barney subsequently inherited and renamed "Alternative Flexible Grid") violated California law by having Financial Advisors pay for reasonable and necessary business expenses such as sales support.

11.    A majority of the cases currently being prosecuted by my firm involve defendants in financial services firms. Some of the closed cases I have prosecuted against financial service firms include the following:

- *Alakozai v. Chase Investment Services Corp.* – 11-cv-09178 – Central District of CA
- *Barber v. U.S. Bank* – MSC11-02173 – Contra Costa County Superior Court
- *Brecher v. Citigroup Global Markets, Inc.* – 09-cv-1344 - Southern District of CA
- *Briones v. Patelco* – RG16805680 – Alameda County Superior Court
- *Burakoff v. US Bancorp* – BC341430 – LA County Superior Court
- *Coles v. FMR Corp. dba Fidelity Investments* – CV067765 – Central District of CA
- *Cordero v. Ameriquest Mortgage Company* – Alameda County Superior Court RG05192827
- *Daugherty v. Oppenheimer & Co.* – C067725 – Northern District of CA
- *Dong Ma v. RSM McGladrey* – 08-cv-01729 – Northern District of CA
- *Duran v US Bank* – 2001035537 – Alameda County Superior Court
- *Erami v. JP Morgan Chase Bank* – 15-cv-07728 – Central District of CA
- *Gilbert v. Citigroup* – C-08-0385 – Northern District of CA
- *Harris v. CUSO Financial Services* – 37-2015-00004960 – San Diego Superior Court
- *In re Citigroup Inc. Securities Litigation* – 09 MDL 2070 – Southern District of NY
- *In Re: Wachovia Wage and Hour Litigation* - C-07-1807 Central District of CA
- *Katita v. US Bank* - 16 cv 03950 - Northern District of CA
- *Maxwell v. Edward D. Jones & Co.* – RG12660343 – Alameda County Superior Court
- *McNerney v. Piper Jaffray & Co/UBS* – 06-5155 – Northern District of CA
- *Moore v. WM Financial Services* – CV 05-6061 – Central District of CA
- *Murphy v. Citigroup, Inc.* – 09-cv-01439 – Northern District of CA
- *Paparella v. JP Morgan Chase Bank* – 30-2010-00370146 – Orange County Superior Court

- *Perry v. U.S. Bank* – 00-01799 – Northern District of CA

- *Schmoekel v. VALIC* - 06-5282 – Central District of CA

- *Spero v. US Bancorp* – CV 06-1100 Central District of CA

- *Stevenson v. Indymac Resources; FDIC* – CV09004272 – Central District of CA

- *Trahan v. U.S. Bank* – 09-03111 – Northern District of CA

- *Tsyn v. Wells Fargo Advisors* – 14-cv-02552 - Northern District of CA

- *Williams v. Empire Equity Group* – 07-cv-00169 – Eastern District of CA

**Procedural Statement and Discovery**

12.     On May 14, 2018, Plaintiff filed his Class Action Complaint against MSSB Morgan Stanley Smith Barney, LLC ("MSSB") alleging three causes of action: (1) violations of the UCL, Business & Professions Code § 17200; (2) Labor Code §§ 221, 223, 400-410, 2802, and Cal. Code Regs. tit. 8 § 11040(8); and (3) Labor Code §§ 226, 1174, and 1174.5.

13.     Soon after the initial filing, Plaintiff engaged in extensive informal discovery including informing putative class members about the claims and proceedings and gathering information from them. Plaintiff caused newsletters to be sent to MSSB Financial Advisors ("FAs") informing them of the case and directing them to counsel. As a result of Plaintiff's informal discovery efforts, Plaintiff was able to gather evidence in order to prosecute the action. In total, Plaintiff's counsel interviewed more than twenty FAs about their potential claims.

14.     On July 12, 2018, Plaintiff filed his First Amended Complaint adding a fourth cause of action for violation of the Labor Code Private Attorneys General Act ("PAGA"). Plaintiff alleges a class under Fed.R.Civ.P. 23 of all Financial Advisors ("FA"), or the functional equivalent however titled, employed by MSSB in California from May 14, 2014 to the present.

15.     On August 3, 2018, I participated in the Rule 26 conference with defense counsel. As is customary in complex litigation, the parties agreed to private mediation.

16.     Pursuant to ADR Local Rule 3-5, on August 28, 2018, the parties submitted their Stipulation Selecting ADR Process and indicated that the parties had agreed to private mediation. (ECF 20)

17.     On September 11, 2018, the parties filed their Joint Case Management Conference Statement confirming their intent to engage in private mediation. (ECF 26)

18.     On September 18, 2018, the parties appeared for the Initial Case Management Conference where the Court approved the parties' ADR selection. The Court scheduled a further Case Management Conference for April 23, 2019.  (ECF 27)

19.     Following the Initial Case Management Conference, the parties exchanged substantial amounts of information, including thousands of pages of documents, data, and information. On September 7, 2018, MSSB served its initial disclosures. On September 17, 2018, Plaintiff served his initial disclosures, along with a production of documents. On September 20, 2018, Plaintiff propounded his first set of interrogatories and requests for production of documents on MSSB. Plaintiff continued to conduct discovery focused on MSSB's policies and practices related to business expenses, compensation, and payroll and deductions. MSSB produced nearly 2,000 pages of documents between October and November 2018.

20.     Following the Case Management Conference, the parties engaged in a number of discussions about the case, including ADR, and, as a result, ultimately agreed to participate in a mediation with Tripper Ortman.

21.     In preparation for the mediation and in response to discovery that Plaintiff had served on MSSB, MSSB produced a number of documents necessary to evaluate Plaintiff's claims and MSSB's defenses such as: all versions of the Financial Advisor Compensation Plan, all versions of MSSB's AFG Program, all versions of MSSB's AFG Process, all versions of MSSB's Expense Policy, all policies and procedures related to Financial Advisor compensation and adjustments made to compensation, and the Plaintiff's entire personnel, payroll and supervisory files. In addition, MSSB provided critical data on the number of Financial Advisors covered by Plaintiff's case, the total amount allocated to AFG broken down by category of expense and by year, and the number of Financial Advisors covered by arbitration agreements and whether they were current versus former.

22.     MSSB also produced extensive and detailed data sets. The data sets reflected,

among other things: (1) the total dollar amount that putative class members directed MSSB to allocate to AFG; (2) the amount of expenses incurred from AFG, itemized by category of expense; (3) information related to approval of expenses; and (4) class wide statistics for the putative class members, including employment status, workweeks, and pay periods.

23.     The parties also engaged in informal discovery to assist the mediation process. In preparation for the mediations, MSSB provided data relevant to Plaintiff's claims, specifically:

- Estimated number of putative class members, for both active and former FAs

- Estimated number of workweeks for both active and former FAs

- Estimated number of pay periods, for both active and former FAs

- Estimated gross number of expenses allocated by FAs

- Gross expenses allocated to AFG by category (including travel and entertainment, registration, promotion marketing, website services, remote access, research and supplemental support staff compensation)

- Gross expenses allocated to BDA by category

- Estimated unspent AFG at termination

- Estimated unspent AFG at year-end

- Estimated PAGA pay periods

- Estimated claimed amount of expenses by FAs

- Estimated amount of expenses not approved but requested by FAs

- Estimated FAs with grid-rate reductions and gross amounts of reduction

24.     The parties participated in an arm's-length mediation with Francis "Tripper" Ortman, Esq. on November 8, 2018. The parties were unable to reach an agreement but met again on November 19, 2018. On November 21, 2018, the parties orally reached an agreement to resolve the claims asserted in *Harvey*. An important aspect of that agreement was, before the parties submitted any request for preliminary approval to this Court, the parties would disclose the terms of the settlement to plaintiff's counsel in *Chen v. Morgan Stanley Smith Barney* (Orange County Superior Court Case No. 30-2014-00724866-CU-OE-CXC) and attempt to reach

an agreement with Chen's counsel that would (1) provide an additional settlement payment for the portion of the *Chen* limitations period not covered by *Harvey*, and (2) fully compensate *Chen's* counsel for the attorneys' fees and costs spent litigating *Chen*.

25.     On January 18, 2019, in an attempt to reach a global settlement with the *Chen* Plaintiffs, Plaintiff Harvey, MSSB, and the *Chen* Plaintiffs attended a joint mediation with both Mark Rudy, the original mediator in *Chen*, and Mr. Ortman, who mediated the settlement in this case.  Unfortunately, that mediation was unsuccessful.

26.     After the hearing, Plaintiff, Defendant and the *Chen* plaintiffs engaged in further global settlement discussions through mediator Tripper Ortman. Those discussions spanned several weeks but ultimately were not successful.

**Terms of Settlement and Administration**

27.     **Settlement Fund:** In return for a release of all claims that were asserted in the action, MSSB shall create a non-reversionary $10,235,000 gross settlement fund consisting of $8,500,000 in cash, as well as $1,735,000 in future immediate payments of business expenses to pay categories of expenses for current California FAs that otherwise could have been submitted to the AFG program. Because this is not a claims-made settlement, Class Members will not be required to make a submission to participate in the settlement.

28.     Of the $10,235,000 gross settlement fund, $600,000 is attributed to the PAGA claims broken down into two tiers ("Tier 1 PAGA Pay Period" and "Tier 2 PAGA Pay Period"). The Tier 1 PAGA Pay Period covers the period from April 23, 2013 to May 9, 2014. This period of time is covered by Plaintiff's Second Amended Complaint. (Dkt. 55.) $500,000 is attributed to the Tier 1 PAGA Pay Period. The Tier 2 PAGA Pay Period covers the period from May 9, 2014 through September 5, 2019, i.e., the date preliminary approval was granted, which is also covered by Plaintiff's class claims, and $100,000 has been attributed for this second period. The allocation between the PAGA tiers reflects that aggrieved employees receiving Tier 2 PAGA payments also are Rule 23 class members who, unless they opt out, will receive additional, valuable settlement payments in connection with the class claims, the potential exposure for

1    which is substantially higher than the PAGA claims. Of the Tier 1 and Tier 2 PAGA payments,

2    75% or $450,000, is allocated to the State of California as is required by PAGA. Labor Code §

3    2699(i).

4          29.     After certain deductions identified below, all class members who do not opt out

5    and all aggrieved employees will be paid on a pro rata basis based on the number of semi-

6    monthly pay periods they worked for MSSB as an FA in California during the settlement period,

7    which extends from May 14, 2014 to September 5, 2019 for the class claims and from April 23,

8    2013, to September 5, 2019 for the PAGA claims. This allocation formula—i.e., calculating

9    settlement payments based on the number of work months—has been adopted in other broker

10   reimbursement cases that have settled in this District.

11         30.     MSSB will pay for the employer's share of payroll taxes on the wage portion of

12   each Class Member's recovery separate and apart from the Maximum Settlement Amount.

13   Employer Payroll Taxes will be computed by the Settlement Administrator based on the amounts

14   to be paid to each class member.

15         31.     **Class Definition:** The Court has approved, for settlement purposes only, a Rule

16   23class defined as individuals employed by MSSB within the State of California from May 14,

17   2014, through September 5, 2019 who worked as Financial Advisors and/or Private Wealth

18   Advisors (collectively, "FAs"). The Court also defined the group of aggrieved employees covered

19   by the PAGA settlement – broken down into two tiers – of FAs who worked for MSSB in

20   California between April 23, 2013 and September 5, 2019. (Dkt. 76.) There are a total of 3,297

21   employees covered by this settlement. There are 2,989 Rule 23 Class Members and PAGA Tier 2

22   aggrieved employees and there are 2,421 PAGA Tier 1 aggrieved employees. According to data

23   provided by Defendant, approximately 87% of the PAGA Tier 1 aggrieved employees are also in

24   both the Rule 23 class and in the PAGA Tier 2 group.

25         32.     **Notice Procedure:** On November 14, 2019, Plaintiff filed his Motion for Attorney

26   Fees and Costs and Request for Representative Enhancement Award. (Dkt. 84.) The motion has

27   been uploaded to the Settlement Administrator's site for review by all individuals covered by this

28

Settlement.

33.     **Class Counsels' Fees and Costs:** On November 14, 2019, Class Counsel filed their Motion for Attorneys' Fees, Costs and Class Representative Enhancement Award. (Dkt. 84.) Class Counsel limited their request to 20% of the Gross Settlement Fund, or $2,047,000, rather than the Ninth Circuit's benchmark of 25%. Because this is a non-reversionary, common fund settlement, the approximate $500,000 that Class Counsel is not requesting will be distributed to the class members. Likewise, Class Counsel are seeking $24,506.37 in costs which is approximately $10,000 less than the amount set aside for costs in the Settlement Agreement, i.e., $35,000. As such, that difference will similarly be distributed to class members.

34.     **LWDA Payment:** The parties have agreed to pay the LWDA $450,000 (or 75% of the $600,000 attributed to the PAGA claim) per Labor Code § 2699 (i) to settle this claim, and Plaintiff has submitted this settlement to the California Labor Workforces Development Agency ("LWDA") per California Labor Code section 2699(l)(2). Class Counsel is not aware of any objection to this payment by the LWDA.

35.     **Settlement Administrator:** The Settlement Administrator, KCC, Inc., has agreed to a cap for its services in the amount of $32,000. Class Counsel solicited bids from two other well-known settlement administrators and KCC was the most competitive.

### The Amount Offered In Settlement

36.     MSSB will pay $10,235,000 consisting of $8,500,000 in cash (of which $600,000 will be designated as PAGA penalties) plus $1,735,000 in future payments of business expenses for California FAs. There are 129,414 monthly pay periods and 2,898 Rule 23 Class Members covered by this settlement. Extrapolating out MSSB's exposure to the date of the order granting preliminary approval, FAs contributed approximately $202m into AFG during the statutory time covered by *Harvey*. Accordingly, the gross settlement represents $75.22 per work month or $3,256 per person (less the $500,000 for the PAGA Tier 1 payment). The settlement also represents approximately 5% of what Plaintiff contends is MSSB's total potential exposure.

37.     I was counsel in *Tysn v. Wells Fargo Advisors*, N.D. Cal. Case 14-cv-02552 which

1    was litigated before the Hon. Laurel Beeler. *Tsyn* was filed on March 28, 2014.

2        38.    Just like in *Harvey*, the plaintiffs in *Tsyn* alleged that Wells Fargo's pre-tax

3    business expense and marketing program – the so-called "Mandatory Supplemental Expense

4    Allowance Program" ("MSEAP") – violated California law by forcing Wells Fargo Financial

5    Advisors to pay for reasonable and necessary business expenses. Tsyn also alleged that Wells

6    Fargo's Financial Advisors illegally incurred other unreimbursed business expenses outside of the

7    MSEAP in the form of payments to support staff that likewise violated California law.

8        39.    Unlike in *Harvey*, however, Tsyn had initially alleged that the Wells Fargo

9    Financial Advisors were misclassified as exempt and owed overtime compensation. However,

10   Wells Fargo's motion for summary judgment on that issue was granted which precipitated

11   Plaintiffs dropping their claims for overtime under both California law and the Federal Fair Labor

12   Standards Act. After the case was narrowed to the business expense claim, the parties engaged in

13   settlement discussions which ultimately resulted in the case being resolved.

14       40.    In *Tsyn*, the Financial Advisors had diverted $38 million into Wells Fargo's

15   MSEAP and had allocated an additional $128 million in support staff payments outside of the

16   MSEAP. Thus, Wells Fargo had a total of $165 million in exposure for unreimbursed business

17   expenses. The *Tsyn* settlement represented 5.75% of Wells Fargo's total exposure.

18       41.    After extensive discovery and law and motion practice, the parties reached as

19   settlement which was given final approval on November 1, 2018.

20       42.    *Tsyn* settled for $9.5 million on a non-reversionary basis. The class members in

21   that case worked a total of 130,633 pay periods. The *Tsyn* settlement equated to approximately

22   $72.72 per work month.

23       43.    I was counsel in *Brecher v. Citigroup Global Markets, Inc.,* S.D. Cal. Case 09-cv-

24   1344. In *Brecher*, plaintiffs alleged unlawful forfeiture of benefits and also unreimbursed

25   business expenses under Labor Code § 2802 for payments made to support staff.[2] U.S. District

26   _____

27   [2] The class of financial advisors in *Brecher* had been employed by CGMI which was a joint
     venture between Citigroup and Morgan Stanley until CGMI sold its retail brokerage operations to
     Morgan Stanley which then formed the new entity, Morgan Stanley Smith Barney.

28

1    Judge Cathy Bencivengo granted final approval of a $3,700,000 non-reversionary settlement on

2    behalf of a 1,006 person class. Sixty-percent of the settlement was attributed to the expense

3    reimbursement claim. Participating class members received $3,171 on average.

4        44.    In *Litty v. Merrill Lynch & Co.*, L.A. Sup. Ct. Case No. BC582127, Superior Court

5    Judge William Highberger approved a $2,465,000 class action settlement reached on behalf of

6    2,501 Financial Advisors and Financial Advisor Trainees employed by Merrill Lynch in

7    California. The *Litty* complaint alleged claims for unreimbursed business expenses under Labor

8    Code section 2802 and derivative claims under the UCL and PAGA. The average settlement in

9    *Litty* was $1,147 per class member.

10                          **Recommendation of Counsel**

11       45.    Based on my investigation, the discovery exchanged, and the data received from

12   MSSB in preparation for mediation, my analysis of the legal issues presented and the procedural

13   posture of this case at the time of mediation, I had a clear understanding of the risks involved in

14   further litigation and the amount the class would have recovered had they ultimately prevailed at

15   trial.

16       46.    Based on my education, experience and my evaluation of the risks involved

17   compared to the likelihood of recovery in the context of the factual and procedural posture of this

18   case, I concluded that an all-cash, non-reversionary settlement of $10,235,000 at this juncture is

19   fair, reasonable and adequate and is in the best interests of the class and I fully support this

20   settlement.

21       47.    I am not aware of any evidence to suggest that the settlement was reached in

22   anything other than an arm's-length transaction and all facts point to vigorous advocacy on both

23   sides.

24       I declare under penalty of perjury under the laws of the State of California that the

25   foregoing is true and correct. Executed this 31st day of December, 2019, at Larkspur, California.

26

27                          /s/ Edward J. Wynne
                            Edward J. Wynne
28

DECLARATION OF EDWARD J. WYNNE ISO MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT